Lawrence Navarre
January 30, 2017

1

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF LOUISIANA
 3
 4   RHEA DAVIS
 5   VERSUS                          CIVIL ACTION NO.
                                     16-297-BAJ-RLB
 6   BATON ROUGE CITY
     CONSTABLE'S OFFICE
 7
 8
 9   * * * * * * * * * * * * * * * * * * * * * * * *
10              TRANSCRIPT OF THE DEPOSITION OF:
11                  LAWRENCE NAVARRE,
12   TAKEN ON BEHALF OF DEFENDANT, REPORTED IN THE ABOVE
13   ENTITLED AND NUMBERED CAUSE BY GAYLE J. KEES,
14   CERTIFIED COURT REPORTER FOR THE STATE OF
15   LOUISIANA.
16   * * * * * * * * * * * * * * * * * * * * * * * *
17
18
19              REPORTED AT THE OFFICE OF:
20              THE PARISH ATTORNEY
21              222 ST. LOUIS STREET, 9TH FLOOR
22              BATON ROUGE, LOUISIANA  70802
23
24
25   COMMENCING AT 9:34 A.M., ON JANUARY 30, 2017.
```

Baton Rouge Court Reporters, LLC
225-292-8686


EXHIBIT
A

Lawrence Navarre
January 30, 2017

2

```
 1                    APPEARANCES
 2   FOR THE PLAINTIFF:
 3        G. KARL BERNARD & ASSOCIATES, LLC
 4        (BY:  G. KARL BERNARD, ESQ.)
 5        1615 POYDRAS STREET, SUITE 220
 6        NEW ORLEANS, LOUISIANA  70112
 7        karl.bernard@karlbernardlaw.com
 8
 9   FOR THE DEFENDANT:
10        OFFICE OF THE PARISH ATTORNEY
11        (BY:  MARSTON FOWLER, ESQ.)
12        222 ST. LOUIS STREET, ROOM 902
13        BATON ROUGE, LOUISIANA  70802
14        mfowler@brgov.com
15
16   ALSO PRESENT:
17        RHEA DAVIS
18
19
20
21
22
23
24
25
```

Lawrence Navarre
January 30, 2017

3

```
 1                    I N D E X
 2                                          PAGE
 3  STIPULATION.......................................4
 4  EXAMINATION BY:
 5       MR. FOWLER...................................5
 6       MR. BERNARD.................................45
 7  RE-EXAMINATION BY:
 8       MR. FOWLER..................................77
 9       MR. BERNARD.................................86
10  CERTIFICATE......................................91
11
12
13                 LIST OF EXHIBITS
14  EXHIBIT 1.......................................14
         (Notice of Deposition)
15
    EXHIBIT 2.......................................11
16       (6/19/13 Constable's Office Memo Re:  Shift
         Change)
17
    EXHIBIT 3.......................................23
18       (7/10/13 Constable's Office Memo Re:  Light
         Duty Assignment)
19
    EXHIBIT 4.......................................26
20       (7/11/13 Memo Re:  Control Room 8a-5p Shift)
21  EXHIBIT P-1.....................................71
         (Louisiana Commission on Human Rights
22       Determination)
23  EXHIBIT P-2.....................................73
         (2/4/14 Constable's Office Memo Re:  Promotion
24       Sgt. Travis Brooks)
25
```

Lawrence Navarre
January 30, 2017

4

```
 1              S T I P U L A T I O N
 2          IT IS STIPULATED AND AGREED by and
 3   between the parties that this deposition is hereby
 4   being taken pursuant to the Federal Rules of Civil
 5   Procedure.
 6          All formalities, excluding the reading
 7   and signing of the transcript by the witness, are
 8   hereby waived.
 9          All objections, except as to the form of
10   the question and responsiveness of the answer, are
11   considered reserved until trial or other use of the
12   deposition.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Lawrence Navarre
January 30, 2017

```
1                    LAWRENCE NAVARRE,
2   having been first duly sworn, was examined and
3   testified as follows:
4                       EXAMINATION
5   BY MR. FOWLER:
6        Q.  Mr. Navarre, state you name and address for
7   the record, please.
8        A.  Lawrence Navarre.  Address is 5645 Howell,
9   H-o-w-e-l-l, Park Avenue, Baton Rouge, Louisiana.
10  ZIP is 70805.
11       Q.  Thank you.  Have you ever given a
12  deposition before?
13       A.  Yes, sir.
14       Q.  Okay.  My name is Marston Fowler.  I work
15  for the parish attorney's office, and in that
16  capacity I'm assigned cases involving employment
17  discrimination matters against departments in the
18  city.  In this particular case, I'm counsel for the
19  constable's office.
20       A.  Yes, sir.
21       Q.  This is Mr. Bernard, who's counsel for Rhea
22  Davis, who's also present.  I'm going to ask you a
23  series of questions about your personal knowledge
24  about things that did or did not happen when
25  Ms. Davis was employed at the constable's office,
```

Lawrence Navarre
January 30, 2017

6

```
 1    some of which you may know, some of which you may
 2    not know.  And I'm going to show you some documents
 3    along the way.
 4         A.   Yes, sir.
 5         Q.   If you need to take a break, let me know.
 6         A.   Okay.
 7         Q.   We can do that at any time.  None of my
 8    questions are meant to harrass or disrespect you.
 9    I'm simply trying to get your take on the facts of
10    the case as part of the discovery phase of this
11    case.  I think this will take about an hour.
12         A.   Okay.
13         Q.   What is your highest level of education?
14         A.   I have four years of college, but I didn't
15    graduate.  I have associate's degree in law
16    enforcement.
17         Q.   Okay.  And where was the associate's degree
18    from?
19         A.   Southern University.
20         Q.   Okay.  And how long did you work for the
21    constable's office?
22         A.   Fifteen years.
23         Q.   Did you work in law enforcement prior to
24    that?
25         A.   Yes, sir.
```

Lawrence Navarre
January 30, 2017

7

1       Q.   And where?

2       A.   I started in Georgia as a police officer,

3  left Georgia and came to Southern University and

4  became a campus police officer.  I worked there for

5  a while.  And then I was hired by the parish

6  attorney as an investigator.

7       Q.   In our office?

8       A.   Yes, sir.

9       Q.   Okay.  I didn't know that.  And was that

10 the job you had immediately before you began to work

11 for the constable?

12      A.   Yes, sir.  I retired from the parish

13 attorney office as chief investigator.

14      Q.   When did you -- what year did you retire?

15      A.   2000.

16      Q.   Is that when you began working at the

17 constable's office directly, or was there a break?

18      A.   No, no break.

19      Q.   And what role did you have at the

20 constable's office when you were hired?

21      A.   I was the chief deputy constable.

22      Q.   And is it the same position that you were

23 in when you separated from that job?

24      A.   Yes, sir.

25      Q.   Okay.  For the entire 15 years, you were

Lawrence Navarre
January 30, 2017

8

```
 1    the chief deputy at the constable's office?
 2         A.  Yes, sir.
 3         Q.  Okay.  In that role as the chief deputy,
 4    were you responsible for personnel or human
 5    resources issues --
 6         A.  Yes, sir.
 7         Q.  -- hiring and things like that?
 8         A.  To a certain extent.
 9         Q.  Okay.  Who did you directly report to?
10         A.  Constable Brown.
11         Q.  Okay.  And who directly reported to you?
12         A.  At the time, everyone.
13         Q.  Okay.  As I understand it, you were the
14    number two person in the department?
15         A.  Yes, sir.
16         Q.  Okay.  And what was -- as it relates to
17    personnel matters, what were you involved in?  Were
18    you involved in hiring or --
19         A.  Hiring and also firing and managing the
20    office and pretty much -- I was there on a
21    eight-hour basis.
22         Q.  Okay.  Were you designated as the Equal
23    Employment Opportunity officer?
24         A.  Yes, sir, at one time.
25         Q.  Can you give me the timeframe that you
```

Lawrence Navarre
January 30, 2017

9

```
 1   were.
 2        A.   When we first -- when I first got there.
 3        Q.   Okay.  And how long did you serve in that
 4   capacity?
 5        A.   Pretty much 13 years, I guess, till I --
 6   you know, till some changes were made.
 7        Q.   Okay.  So you were the primary EEO officer
 8   for the first 13 years of your 15 years?
 9        A.   Yes, sir.
10        Q.   Okay.  And do you know why you were not the
11   EEO officer in the last two years of your service?
12        A.   Hard to say.  You know, I work at the
13   pleasure of the constable.  And whenever he desires
14   a change, he make those changes.
15        Q.   Okay.  Did he tell you why at the time?
16        A.   I think it had to do with a disagreement
17   with him at certain points.
18        Q.   Did he specifically tell you at the time
19   that he removed those from your duties as to what --
20   was there a specific incident, or did he tell you?
21        A.   Well, he had a memo.  I don't have the memo
22   that he had written reducing me to where none of the
23   employees can come directly under me anymore.  So I
24   don't have the memo, but I'm quite sure y'all should
25   have copies of it.
```

Lawrence Navarre
January 30, 2017

10

```
1        Q.   Okay.  I don't.
2        A.   You don't?
3        Q.   Uh-uh.  But that doesn't mean anything.
4   That just means I need to ask for it.  And what --
5   did you remain the chief deputy at this time?
6        A.   I remained the chief deputy in pretty much
7   name.  A lot of my duties was shifted.
8        Q.   Were duties other than the EEO officer
9   shifted?
10       A.   Yes, sir.
11       Q.   Okay.  What were those?
12       A.   Personnel management, hiring, firing, and
13  supervision.
14       Q.   Of the department?
15       A.   Yeah.
16       Q.   Okay.  What were your primary duties after
17  the removal that we're talking about?
18       A.   Pretty much helping the general public.
19  People that come through the office that needed
20  legal advice, pretty much I assisted with them,
21  moved them through the court system.  And addressing
22  all other matters where law enforcement people would
23  call and have a problem and needed some assistance,
24  I pretty much handled that.
25       Q.   Okay.  And when did you separate from the
```

Lawrence Navarre
January 30, 2017

11

1   chief deputy position?

2   　　A.　I think it was right after the incident

3   with the filing of a deposition on the civil rights

4   complaint.

5   　　Q.　Do you know who this complaint was made by?

6   　　A.　I think it was several officers was

7   involved.

8   　　Q.　Were you classified or unclassified?

9   　　A.　I worked at the pleasure of him.  I was

10  appointed.

11  　　Q.　Okay.  Are you familiar with maybe not all

12  but some of the circumstances involving Rhea Davis's

13  allegations against the City?

14  　　A.　Yes, sir.

15  　　Q.　Okay.  One of the first allegations -- the

16  first allegation Ms. Davis made related to a shift

17  change.  I'm going to show you a memo.  Take a look

18  at that.  (Tenders document to witness.)

19  　　A.　Okay.

20  　　Q.　Are you familiar with this document?

21  　　A.　Yes, sir.

22  　　Q.　Are those your initials?

23  　　A.　Yes, it is, sir.

24  　　　　　　MR. FOWLER:  Okay.  Karl, I'm going to

25  　　　　　　mark this -- I'll mark this Exhibit 2.

Lawrence Navarre
January 30, 2017

12

```
 1            (Exhibit 2 marked for identification.)
 2                 MR. BERNARD:  No objection.
 3    BY MR. FOWLER:
 4        Q.  All right.  As I read this, this is a memo
 5    from you, June 19th, 2013, outlining that effective
 6    June 24th, Rhea Davis's schedule would change from
 7    08 -- to 0800 hours to 1700 hours.
 8        A.  Uh-huh.
 9        Q.  Okay.  Do you remember why that decision
10    was made?
11        A.  I think it was at the -- her supervisor's
12    request, which was, I think, Terrica Williams.
13        Q.  Do you recall why Ms. Williams wanted
14    Ms. Davis to have a shift change?
15        A.  No, I really don't.
16        Q.  Do you recall any, like, operational reason
17    for that?
18        A.  No.  We often make shift changes.  I mean,
19    depending on -- and a lot of times, the shift
20    changes, sometimes I'm directed to do a shift
21    change --
22        Q.  Sure.
23        A.  -- from the constable.
24        Q.  Sure.
25        A.  Now, does he give me a reason?  No.  He
```

Lawrence Navarre
January 30, 2017

13

```
 1    say, I need this done.
 2            And I follow.  Most times, I follow orders.
 3        Q.  Okay.  And in this case -- but in this
 4    case, you think that it came from a request from
 5    Ms. Williams?
 6        A.  Yes, sir.  I think so.
 7        Q.  And I may have asked you this before, but
 8    did she outline for you why she wanted that?
 9        A.  No, sir.
10        Q.  Okay.  All right.  I'm going to show you
11    another memo about the shift change.  This is from
12    Sergeant Williams to you.  Take a look at it and
13    familiarize yourself with it.  (Tenders document to
14    witness.)
15        A.  Okay.
16        Q.  All right.  And, Mr. Navarre, this -- it
17    seems to indicate that -- it addresses the memo that
18    you just reviewed, and it says that Sergeant
19    Williams is asking you if the decision could be
20    reconsidered to give a chance to present a plan that
21    will better accommodate all deputies working in the
22    jail, a plan that is convenient for everyone in the
23    jail.
24            Does this help you, like, remember, like,
25    why -- like, what Ms. Williams was asking at the
```

Lawrence Navarre
January 30, 2017

14

```
 1   time or if you know why that was sent to you?
 2        A.   There were so many different changes.   I
 3   truly can't recall, but I believe what happened was
 4   Constable Brown may have wanted Rhea shifted.   And I
 5   think Terrica Williams felt that she would better
 6   serve her on the shift that she was on.   And I want
 7   you to know, now, a lot of times memos go -- that
 8   came out, I just follow orders.   When the order is
 9   given to me, I'll do the memo.
10        Q.   Okay.   So --
11        A.   You know, so -- because I had no intention
12   of making any shift change.
13        Q.   Okay.   So the decision to change her shift
14   was not yours?
15        A.   No, I don't think it was.   No.
16              (Brief interruption.)
17              MR. FOWLER:   I've got a copy of that
18         (indicating).   I'm just going to attach it
19         as Exhibit 1.
20              MR. BERNARD:   Okay.
21         (Exhibit 1 marked for identification.)
22   BY MR. FOWLER:
23        Q.   Give me just a second, Mr. Navarre.
24              Are you familiar with a -- issues about
25   light duty assignment for Rhea -- around the same
```

Lawrence Navarre
January 30, 2017

```
1   time, are you familiar with light duty assignment?
2        A.   Was it due for her pregnancy?
3        Q.   Yes.
4        A.   Yeah.
5        Q.   Do you recall what decisions were made
6   about how to handle that?  Actually, strike that.
7   Let me ask you a better question.
8             Before the Rhea Davis light-duty
9   incident --
10       A.   Okay.
11       Q.   -- what was your appreciation of the policy
12  regarding light duty for constable's office
13  employees?
14       A.   At one time we didn't have a policy on
15  light duty, but eventually, I think we had to do it;
16  because I think they consulted the parish attorney
17  office, and we had to create some form of light duty
18  for people that were -- would have been
19  incapacitated to do a full job.
20       Q.   Okay.  Had the constable's office, when you
21  were there in your 15 years, ever experienced an
22  employee that was pregnant before Rhea Davis?
23       A.   No, I don't think so.
24       Q.   Okay.
25       A.   Now, when you say "employee," do you mean a
```

Lawrence Navarre
January 30, 2017

16

```
 1   deputy or a clerk?
 2       Q.  I'll ask either.  I understand what you
 3   mean, the differences of the duties.
 4       A.  Yeah.
 5       Q.  But as it relates to just a policy for the
 6   department, are you aware that there or was not
 7   one before these issues with Ms. Davis arose?
 8       A.  Right.  You're saying was there a policy --
 9       Q.  I'm saying, are you aware --
10       A.  -- in place?
11       Q.  Yeah.  Was there a policy in place that you
12   were aware of before Ms. Davis?
13       A.  No.  Uh-uh.
14       Q.  Okay.  And I'm going to show you another
15   memo from you, give you a chance to take a look at
16   it.
17               MR. FOWLER:  Karl, I want to introduce
18           this one.
19               MR. BERNARD:  Did he identify that
20           one?  I don't think he said he recognized
21           the document.
22               MR. FOWLER:  Let's do that then.
23   BY MR. FOWLER:
24       Q.  Mr. Navarre, let me -- give that back to
25   me.
```

Lawrence Navarre
January 30, 2017

17

```
 1            Do you recognize this memo?  Did you
 2   receive that?  (Tenders document to witness.)
 3            MR. BERNARD:  It's not signed.
 4       A.  I'm not sure; I'm going to be honest with
 5   you.  We had so many memos lying around there, you
 6   would be surprised.  If it went out, it probably
 7   did.
 8   BY MR. FOWLER:
 9       Q.  That's okay.  All right.  Let's go to this
10   one here.  (Tenders document to witness.)
11            Take a look at that.  This refers to what
12   we were just talking about with -- regarding light
13   duty.
14       A.  Yeah, I remember that.
15       Q.  Okay.  This came from you?
16       A.  Uh-huh.
17       Q.  If you know, do you know whose handwriting
18   that is on the document -- not your signature but
19   the remainder of the handwritten portion of it?
20       A.  That's mine.
21       Q.  Okay.  As I understand this memo, it
22   assigns Corporal Davis, effective Wednesday,
23   July 10th, assignment to Sergeant Coleman-Crump.
24   During the light duty assignment, she'll be the
25   supervisor for the transition period.  It also says
```

Lawrence Navarre
January 30, 2017

18

```
 1   you have indicated -- well, let me just ask that.
 2            The decision was made to transfer her to
 3   Sergeant Coleman-Crump's supervision?
 4        A.   Yeah.
 5        Q.   Okay.  And where was Sergeant Coleman-Crump
 6   at the time?
 7        A.   She was with -- let me see here.  She had
 8   several different -- I think she was in civil, if
 9   I'm not mistaken.
10        Q.   Okay.  So was this memo designed to
11   transfer Corporal Davis to the civil division?
12        A.   Yeah.
13        Q.   Okay.  Do you recall Corporal Davis being
14   pregnant before this issue arose -- a separate
15   pregnancy?
16        A.   Yeah.  I think -- I recall that she was
17   pregnant before, and I think she got along in a
18   certain stage where we had to move her.
19        Q.   Do you remember, like, how the constable's
20   office handled that pregnancy?
21        A.   Well, normally, what we try to do is give
22   her a situation where she's not in harm or danger.
23        Q.   Uh-huh.
24        A.   And I think usually -- we usually keep her
25   in the radio room, or we would shift her to civil
```

Lawrence Navarre
January 30, 2017

19

```
1   where it's strictly paperwork and there's no
2   situation where any harm could come to her, as far
3   as dealing with prisoners or any violent offenders.
4       Q.  Take a look at the second paragraph.  I'm
5   going to ask you about that.  Let me know when
6   you're ready.
7       A.  Okay.
8       Q.  All right.  What -- do you recall the
9   conversation that you had with Ms. Davis about
10  stepping down from corporal?
11      A.  I think the reason why she was asked to
12  step down -- and -- because we needed someone, a
13  supervisor, in the same capacity that she were in to
14  be the sergeant assistant.
15      Q.  Was she asked, or did she -- was she asked
16  by the constable's office, or did she ask?
17      A.  I think she was asked by us.
18      Q.  Okay.  Okay.  The memo indicates that
19  Ms. Davis asked.  Because you wrote, "you have
20  indicated that you would like to voluntarily step
21  down from your assigned corporal position."
22      A.  If that's what it says, then that's
23  probably -- that's a true answer then.  I'm only
24  trying to go by --
25      Q.  So to the best of your memory, she
```

Lawrence Navarre
January 30, 2017

```
 1   requested --
 2        A.   If that's --
 3        Q.   -- to voluntarily step down?
 4        A.   If that's what's written there, that's what
 5   happened.
 6        Q.   Okay.  Do you recall -- in the conversation
 7   that you had with Ms. Davis about her voluntarily
 8   stepping down, do you recall a discussion about
 9   where she would then be employed -- what division?
10        A.   No, but I know it wouldn't be in a
11   situation where harm or danger would come to her.
12   And the only places that we have would be civil or
13   either in the control room where it's a controlled
14   environment and a safe environment.
15        Q.   Okay.  So from your memory, the policy was
16   administered with the -- the purpose of which was to
17   avoid harm or danger to an individual on light duty?
18        A.   Well, in her pregnancy.
19        Q.   In her pregnancy.  Okay.
20        A.   Because we've had other people with light
21   duty.  Sergeant Watson, who had a cast on his leg
22   and, you know, he was reassigned to where he
23   wouldn't be put in a situation where he had to deal
24   with, you know, situations he couldn't control as
25   being a deputy.
```

Lawrence Navarre
January 30, 2017

1    Q.   And what happened in his case?  He was --

2    A.   He was put in the control room.

3    Q.   Okay.  In the jail?

4    A.   In the jail.

5    Q.   Where was he working before he injured his

6    leg?

7    A.   Let me see.  Where was he at?  I think he

8    was in civil.  And that's getting in and out of cars

9    and serving papers.

10   Q.   Okay.  Can you read the handwriting?

11   A.   Which one?

12   Q.   Your handwritten note on the right side of

13   the page.  I don't want to read it and put words in

14   your mouth, because I'm not -- I can't understand

15   every word.

16   A.   Okay.

17   Q.   I'm sorry, Mr. Navarre.  I meant read it

18   out loud.

19   A.   Oh.

20   Q.   Yeah.

21   A.   [As read]:  Note that the sergeant with the

22   jail staff will be interviewed by me and Captain

23   Lawton, along with Constable Brown, next week.

24   Please feel free to address me, Chief Navarre,

25   regarding -- regarding rescinding this letter.

Lawrence Navarre
January 30, 2017

22

```
 1            So the letter was rescinded.
 2       Q.  Do you -- do you remember on what date it
 3  was rescinded?
 4       A.  No.  No.  I really don't know.
 5       Q.  Do you remember how long it was after the
 6  initial typed memo was given to Ms. Davis that it
 7  was rescinded?
 8       A.  No.  I really don't know.
 9       Q.  Okay.  Do you recall whether or not it was
10  rescinded?
11       A.  It was rescinded.
12       Q.  And what was the final outcome as it
13  relates to Ms. Davis's job?
14       A.  I think we wound up doing an interview with
15  all the jail employees.
16       Q.  Okay.  And you interviewed all of them?
17       A.  Yeah.  I think so.
18       Q.  Who was a part of that process?
19       A.  Brown.  I think I indicated the ones in the
20  memo.  It stated John Lawton, myself, and Constable
21  Brown.
22       Q.  Okay.  And what were the purpose of the
23  interviews?
24       A.  There was a lot of dissension that was
25  within that jail shift, and we were trying to get to
```

Lawrence Navarre
January 30, 2017

23

1   the bottom of it.  They weren't getting along, and

2   we needed to have that resolved.

3        Q.  And was part of those interviews related to

4   trying to determine what to do regarding Ms. Davis's

5   light duty?

6        A.  Yes, sir.

7        Q.  Okay.  And the decision to rescind this was

8   a result of these interviews?

9        A.  Yes, sir.

10       Q.  And do you recall the final outcome?  Was

11  she simply returned to her former position?

12       A.  I'm not sure.  I can't recall what was the

13  outcome, but I know we got it resolved.

14                MR. FOWLER:  Okay.  Karl, I'll offer

15            and introduce this memo as Exhibit 3.

16                MR. BERNARD:  No objection.

17          (Exhibit 3 marked for identification.)

18  BY MR. FOWLER:

19       Q.  All right.  Thank you, Mr. Navarre.  One of

20  the next issues raised related to a hiring

21  opportunity for Ms. Davis.

22                Actually, let me wrap up the other issue.

23  I had one more thing to look at.  I want you to see

24  if you can identify from your memory that memo if

25  you received it.  (Tenders document to witness.)

Lawrence Navarre
January 30, 2017

24

```
1        A.  Uh-huh.
2               MR. FOWLER:  Do you want to look at
3        this?
4               MR. BERNARD:  I've got it.
5               MR. FOWLER:  You got it?
6               MR. BERNARD:  Yeah.
7   BY MR. FOWLER:
8        Q.  The memo seems to address the shift issue.
9        A.  Uh-huh.
10       Q.  What was your memory as to what the final
11  decision was made about how to handle the shift
12  issues raised by Sergeant Williams?
13       A.  Normally, when a supervisor make a
14  recommendation, we try to stick with it.  And if I
15  can recall, if she made that, you know, I probably
16  would have stuck with it.  But let me say this:  A
17  lot of the things were done with Captain Lawton
18  bypass me, because Constable Brown didn't want me to
19  override him.
20       Q.  Uh-huh.
21       A.  So, you know, it's hard for me to say what
22  happened.
23       Q.  Okay.  All right.  Do you remember whether
24  or not the shift issues in the jail were about
25  supervision at a particular time of the day?
```

Lawrence Navarre
January 30, 2017

25

```
1        A.   We had supervision problems.   And
2   particular time of the day is hard to say because we
3   only have one shift.
4        Q.   Uh-huh.
5        A.   And that's the jail shift.   You know, we
6   don't work at night.   Normally, the jail is closed
7   by 3:30, and then I think we extended it to
8   5:00 o'clock.   So the only thing that I could see is
9   the people that comes in at 7:00 and leave at 3:00
10  and the people that come in a little later leave at
11  5:00.   That's where the difference in the shift
12  comes in.
13       Q.   Okay.   Around this time -- I realize this
14  is a long time ago -- but was everybody on working
15  7:00 to 3:00 at the jail?
16       A.   No.   Uh-uh.
17       Q.   Okay.   So there were other personnel that
18  worked later?
19       A.   Yeah.
20       Q.   Okay.   All right.
21       A.   But at one time, they were working 7:00 to
22  3:00, but Constable Brown changed it to accommodate
23  the city police department.   Because of the jail --
24  arrest problems in the city of Baton Rouge, we had
25  to accommodate assisting the city police, and that's
```

Lawrence Navarre
January 30, 2017

1  why we went to 5:00 o'clock.

2      Q.  And was there a specific supervisor

3  assigned to 8:00 to 5:00, or was it any jail

4  personnel?

5      A.  Normally, the supervisor and the corporal

6  would work that out.  That's why it was essential to

7  have a corporal.  They would switch on 3:00 o'clock

8  and 5:00 o'clock.

9      Q.  Okay.  To the best of your memory, was one

10  of the them supposed to be there until 5:00?

11      A.  Yeah.

12      Q.  Okay.  Do you remember at the time what the

13  arrangement was?

14      A.  Well, that was left up to the sergeant and

15  his supervisor to coordinate that and make it work.

16      Q.  Okay.  Thank you.

17          MR. FOWLER:  Karl, I'm going to attach

18      this as Exhibit 4.

19      (Exhibit 4 marked for identification.)

20          MR. BERNARD:  No objection.

21  BY MR. FOWLER:

22      Q.  Thank you.  All right.  One of the --

23  another issue raised in Ms. Davis's claim is

24  regarding a promotional opportunity and regarding

25  the jail sergeant position.  Were you involved in

Lawrence Navarre
January 30, 2017

27

```
1    the interview process?

2         A.   Yes, sir.

3         Q.   Okay.  Who else interviewed applicants for

4    the jail sergeant position?

5         A.   John -- Captain Lawton and Constable Brown

6    and sometimes Lieutenant Vernon Scott.

7         Q.   For all interviews or for some of the --

8         A.   For when Lawton not there.  It would be

9    Lawton, myself, and Constable Brown.

10        Q.   Okay.  And I'm specifically referring to

11   the hiring decision for the jail sergeant position

12   after Terrica Williams resigned.

13        A.   Okay.

14        Q.   Do you remember who was hired?

15        A.   They had an interim.  What was that guy's

16   name?  And then he stepped down.  Then decided to

17   give it -- if you have any names, I can recall; but

18   right now I can't recall the names.

19        Q.   Well, do you recall selecting Travis Brooks

20   to be the jail sergeant?

21        A.   After Terrica Williams?

22        Q.   After Terrica Williams resigned.

23        A.   Because he was interviewed when Terrica got

24   promoted also.

25        Q.   Correct.
```

Lawrence Navarre
January 30, 2017

28

```
1        A.   Yeah.
2        Q.   After Terrica resigned, there was a hiring.
3   You know, people put in applications to be the jail
4   sergeant.
5        A.   Yes, sir.
6        Q.   Okay.  Did you sit on that -- those
7   interviews?
8        A.   Yes, sir.
9        Q.   Okay.  Do you remember who was interviewed?
10       A.   Well, we had a D.A.R.E. officer, I think,
11  Scott Shaffer; another female, if I'm not mistaken.
12  As far as my memory goes, I mean, I can't recall,
13  because everybody wanted to get promoted.  Everybody
14  applied for those positions.
15       Q.   All right.  Did you -- do you remember
16  participating in an interview with Rhea Davis?
17       A.   Yes, sir.
18       Q.   Do you remember participating in an
19  interview with Travis Brooks?
20       A.   Yes, sir.
21       Q.   And do you remember -- for this position?
22       A.   Uh-huh.
23       Q.   And do you remember participating in an
24  interview with Carol Edwards for the jail sergeant
25  position in 2014?
```

Lawrence Navarre
January 30, 2017

29

```
1        A.   Yeah, I think she applied.
2        Q.   Okay.  Was Constable Brown in these three
3   interviews also?
4        A.   Yeah.
5        Q.   Was Captain Lawton in these three
6   interviews also?
7        A.   Yes, sir.
8        Q.   Okay.  Was anyone else at any of these
9   three interviews?
10       A.   If it would have been anybody else, it
11  would have been either Sergeant Jimoh or Lieutenant
12  Vernon Scott.
13       Q.   Okay.
14       A.   Or --
15       Q.   Do you recall whether or not they were in
16  this particular case?
17       A.   I can't remember.  I'm not going to tell a
18  lie.  But I know Lawton would have been in there and
19  Constable Brown and myself.
20       Q.   Can you recall whether each person was
21  interviewed by the same group of people?  Do you
22  know what I mean when I ask that?
23       A.   Yeah.  Uh-huh.
24       Q.   Okay.
25       A.   If it was conducted the same day, yes, it
```

Lawrence Navarre
January 30, 2017

30

```
 1   would be the same group of people.
 2        Q.  Okay.  And did the interview panel have,
 3   like, a list of questions that they asked
 4   applicants, or was it less formal than that?
 5        A.  It was kind of less formal.
 6        Q.  How -- can you give me an idea of how the
 7   process -- the interview -- the panel would operate.
 8        A.  Well, normally, what you do is you pull
 9   everybody's qualifications, and you look at
10   everybody's qualifications.  And you look at their
11   education level, and you look at their work product.
12   And based on that, each person votes separately, you
13   know, I mean -- when we vote, the constable have the
14   last vote.  I may vote one way; Lawton may vote one
15   way.  The constable make the last decision.
16        Q.  Okay.  And are these votes recorded in a
17   document anywhere, or are y'all --
18        A.  No, sir.
19        Q.  Are y'all sitting around a room talking
20   about who you think is the best person for the job?
21        A.  Pretty much.
22        Q.  Okay.  Do you remember in this particular
23   case who you believed was the best person for the
24   job?
25        A.  Yeah.  Yes, sir.  Yeah.
```

Lawrence Navarre
January 30, 2017

31

```
 1        Q.   Who did you advise -- who did you recommend
 2   to Constable Brown be hired?
 3        A.   Rhea Davis.
 4        Q.   Okay.  And what was Captain Lawton's
 5   recommendation?
 6        A.   He went with the other guy.
 7        Q.   Mr. Brooks?
 8        A.   Brooks.
 9        Q.   Okay.  And the way that -- you said that
10   the way that it works is everybody gets to weigh in
11   and then Major Brown makes the final decision?
12        A.   Yes, sir.
13        Q.   So we can assume that Major Brown agreed
14   with Captain Lawton and hired Travis Brooks?
15        A.   Yes, sir.
16        Q.   That's your memory?  Okay.  Did the three
17   of you have a discussion after all the interviews,
18   or do you just vote?
19        A.   No.  We discuss them prior to the
20   interview, and after the interview, then we make a
21   decision.  And when I say "prior," we determine what
22   people is going to be interviewed.
23        Q.   Right.
24        A.   Right.
25        Q.   Sure.  I would assume that before the
```

Lawrence Navarre
January 30, 2017

32

1  interview, you would review their qualifications,
2  education, and experience.
3       A.  Yeah.
4       Q.  And in the interview process, you then ask
5  the applicant questions that you think are relevant
6  to their job knowledge --
7       A.  Right.
8       Q.  -- and their fit for the job.
9       A.  Right.
10      Q.  Do the three of you talk after all the
11 interviews are completed, or do you just vote at
12 that point?
13      A.  We talk.
14      Q.  Okay.  Did you feel like Travis Brooks was
15 qualified for the position?
16      A.  They all are qualified, because civil
17 services determine who's eligible to be promoted to
18 sergeant.
19      Q.  Right.
20      A.  So my choice was her (indicating).  Lawton
21 choice was the other guy.  Major Brown made the
22 decision.
23      Q.  Did Major Brown, during this discussion,
24 indicate to you why he wanted to go with Travis
25 Brooks?

Lawrence Navarre
January 30, 2017

```
 1        A.  No, sir.
 2        Q.  Okay.  Was there any conversation during
 3   this discussion about Ms. Davis's gender and its
 4   relationship to the job?
 5        A.  No, sir.
 6        Q.  Okay.  From either yourself or Captain
 7   Lawton or Major Brown?
 8        A.  Well, if he had a preference on gender, he
 9   kept it to himself.  No way I would have known.
10        Q.  Nothing that you heard?
11        A.  Right.
12        Q.  All right.  Another issue raised by
13   Ms. Davis in her claim, Mr. Navarre, is the
14   selection process for a position in judicial
15   enforcement.
16        A.  Yes, sir.
17        Q.  Are you familiar with what I'm talking
18   about?
19        A.  Yes, sir.
20        Q.  This was shortly after the jail sergeant
21   hiring decision.
22        A.  Yes, sir.
23        Q.  Okay.  And were you on that interview
24   panel?
25        A.  Yes, sir, I was.
```

Lawrence Navarre
January 30, 2017

34

1    Q.   Who else was on it?

2    A.   Captain Lawton and Jimoh.

3    Q.   Okay.  Anyone else?

4    A.   No, sir.

5    Q.   Okay.  Do you remember how many people that

6    you interviewed?

7    A.   I'm not sure how many applied for that

8    position, because it was not a promotion; it was

9    just a open position.  And I think several people

10   applied.

11   Q.   Do you remember who was interviewed?

12   A.   Rhea was interviewed; Henson, I think; the

13   guy that got the position.  I can't think of his

14   name.

15   Q.   Does Anthony Haynes ring a bell?

16   A.   Right.

17   Q.   Okay.  And you testified earlier as to when

18   you were on an interview panel with Major Brown, how

19   the voting worked.  Since Major Brown was not

20   involved in this decision, how did it work between

21   you, Mr. Lawton, and Mr. Jimoh?

22   A.   Well, myself and Jimoh indicated that Rhea

23   should have got the position.

24   Q.   This was in your conversation between the

25   three of you after the interviews?

Lawrence Navarre
January 30, 2017

35

1    A.  After the interview, I informed -- yeah.

2    Q.  And did you make that recommendation to

3  Major Brown?

4    A.  Yeah.

5    Q.  Did Jimoh make that recommendation to Major

6  Brown?

7    A.  Yeah.

8    Q.  Was she -- her the only name given to Major

9  Brown?

10    A.  No.  You have to give all the applicants'

11  name who applied to Major Brown.  Yeah.

12    Q.  But did the interview panel make a

13  recommendation as to who should be hired?

14    A.  Yeah, myself and Jimoh.

15    Q.  Okay.  What did -- do you remember what --

16  who Captain Lawton wanted?

17    A.  I think he went along with Haynes.

18    Q.  Okay.  And do you remember if one name was

19  provided to Major Brown or if a group of names was

20  provided to Major Brown?

21    A.  Well, I think all of them should have

22  provided to him.  You know, he have to know who all

23  applied.

24    Q.  All the applicants --

25    A.  Yeah.

Lawrence Navarre
January 30, 2017

36

1     Q.   -- or all the people interviewed?

2     A.   People that were interviewed.

3     Q.   Okay.  And what was -- you said "should."

4  What happened in this case, to the best of your

5  memory?

6     A.   To the best of my memory, myself and Jimoh

7  had a conversation with Major Brown, and we told him

8  we felt that this young lady should have gotten the

9  position.

10    Q.   After she was not selected?

11    A.   Before the selection.  He was told before

12 the selection.

13    Q.   Did Major Brown indicate to you at that

14 time as to why she didn't get the position?

15    A.   No, sir.

16    Q.   Do you recall meeting with the EEOC about

17 this matter?

18    A.   Investigator?

19    Q.   Yes.

20    A.   Yes, sir.

21    Q.   Okay.  Did you advise the EEO -- let me

22 back up.  Strike that.

23         Did you -- did anyone in that hiring

24 process advise you that that decision was made based

25 on gender?

Lawrence Navarre
January 30, 2017

37

1    A.   No, sir.

2    Q.   Okay.  When you met with the EEOC

3 investigator --

4    A.   Yes, sir.

5    Q.   -- did you advise the investigator that you

6 thought the decision was made based on gender?

7    A.   I can't recall.  The only thing I can

8 recall was I did make some statements in lieu of the

9 office to try to soften that process after I

10 realized what had happened; but before the process

11 started, myself and Jimoh told Major Brown, you're

12 going to see this in a lawsuit, and...

13   Q.   After Ms. Davis was not hired?

14   A.   Yes, sir.

15   Q.   Okay.  So what about this interview process

16 when you met with the EEOC investigator?

17   A.   When I met with him, the statement I gave

18 is true.  That's the statement I made.  Now, if you

19 want to know the whole truth and nothing but the

20 truth, so help me God, I was only trying to protect

21 the office.

22   Q.   What did you tell the investigator about

23 this hiring decision?

24   A.   I told them that we were trying protect

25 Ms. Davis because of she had just recently had a

Lawrence Navarre
January 30, 2017

38

1   baby and that we was trying to shelter her and keep
2   her from going into an environment that may have
3   put -- would have put her in a situation that I felt
4   she couldn't control.
5        Q.  Was that because of the nature of the
6   duties of the judicial enforcement position?
7        A.  Yes, sir.
8        Q.  Okay.  And what was it about that position
9   that caused you concern about her safety?
10       A.  It was not about her safety at the time,
11  sir.  It was about trying to protect the office,
12  because I knew that this girl was wronged.
13       Q.  Do you feel like she was wronged because
14  she should have gotten the position --
15       A.  Yes, sir.
16       Q.  -- or do you feel like she was wronged
17  because she was discriminated against based on her
18  gender?
19       A.  I think it's a combination of everything in
20  civil rights.  Based on her gender, based on, you
21  know, the opportunities that she should have been
22  afforded, because it was her time.  And, you know,
23  we had a process where we were putting people; but
24  when political people are in office, they make
25  political decision.  So that's all I could tell you.

Lawrence Navarre
January 30, 2017

1    Q.   So you've stated to the EEOC investigator

2  that you thought part of the reason was because of

3  the nature of the duties in judicial enforcement?

4    A.   Yes, sir, I did say that.

5    Q.   Did anyone during the interview process

6  indicate to you that that was their -- the reason

7  for their decision?

8    A.   The investigator, I think, indicated to me

9  that that was the violation of her -- her civil

10  rights, I think.

11    Q.   Sure.  That was what the investigator

12  believed.

13    A.   Yes, sir.

14    Q.   But when you were -- when you and Jimoh and

15  Captain Lawton interviewed -- gave Ms. Davis's name

16  to Major Brown and Major Brown selected Anthony

17  Haynes, during that process, were there any

18  conversations that anyone had about Ms. Davis's

19  gender as it relates to performing the duties of

20  that position?

21    A.   No, sir.

22    Q.   Okay.  So the statements that you made to

23  the EEOC were designed to protect the office?

24    A.   Yes, sir.

25    Q.   Okay.

Lawrence Navarre
January 30, 2017

40

```
 1        A.   And it probably was ill-advised, but it
 2   happened.
 3        Q.   Okay.  All right.  One final area to cover,
 4   Mr. Navarre.  The -- were you involved in -- Rhea
 5   Davis was placed on administrative leave with pay
 6   following these -- sometime after these incidents
 7   that we discussed, the hiring issues.  Were you
 8   involved in that decision?
 9        A.   I don't think so, because consequently,
10   right after she -- this thing came about -- the
11   investigator, pretty much all my powers were
12   removed.
13        Q.   Okay.  What -- do you remember what --
14   around -- the month and year that your powers were
15   removed?
16        A.   I don't, but I can tell you this:  I wrote
17   the parish attorney office in a grievance, and it
18   stated in that grievance the month and time and my
19   feelings regarding my powers being removed.  And I
20   also wrote the EEOC, and they have documents on
21   that.
22        Q.   Okay.  You can assume that I don't have
23   that stuff, because I don't.
24        A.   Yeah.
25        Q.   So I'm going to give you a range of time to
```

Lawrence Navarre
January 30, 2017

41

```
1    see if it can help trigger your memory.  The --
2    please jump in if I'm off, because I'm going to do
3    this from my memory, too.  The hiring decisions that
4    relate to Ms. Davis were made in the early part of
5    2014 --
6         A.  Okay.
7         Q.  -- February and April, as my knowledge of
8    this case occurred.  Ms. Davis resigned from
9    employment at the beginning of 2015.
10        A.  Uh-huh.
11        Q.  Okay.  So there's an eight-month window
12   from when Anthony Haynes was hired in judicial
13   enforcement and Ms. Davis resigned from employment.
14   Were your duties stripped from you during this
15   period?
16        A.  Oh, yeah.
17        Q.  Okay.  And when was your separation from
18   the constable's office?
19        A.  January 22nd of last year.
20        Q.  Of '16?
21        A.  Yeah.
22        Q.  Okay.  All right.  All right.  So
23   recognizing that your duties were stripped from
24   personnel management, I'm going to ask you again,
25   were you involved in the decision to place Rhea
```

Lawrence Navarre
January 30, 2017

42

```
1   Davis on administrative leave?
2        A.   And when did you say it happened?
3        Q.   She was placed on administrative leave --
4        A.   What year?
5        Q.   -- in October of 2014.  And I'm trying to
6   see if -- I'm just trying to get at whether or not
7   you were involved in that decision.
8        A.   I can't be sure, to be honest with you.  I
9   don't know.
10       Q.   Okay.  And I'll attempt to trigger your
11  memory.  Ms. Davis was ordered to go take a drug
12  test.  Were you involved in that decision?
13       A.   I don't think so.
14       Q.   And Ms. Davis was also ordered to take a
15  psychological exam.  Were you involved in that
16  decision?
17       A.   I don't think so.
18       Q.   Okay.  Are you familiar with the
19  psychological exam that the City uses for law
20  enforcement?
21       A.   I mean, I know we use the psychological
22  testing.  We had to change who were doing the
23  testing because they were flunking just about
24  everybody that went through the door, so we went to
25  a different tester.  But I know it's a battery of
```

Lawrence Navarre
January 30, 2017

43

```
1    questions that they ask you, and that's how they
2    determine whether or not you fit for -- you know,
3    for duty to work in the constable's office.
4         Q.   Would it be in your -- in your capacity as
5    doing personnel management in your job as chief
6    deputy, would it be proper in your mind to ask an
7    employee to submit to a drug test if you received a
8    complaint from another employee about illegal drug
9    use?
10        A.   From another employee?
11        Q.   Uh-huh.  A written complaint.
12        A.   I would have to consult the parish attorney
13   office before I would even do that, because normally
14   that's what we normally do.  Everything is run
15   through your office.
16        Q.   Okay.  So the decision whether or not to --
17   in your work experience --
18        A.   Uh-huh.
19        Q.   -- the decision as to whether or not to
20   send an employee for a drug test following a
21   complaint would be made by the parish attorney's
22   office --
23        A.   Right.
24        Q.   -- and not by someone at the constable's
25   office?
```

Lawrence Navarre
January 30, 2017

44

```
 1       A.   No.
 2       Q.   Okay.   Would that answer be the same if it
 3  was a decision about sending someone for a
 4  psychological exam?
 5       A.   Yeah.
 6       Q.   Okay.   Do you personally think that Rhea
 7  Davis was discriminated against?
 8       A.   Do I personally?
 9       Q.   Yeah.
10       A.   Yeah.
11       Q.   Based on her gender?
12       A.   No, not gender.
13       Q.   How would you character -- what was the --
14  how was she discriminated against?
15       A.   I just felt that it was her time to be
16  promoted, and we had been promoting people the same
17  way, and obviously it didn't go her way.   So I guess
18  you could only assume that it was gender.
19       Q.   Well, I mean, I think there's a lot of
20  reasons for hiring somebody.   Certainly, you can
21  imagine a situation where people are discriminated
22  against, and there's other chances where people
23  believe they're discriminated against but are
24  actually not selected because other people are a
25  better fit.   Do you agree with that statement?
```

Baton Rouge Court Reporters, LLC
225-292-8686

Lawrence Navarre
January 30, 2017

1      A.   Yeah, that's a true statement.

2              MR. FOWLER:  Okay.  Go ahead, Karl.

3              Thank you, Mr. Navarre.  Mr. Bernard,

4         Ms. Davis's lawyer, will have some

5         questions for you.  I may have some

6         followup, but we're going to do that now.

7              THE WITNESS:  Okay, sir.

8                     EXAMINATION

9   BY MR. BERNARD:

10     Q.   Good morning, Chief.

11     A.   Yes, sir.

12     Q.   As you know, I've been here listening to

13  the testimony that you've provided to questions

14  asked by Attorney Marston Fowler, but I just have a

15  few questions I want to ask you.  And primarily,

16  we're just going to kind of go through the same

17  sequence that Mr. Fowler went through.  And I'm

18  going to try to show you similar -- the same

19  documents.

20              MR. BERNARD:  As a matter of fact,

21         Marston, if you've got those documents

22         marked, let me have that set there.

23         Document Number 1.

24  BY MR. BERNARD:

25     Q.   Okay.  Now, you were asked questions about

Lawrence Navarre
January 30, 2017

46

1   Defense Exhibit Number 2.  This is a document
2   dealing with a shift change.  The document was
3   authored by you, has your signature.  I think you
4   identified that.  And it was during the summertime
5   of 2013.  And the question I have to ask you is, do
6   you recall whether or not Rhea Davis was pregnant
7   during that time?
8         A.   I think so.
9         Q.   Okay.  She was pregnant?
10        A.   Yes, sir.
11        Q.   Now, it's my memory -- and I could be
12  misquoting you, but I got the impression that --
13  from your answers to Mr. Fowler that the
14  pregnancy -- her pregnancy may not have had anything
15  to do with this shift change.  Is that accurate?
16        A.   It would be accurate if she was simply
17  assigned to the jail control room.  Normally, that's
18  a controlled environment where her safety -- you
19  know, she wouldn't be involved with any contact with
20  prisoners or violent offenders or anybody that would
21  come in that area.
22        Q.   Right.  And because at this particular time
23  when this memo was written, this was Rhea Davis's
24  second pregnancy; isn't that accurate?
25        A.   I don't know.

Lawrence Navarre
January 30, 2017

47

1       Q.   I mean, she was pregnant twice.  Do you
2  recall that?
3       A.   Yeah.
4       Q.   Okay.  And the first pregnancy was during
5  the year before this particular pregnancy.
6       A.   Okay.
7       Q.   Okay.  Wasn't Ms. Davis assigned to light
8  duty during her first pregnancy where she worked in
9  the control room?
10       A.   Yes, sir.
11       Q.   Okay.  And -- but during this particular
12  pregnancy, the second pregnancy, in the year 2013 --
13       A.   Uh-huh.
14       Q.   -- the constable's office suggested that a
15  shift change be had; is that accurate?
16       A.   Yes, sir.
17       Q.   Okay.  Isn't it a fact that Rhea Davis
18  complained about the shift change?
19       A.   Yes, sir.
20       Q.   Do you remember Rhea Davis stating that the
21  shift change would upset her schedule with her --
22  the other child that's in school, which would
23  require her to get off later than her normal -- the
24  time that she would normally get off?
25       A.   I think she did make that -- yeah.

Lawrence Navarre
January 30, 2017

48

1    Q.  Do you recall meeting about that, that Rhea
2  Davis even threatened or at least said that she
3  thought that y'all's decision to make the shift
4  change may be in a violation of her -- her rights or
5  may be in violating her rights because she was
6  pregnant?
7    A.  I can't recall that.  I'm not sure.
8    Q.  So are you -- do you recall that discussion
9  with Rhea Davis, yourself, and the constable and
10  chief -- and Mr. Lawton where she came into a
11  meeting and indicated to you-guys that she didn't
12  think it was fair that her shift had to be changed
13  and that --
14    A.  I think she did that; yeah.  She did make a
15  comment to us about that.
16    Q.  And do you believe that after she made the
17  comment that that's when the second memo came out
18  from Terrica Williams asking that you-guys
19  reconsider the shift change and give her an
20  opportunity to restructure some things within the
21  jail?
22    A.  Right.
23    Q.  Okay.  So is it your testimony that -- that
24  because -- or as a result of the discussion that
25  you-guys had with Rhea Davis that you-guys

Lawrence Navarre
January 30, 2017

49

```
1    reconsidered changing her shift hours?  Is that
2    accurate?
3         A.   Yeah.
4         Q.   Okay.  And that's when you put out the
5    letter --
6         A.   -- rescinding the --
7         Q.   -- rescinding the earlier --
8         A.   -- memo.
9         Q.   -- memo.
10        A.   Yes, sir.
11        Q.   Okay.  And is your memory kind of coming
12   back a little bit?  I know it's been --
13        A.   It's been a while.
14        Q.   -- five, six, seven years or so.
15        A.   Yeah.
16        Q.   Okay.  All right.  Okay.  Now, let me move
17   on to the second point dealing with the jail
18   sergeant position.  As Mr. Fowler indicated, Terrica
19   Williams had resigned.
20        A.   Uh-huh.
21        Q.   And the jail sergeant position was vacant.
22        A.   Uh-huh.
23        Q.   And it was time to fill the position.
24        A.   Yes, sir.
25        Q.   And I believe you testified that several
```

Lawrence Navarre
January 30, 2017

50

```
 1   employees -- constable employees or deputies or what
 2   have you applied for the position.
 3        A.   That's correct, sir.
 4        Q.   And one of the persons that applied for the
 5   position was Ms. Rhea Davis; is that accurate?
 6        A.   Correct.
 7        Q.   Another individual that applied for the
 8   position was a Travis Brooks; is that accurate?
 9        A.   That's correct.
10        Q.   And I believe you testified that you were
11   of the opinion that Rhea Davis should have gotten
12   the position.  Is that accurate?
13        A.   Yes, sir.
14        Q.   Okay.  And -- but Mr. Lawton, the other
15   interviewer, thought that Mr. Brooks should have
16   gotten the position.
17        A.   Yes, sir.
18        Q.   Okay.  And that Chief...
19        A.   Constable?
20        Q.   Constable Brown made the final decision.
21        A.   Yes, sir.
22        Q.   Okay.  Now, why was -- in your opinion,
23   based upon you being a part of the interviewing
24   process, why was Travis Brooks chosen?
25        A.   I can only assume that Constable Brown felt
```

Lawrence Navarre
January 30, 2017

51

```
 1   that he was a better choice.  That's all I can
 2   assume.
 3        Q.  Okay.  What about the interview that you
 4   had with Mr. Travis Brooks would justify Major
 5   Brown's decision to hire Brooks over Davis?  What
 6   about Mr. Davis -- Mr. Brooks's qualifications would
 7   make him more qualified or a better candidate for
 8   the position than Ms. Davis?
 9        A.  Well, let me -- well, the process is that
10   you go through three people.  And everybody that's
11   qualified, you interview.  So that means that they
12   were all qualified.
13        Q.  Right.
14        A.  I can't say who were better qualified other
15   than, you know, she had already been in the jail,
16   and she was already a supervisor.  You know, so
17   based on that information that I had, that was my
18   choice, because I felt that she was, you know...
19        Q.  So she was your choice because she was a
20   supervisor.  What was her rank at that time?
21        A.  She was a corporal.
22        Q.  She was a corporal.  And she had already
23   been in the jail?
24        A.  That's right.
25        Q.  What do you mean by that?
```

Lawrence Navarre
January 30, 2017

52

1     A.   She already had the jail experience.   She
2  had already been supervising, and, you know, she --
3  she knew the ropes.
4     Q.   How long had she been in the jail?
5     A.   A good while.   Rhea had been in that jail a
6  good while.
7     Q.   More than one year?
8     A.   Oh, yeah.
9     Q.   More than three years?
10    A.   Probably so.
11    Q.   Possibly five years?
12    A.   Yes, sir.
13    Q.   Okay.   Now, what about Mr. Brooks?   Was he
14 a supervisor?
15    A.   At the time?
16    Q.   At the time.
17    A.   No.
18    Q.   Was Mr. Brooks -- had Mr. Brooks spent any
19 time in the jail?
20    A.   Yeah.   Everybody that is hired comes
21 through the jail and spends some time in the jail,
22 and then we ship them off to different -- various
23 areas.
24    Q.   How much time did Mr. Brooks spend in the
25 jail?  Do you recall?

Lawrence Navarre
January 30, 2017

53

```
 1        A.   I can't recall.
 2        Q.   Did Mr. Brooks spend time in the jail as an
 3   intern, or did he spend time in the jail as a
 4   deputy?
 5        A.   Intern and deputy.
 6        Q.   Okay.  Would you say he had maybe more than
 7   one year, two years in the jail -- experience?
 8        A.   Might have had two years' experience.
 9        Q.   Okay.  Now prior -- when this decision was
10   made, where was Mr. Brooks employed?
11        A.   Mr. Brooks was a reserve with our
12   department, and -- when the decision was made to
13   promote him to sergeant?
14        Q.   Yes.
15        A.   He was a bailiff.
16        Q.   A bailiff.
17        A.   A jail bailiff.
18        Q.   And how long had he been a jail bailiff at
19   the time the decision was made to employ him?
20        A.   Maybe two or three years.
21        Q.   Okay.  Now, did Mr. Brooks and Ms. Davis
22   work together in the jail at any time?
23        A.   I think so.  I don't think it was long, but
24   they probably spent some time in the jail.
25        Q.   Okay.  So --
```

Lawrence Navarre
January 30, 2017

54

```
1        A.   By her -- by virtue of being there that
2   long.  She sees everybody.
3        Q.   So we know at least -- Mr. Brooks had not
4   been in the jail for at least two or three years
5   prior to being selected in that position?
6        A.   Yes, sir.
7        Q.   Okay.  Now, you testified that the reason
8   why you thought that Ms. Davis was more qualified --
9   or at least a better candidate; I won't say
10  qualified -- was a better candidate was because she
11  was a supervisor and had been in the jail for five
12  years.
13       A.   (Nodding.)
14       Q.   Why did Mr. Lawton believe that Mr. Brooks
15  was the better candidate?
16       A.   No way I could figure out why he did that.
17  I mean, I can't go in his head, but it was his
18  choice.
19       Q.   Okay.  Why did Major Brown think that
20  Mr. Brooks was the better choice?
21       A.   Hard to say, too.
22       Q.   Okay.  Now, Mr. Fowler asked you a question
23  as to whether or not any discussions were had
24  between you-guys in making the decision as to who
25  would be the jail sergeant.  Did you-guys have a
```

Baton Rouge Court Reporters, LLC
225-292-8686

Lawrence Navarre
January 30, 2017

1   discussion?

2       A.   We discussed the candidates.

3       Q.   Okay.

4       A.   You know...

5       Q.   And let me -- just -- this is what I'm

6   seeing:   I see you-guys talking in maybe Major's

7   office?

8       A.   Uh-huh.

9       Q.   And you're discussing the candidates, and

10  I'm assuming -- and you tell me if I'm right or

11  wrong -- that you're voicing your opinion about Rhea

12  Davis.   Is that accurate?

13      A.   Yes, sir.

14      Q.   And that Mr. Lawton is probably voicing his

15  opinion about Mr. Brooks.   Is that accurate?

16      A.   Probably so.

17      Q.   Okay.   Do you recall what Mr. Lawton said?

18      A.   No, sir.

19      Q.   Okay.   All right.   And after you-guys had

20  an opportunity to voice your opinion, what did Major

21  Brown say?

22      A.   We didn't know till after we left the

23  process.   You know, we did our selection, and he

24  always do it afterwards.   He'll come out and say,

25  well, I want Sergeant Davis, or, I want so-and-so.

Lawrence Navarre
January 30, 2017

56

1   Q.  Okay.  Did he indicate to you at any point
2   in time that -- as to the reason why he selected
3   Brooks over Davis?
4   A.  No, sir.
5   Q.  Okay.  Did it have -- now, at this time --
6   and I don't know if you recall, but let me just, for
7   the record, state that Ms. Davis was out on
8   maternity leave.  Do you recall that?
9   A.  Uh-huh.
10  Q.  Do you?
11  A.  When the process was going on --
12  Q.  Yes.
13  A.  -- for the selection?
14  Q.  Yes.
15  A.  No, I don't recall that, but I don't think
16  that had anything to do with why I chose her.
17  Q.  No, I'm not -- I'm not asking.  I'm just
18  saying, the question is, do you recall that
19  Ms. Davis was out on maternity leave?
20  A.  No, I didn't recall.
21  Q.  Say again.
22  A.  No.  I can't remember.  I really can't.
23  Q.  All right.  Did anybody voice any concerns
24  about Ms. Davis's gender and being the jail
25  sergeant -- her being a female, a woman?

Lawrence Navarre
January 30, 2017

57

1      A.   Not to me.

2      Q.   Did anybody get upset that Ms. Davis got

3  pregnant at any time while she was an employee in

4  the constable's office?

5           Did Major Brown ever make a comment to you

6  about Ms. Davis becoming pregnant as an employee in

7  the constable's office?

8      A.   Not to me.  He might have made it -- you

9  know, if he said it, might have been someone else;

10  but I don't try to get in those conversations

11  with -- involving pregnancy and stuff like that.

12  That ain't my agenda.

13     Q.   Okay.  Are you aware of any comment that

14  Major Brown made about Rhea Davis becoming pregnant

15  while employed?  Because you testified that she was

16  the first person that was pregnant in the

17  constable's office.

18     A.   And then twice.

19     Q.   And then twice.  Did anybody say anything?

20     A.   Not to me.  I mean, it's normal for a woman

21  to get pregnant.  I mean -- and I don't think that,

22  you know, it should have been held against her, but

23  I really don't know, Mr. Bernard.  I'm not sure if

24  it was held against her.  All I knew was I tried to

25  do the right thing.  That's all.

Lawrence Navarre
January 30, 2017

58

1       Q.  All I'm saying is, was there any banter,
2   any conversation amongst the supervisoring [sic]
3   officers -- supervisors within the constable's
4   office about her becoming pregnant not once, as you
5   mentioned, but twice?
6       A.  Well, no, because, you know what, I ran a
7   pretty -- a fair and honest office.  Nobody came to
8   me personally and said anything negative about her
9   or about her pregnancy.  Now, rumors all over the
10  place.  People say all kind of things.  But they
11  respect me that much not to get it to me.  Yeah, I
12  was kind of respected.  I didn't --
13      Q.  Last question:  Do you recall -- or did
14  Major Brown ever mention or say anything that, I
15  can't believe she got pregnant while being employed
16  with me as a constable?
17      A.  Now, that's possible.  He might have
18  mentioned it in a supervisor's meeting, you know,
19  but I -- you know, my memory doesn't make me recall
20  that incident.
21      Q.  Okay.  Now, one question on Mr. Brooks:
22  What was so appealing about Mr. Brooks to Major
23  Brown, in your opinion?
24      A.  I think -- he started as a reserve, and he
25  stuck with that program for the longest and then

Lawrence Navarre
January 30, 2017

59

1   became a deputy.  You know, so -- and Brown, you
2   know, he pretty much admired his reserve department
3   because they does a lot of free work where other
4   people charge for what they do.  They do it to be a
5   reserve.  So, you know, he may have favored that and
6   looked at that and say, well, you know, this guy
7   have really done something while he was here as a
8   reserve, and, you know -- I don't know what the
9   answer is.
10       Q.  Okay.  Let me ask you this question:  Now,
11  Terrica Williams had just resigned.
12       A.  Yes, sir.
13       Q.  And Terrica Williams is a female.
14       A.  Yes, sir.
15       Q.  The department had problems with
16  Ms. Terrica Williams.
17       A.  Yes, sir.
18       Q.  Okay.  Do you believe that a decision was
19  made basically saying, we're not going to have
20  another woman in that position again?
21       A.  That's possible.  Not by me.  It's
22  possible.
23       Q.  And why do you believe it's possible?
24       A.  Because of the way it happened.  You know,
25  she did create some problems, especially with the

Lawrence Navarre
January 30, 2017

60

```
1   personnel issues with her shift -- her own
2   employees.  And that may have wavered into how they
3   felt.  I don't know.
4        Q.   Okay.  All right.  Let's move on to
5   Mr. Hayes, I believe.
6        A.   Haynes?
7        Q.   Haynes.  Yeah.  Now, the next position that
8   I think you testified to that Ms. Davis applied for
9   was the...
10       A.   Civil position.
11       Q.   Yes.  Judicial enforcement division, right?
12       A.   Right.
13       Q.   You indicated that there were three people
14  that interviewed the candidates for that position;
15  is that accurate?
16       A.   Yes, sir.
17       Q.   And out of the three, two individuals,
18  yourself and Jimoh --
19       A.   Jimoh.
20       Q.   -- Jimoh recommended that Rhea Davis be
21  hired?
22       A.   Yes, sir.
23       Q.   Why did you recommend that Rhea Davis be
24  hired?
25       A.   Because she was -- she had the experience,
```

Lawrence Navarre
January 30, 2017

61

```
 1   the seniority; and I went with seniority.  And she
 2   was -- you know, she was due, because I felt that
 3   she had -- you know, she wasn't promoted to
 4   sergeant.  And when that position became available,
 5   I just knew that this was where she should have
 6   went, you know.
 7         Q.  Okay.  And you also indicated that Captain
 8   Lawton recommended Mr. Haynes; is that accurate?
 9         A.  Yes, sir.
10         Q.  And why did he select -- why was he -- why
11   did he favor Mr. Haynes?
12         A.  Him and Mr. Brown had a special
13   relationship.  That's all I can tell you.
14         Q.  Who was that?
15         A.  Him and Constable Brown.
16         Q.  Who?
17         A.  Lawton.
18         Q.  And Constable Brown?
19         A.  Yeah.
20         Q.  But I'm saying, though, why was -- I'm
21   assuming Ms. Davis had five-plus years with the
22   department at this time, right?
23         A.  Yes, sir.
24         Q.  How long had Mr. Haynes been with the
25   department?
```

Lawrence Navarre
January 30, 2017

62

1      A.   He had just got on.  He hadn't been there
2   that long.
3      Q.   And had -- so he was a new employee?
4      A.   Yes, sir.
5      Q.   And where was he working at the time?  What
6   department was he working at?
7      A.   You know what, he came from the private
8   sector; and when he got there, I think his
9   experience was working with halfway houses or
10  something like that.  I'm not sure.
11     Q.   But what department was he hired in with
12  the constable's office?
13     A.   He was working in the jail.
14     Q.   In the jail.
15     A.   And then when he went from the jail, I
16  think he went to courtroom security.
17     Q.   Courtroom security.
18     A.   Yeah.
19     Q.   And what about his qualifications do you
20  believe made him a more attractive candidate to
21  Mr. Lawton as opposed to Rhea Davis?
22     A.   I have no idea.
23     Q.   Okay.  Do you believe that Mr. -- Ms. Davis
24  was not selected because of her gender -- because
25  she was woman, a female?

Lawrence Navarre
January 30, 2017

1      A.   I can't say that, because we had female
2   worked in civil.
3      Q.   Uh-huh.
4      A.   So that's why I couldn't see what the
5   problem was.
6      Q.   Uh-huh.
7      A.   You know, I guess it was just his choice.
8      Q.   Okay.  So you don't think it had anything
9   to do with her gender?
10     A.   It may have had something to do with her
11  past.  And when I say "past," with the pregnancies
12  and what have you.  And I guess down the road, you
13  know, they may might have said, well, this might
14  happen again.
15     Q.   Okay.  Let me -- you testified that you had
16  an opportunity to speak with the EEOC regarding the
17  hiring or non-hiring of Ms. Davis.  Do you recall
18  talking to the EEOC?
19     A.   He asked me a battery of questions --
20     Q.   Yeah.
21     A.   -- and I tried to answer them to the best
22  of my knowledge.
23     Q.   I want you to look at what we're going to
24  mark as Plaintiff's Exhibit Number 1, and that's a
25  document dated January 26, 2015.  It's from

Lawrence Navarre
January 30, 2017

64

1    Louisiana Commission on Human Rights.  It was signed

2    by Ms. Loyce Pierce Wright, executive director.

3    It's three pages long -- one, two, three.  And there

4    are some quotes on page 2 that are attributed to

5    you.  And I want you to read -- one, two, three --

6    the third paragraph in this particular section and

7    tell me whether or not the quotes are accurate.

8    First of all, do you -- have you seen this document

9    before?

10        A.   No.

11        Q.   You have not?

12        A.   No.  When the documents came out -- the

13    dispositions, all that, that was not even made for

14    my view.  Never saw none of this.

15        Q.   Okay.

16        A.   Okay.  You said the third paragraph?

17        Q.   Yes, sir.

18        A.   I don't have my reading glasses, so bear

19    with me now.  I didn't know I'd need to have my

20    reading glasses.

21        [As read]:  Additionally, sufficient

22    evidence exists that brings into question the

23    veracity of the respondent's explanation of its

24    decision to not hire the complainant for the deputy

25    constable's position in the judicial enforcement.

Lawrence Navarre
January 30, 2017

65

```
 1   During witness interview, inconsistent testimony was
 2   given by three separate hiring officials as to why
 3   the complainant was not -- complainant was not hired
 4   for the position.  Major Brown stated that Deputy
 5   Haynes' street experience was the determining
 6   factor.  Captain Lawton stated that it was the best
 7   officer kept -- the complaint -- in the jail
 8   division.  The best office...
 9        Q.  "It was best for the office."
10        A.  Oh, okay.  [As read]:  He was stating --
11   Captain Lawton stated that it was best for the
12   office to keep the complainant -- oh -- in the jail
13   because she was a tremendous asset to the position.
14            Well, that's kind of funny.
15        Q.  Well, just keep reading.  We're going to
16   talk about that just in a minute.
17        A.  All right.  [As read]:  The division --
18   because she was a tremendous asset to the position
19   and he did not want to cripple the jail division by
20   hiring a new corporal after recent hiring a sergeant
21   with little jail experience.
22        Q.  Go ahead.
23        A.  Okay.  [As read]:  Chief Navarre stated
24   that the complainant was not hired because the
25   constable probably didn't want to put a female in
```

Lawrence Navarre
January 30, 2017

66

```
1   that position because it requires employees to serve
2   papers in certain neighborhoods and it was in a
3   area -- a dangerous area.
4        Q.  Is that quote accurate from you?  Did you
5   say that?
6        A.  That quote is accurate, and I did say that
7   without a doubt.  I said that.
8        Q.  All right.  You said that.  And you
9   mentioned -- well, let me go -- you also read some
10  statements that are quoted by Ms. Wright, executive
11  director for the human rights -- Louisiana
12  Commission on Human Rights --
13       A.  Uh-huh.
14       Q.  -- stating the reason why he favored Mr. --
15  or did not favor Ms. Davis for the judicial
16  enforcement division.
17       A.  Uh-huh.
18       Q.  Does that refresh your memory somewhat as
19  to why Mr. Lawton was -- thought that Mr. Haynes was
20  the better choice after reading that statement?
21       A.  I think Mr. Haynes probably had a
22  conversation with Constable Brown.
23       Q.  But --
24       A.  That's probably what came up.
25       Q.  But --
```

Lawrence Navarre
January 30, 2017

67

1      A.   That's all I can tell you.

2      Q.   What I'm asking you is this:  You had an

3  opportunity to read a statement that purports to

4  quote Mr. Lawton as saying that he didn't want -- he

5  didn't choose Ms. Davis because he wanted Ms. Davis

6  to -- Ms. Davis to stay in the jail because she's an

7  asset there and he didn't want to cripple the jail

8  by hiring another -- a new corporal after just

9  hiring a sergeant with little jail experience?

10      A.   Yes, sir.

11      Q.   Does that refresh your memory as to the

12  discussion or the reason why Mr. Lawton wanted

13  Mr. Haynes in that judicial enforcement division

14  position?  Does that refresh your memory?

15      A.   That part of what he state, it doesn't

16  refresh my memory, because I didn't know that that

17  was his -- you know, his reasons, you know...

18      Q.   So are you telling -- is it your testimony

19  that when you-guys interview a candidate for a

20  position, you-guys don't discuss pros and cons with

21  each other prior to making your recommendation to

22  the major -- to Constable Brown?

23      A.   Well, I guess it -- it's done individually,

24  you know.  I stated mine; he stated his.  Constable

25  makes a decision.

Lawrence Navarre
January 30, 2017

1      Q.   Okay.  So it's -- so is it a correct
2   characterization to state that when an interview --
3   when you're interviewing to fill a position, that
4   after the interviewing process is completed that you
5   and the other interviewee -- interviewers, that
6   you-guys don't discuss the pros and cons of --
7      A.   No.
8      Q.   You do not discuss the pros and cons?
9      A.   No, because Constable Brown is going to
10  make his decision.  It's always his choice.  You
11  know, I mean, I can tell him that it's a better
12  applicant, probably should have got the job; but
13  it's left up to him.  He makes those decisions.
14     Q.   Okay.  So -- all right.  Let me ask you
15  this question before we move off of this document
16  here:  The statement that's attributed to Mr. Lawton
17  in the paragraph you just read, is that statement
18  true?  What do I mean by that is this:  Was Rhea
19  Davis a tremendous asset --
20     A.   Yes, she was.
21     Q.   -- to the jail division?
22     A.   Yes, she was.  That's why she was my
23  choice.  She had been there; she was a supervisor;
24  she had served.
25     Q.   Okay.  Number two:  Would it have crippled

Baton Rouge Court Reporters, LLC
225-292-8686

Lawrence Navarre
January 30, 2017

69

1   the jail division if she were moved out of that
2   position into another position because the sergeant
3   had little to no experience in the jail division?
4         A.   Yes, sir.
5         Q.   Okay.  Now, if those statements are true,
6   did Mr. Brooks require -- need training when he
7   became the sergeant of the jail?
8         A.   Yeah.
9         Q.   Who trained him?
10        A.   I think Lieutenant Wagner.
11        Q.   Lieutenant Wagner?
12        A.   Wagner and, I think, C.C., because she
13  supervised the jail for a certain period of time
14  also.
15        Q.   Okay.  Do you recall that -- whether or not
16  Ms. Davis trained Mr. Brooks?
17        A.   I'm quite sure she was there to train.  She
18  was there.
19        Q.   Would it be -- would it shock you if I told
20  you that -- let me just ask you a few little
21  questions here -- that Ms. Davis trained Mr. Brooks
22  on how to book inmates on the AFIS system --
23  machine?
24        A.   Yeah, because she -- she had been there.
25  She had been well trained and well informed.

Lawrence Navarre
January 30, 2017

70

```
1        Q.   Would it surprise you that Mr. Brooks --
2   that Ms. Davis trained Mr. Brooks on how to
3   calculate bonds?
4        A.   No, it wouldn't surprise me.
5        Q.   Would it surprise you whether or not
6   Ms. Davis trained Mr. Brooks on how to write a bond?
7        A.   No, sir.
8        Q.   What about collecting fees?
9        A.   No, sir.
10       Q.   Where to deposit different collections of
11  the fees?
12       A.   (Nodding.)
13       Q.   Would that shock you?
14       A.   No, sir.
15       Q.   Where to log entry of each bond posted,
16  would that shock you?
17       A.   No, sir.
18       Q.   How to use a jail management system to
19  create the next day's inmate transport list?
20       A.   No, sir, that wouldn't surprise me.
21       Q.   How to prepare transmittals and send to the
22  first district?
23       A.   No, that wouldn't surprise me.
24       Q.   Doing the morning checklist?
25       A.   No, wouldn't surprise me.
```

Lawrence Navarre
January 30, 2017

71

```
1        Q.  And how to -- and to introduce him to the
2   other jail deputies -- the deputies that were in
3   the -- that were working in the jail?
4        A.  No, it wouldn't surprise me.  That's why
5   Captain Lawton's statement is so true.
6           (Exhibit P-1 marked for identification.)
7                   MR. BERNARD:  Let the record reflect
8               that I'm marking the document that has been
9               part of the Q and A with Chief Navarre.
10              I'm marking it as P-1.
11  BY MR. BERNARD:
12       Q.  One last document I want you to look at.
13  And I want you -- it's -- we're going to -- I wanted
14  to ask you, do you recognize that document?
15                  (Off-record discussion.)
16  BY MR. BERNARD:
17       Q.  Chief Navarre, do you recognize that
18  document?
19       A.  Uh-huh.
20       Q.  Okay.  What is that document, sir?
21       A.  That's Major Brown directing the promotion
22  of Travis Brooks.
23       Q.  This document is dated February the 4th,
24  2014; is that accurate?
25       A.  Uh-huh.
```

Lawrence Navarre
January 30, 2017

72

1      Q.   And it's a document written -- or it's sent
2   from Mr. Reginald R. Brown, city counsel; is that
3   accurate?
4      A.   Yes, sir.
5      Q.   And you were copied on that document.
6      A.   Yes, sir.
7      Q.   You're cc'd, "Chief Navarre"; is that
8   right?
9      A.   Yes, sir.
10     Q.   Okay.  Now, this document states that
11  Travis Brooks will be promoted to sergeant and
12  assigned as a supervisor to the Baton Rouge City
13  Jail.
14     A.   Yes, sir.
15     Q.   And it also says that Lieutenant Thomas
16  Wagner will assist in overseeing Sergeant Brooks
17  during his transition period to his new assignment.
18     A.   Yes, sir.
19     Q.   Okay.  I think you testified that
20  Mr. Wagner may have helped out in some of his
21  training.
22     A.   Yes, sir.
23     Q.   Mr. Brooks' training, I should say.  And
24  then it goes on to say that furthermore, the
25  corporal position in the city jail will be vacated

Lawrence Navarre
January 30, 2017

73

```
1   until Sergeant Brooks completes his transition and
2   makes the assignment.
3        A.  Yes, sir.
4        Q.  What does that mean to you?  Who was the
5   corporal at that time?
6        A.  Brooks.  But he was in the jail.  I mean,
7   he wasn't in the jail, but he was leaving --
8        Q.  I want you to look at that --
9        A.  -- court security.  Yeah.
10       Q.  Read that document closely.
11       A.  Okay.  "Furthermore" --
12       Q.  I'm going to ask you the same question:
13  Who was the corporal in the city jail at the time
14  this document was issued?
15       A.  Rhea Davis was the corporal.
16       Q.  Rhea Davis was the corporal.
17       A.  Yes, sir.
18       Q.  Well, what was Major Brown doing -- what
19  did he -- what was your understanding of paragraph 2
20  in this document we're going to mark as P-2?
21       (Exhibit P-2 marked for identification.)
22       A.  Obviously, he vacated the position of
23  corporal.
24  BY MR. BERNARD:
25       Q.  Now, what does "vacated" mean to you, sir?
```

Lawrence Navarre
January 30, 2017

74

1      A.   It doesn't exist for the time being.

2      Q.   Okay.  Did you, Captain Lawton, meet with

3   Mr. Brown and discuss his decision to vacate the

4   corporal position?

5      A.   No.  I don't recall this about the corporal

6   position being vacated in the jail.

7      Q.   Uh-huh.  Are you saying that this letter is

8   not accurate or this --

9      A.   No, this letter's accurate.  I mean, it

10   states what it states.  He vacated the position.

11      Q.   Okay.  Now, when you vacate something, does

12   that mean to eliminate the person that's in that

13   position?

14      A.   Remove them.

15      Q.   Remove them?

16      A.   It means to remove them from that position.

17      Q.   Because it goes on to say that there will

18   be an opening in court security due to Sergeant

19   Brooks' promotion.  I'm sorry.  It goes on to say

20   that Brooks -- that furthermore the corporal

21   position in the city jail will be vacated until

22   Sergeant Brooks completes his transition and makes

23   the assignment.

24           What is Major Brown indicating here?  He

25   wants to -- first, I think it's clear that he wants

Lawrence Navarre
January 30, 2017

75

```
 1    that position -- the person in that position to be
 2    removed.  Is that accurate?
 3         A.   I guess so.  Yes, sir.
 4         Q.   I mean, is it --
 5         A.   Yeah, that's accurate.
 6         Q.   It's --
 7         A.   I mean, if it was vacated, he want him to
 8    be removed.
 9         Q.   And he wants -- is it accurate to state
10    that he wanted Sergeant Brooks to appoint someone
11    else to become the corporal --
12         A.   Yes, sir.
13         Q.   -- to fill the position.
14         A.   To fill the position.
15         Q.   Right.  So Major Brown vacated the
16    position; am I right?
17         A.   Yes, sir.
18         Q.   Or at least he desired to have the position
19    vacated, right?
20         A.   Yes, sir.
21         Q.   And he wanted Mr. Brooks, the new sergeant,
22    to fill the position.
23         A.   Yes, sir.
24         Q.   Okay.  And you've already testified that at
25    this time when this letter came out that Rhea Davis
```

Lawrence Navarre
January 30, 2017

```
 1   was the corporal.
 2        A.  Yes, sir.
 3        Q.  Okay.  Now, one thing that's not stated in
 4   that letter is what was going to happen -- what did
 5   Major Brown intend to happen to the person who was
 6   removed from -- or that he recommended be removed
 7   from that position via that letter?
 8        A.  I think his intent was that he already knew
 9   that Brooks probably was going to name her the
10   corporal because he couldn't do without her anyway,
11   so I think he was giving the sergeant leverage with
12   her.
13        Q.  So he was removing her to give the sergeant
14   leverage with her?
15        A.  (Nodding.)  To name her corporal.
16                 THE WITNESS:  Did he name you
17           corporal?
18   BY MR. BERNARD:
19        Q.  No, you can't -- you can't ask her any
20   questions.
21        A.  Oh, I'm sorry.
22        Q.  So it's your testimony that Major Brown,
23   via this letter, removed -- wanted Rhea Davis
24   removed from the position --
25        A.  Yes, sir.
```

Lawrence Navarre
January 30, 2017

77

1      Q.   -- so that Mr. Brooks could appoint her to
2  the position that he wanted her removed from?
3      A.   That's what it seems like.
4           MR. BERNARD:   Okay.   No further
5      questions.
6                    RE-EXAMINATION
7  BY MR. FOWLER:
8      Q.   I'll stay on this topic, Mr. Navarre.
9           Was it the custom in the office for the
10 sergeant of the jail to select the corporal?
11     A.   Yes, sir.
12     Q.   Was Terrica Williams allowed to select her
13 corporal?
14     A.   I'm trying to think.   There have been
15 corporals that was not selected by their sergeant.
16 It is the policy, but it depends on how well that
17 office is functioning.
18     Q.   Okay.   But it's -- what is the policy?   Is
19 the policy that the -- whoever is the jail sergeant
20 gets to decide who the corporal will be?
21     A.   Well, it's not in writing, now.   That's
22 just --
23     Q.   I understand.
24     A.   Yeah.
25     Q.   The custom.

Lawrence Navarre
January 30, 2017

78

```
1      A.   Yeah.
2      Q.   I'll use the word "custom."
3      A.   The custom.  Yeah.
4      Q.   The custom --
5      A.   That is the custom.
6      Q.   -- in the office --
7      A.   Yeah.
8      Q.   -- was that whoever was the jail sergeant
9  was allowed to select their own corporal.
10     A.   Yes, sir.
11     Q.   Okay.  In reading this memo --
12     A.   Uh-huh.
13     Q.   -- is this something that would fulfill
14 that custom?
15     A.   Yeah.
16     Q.   All right.  I'm going to go back to
17 something that you testified to when Mr. Bernard was
18 asking you -- you said, it's possible, regarding
19 gender discrimination, it's possible.
20          I want to ask you again, did Major Brown
21 ever specifically provide you, orally or in writing,
22 that part of the decision not to promote Ms. Davis
23 in either instance was related to her gender?
24     A.   No, nothing in writing.
25     Q.   Did Captain Lawton -- nothing in writing?
```

Lawrence Navarre
January 30, 2017

79

```
1   What about verbally?  Did he ever say anything to
2   you verbally that --
3        A.  Not to me.
4        Q.  Okay.  Did Captain Lawton ever say anything
5   to you verbally that part of his decision not to
6   promote Rhea Davis was related to her gender?
7        A.  We discussed that.
8        Q.  What did Captain Lawton say?
9        A.  He would much prefer a male being in the
10  jail.
11       Q.  And when was this conversation?
12       A.  It was prior to selecting a sergeant.  It
13  was prior to, but it was -- you know, it wasn't in
14  no official capacity.  It was a talk -- general
15  conversation.  We'd usually come in the office and
16  we would have general conversations, you know.
17       Q.  Sure.  Was anything related to this in
18  writing?
19       A.  No, sir.
20       Q.  This was strictly a verbal conversation
21  between --
22       A.  General conversation --
23       Q.  -- you and Captain Lawton?
24       A.  -- between me and him.
25       Q.  Okay.  Were you familiar -- and I'm going
```

Lawrence Navarre
January 30, 2017

80

1   to go to the judicial enforcement issue.

2       A.  Yes, sir.

3       Q.  Were you familiar with Anthony Haynes' work

4   experience at the time he was selected, outside of

5   the constable's office?

6       A.  No.  Well, during the interview process,

7   you know, we interview the applicants, and we look

8   at their -- you know, their employment record and

9   stuff like that.

10      Q.  Sure.

11      A.  And his experience was working with the

12  public and -- like I said, I'm not sure what kind of

13  halfway houses that he worked at, but it had to do

14  with help people, something about their health

15  problems and...

16      Q.  Were you aware that at the time that

17  Anthony Haynes' law enforcement history -- not in

18  the office, but in terms of his law enforcement

19  background, that he had more experience than Rhea

20  Davis?

21      A.  No, sir.

22              MR. BERNARD:  Objection to form.

23      A.  No, I didn't know.

24  BY MR. FOWLER:

25      Q.  You didn't know?

Lawrence Navarre
January 30, 2017

81

```
 1       A.   That he had more --
 2       Q.   That he had more --
 3       A.   -- law enforcement --
 4       Q.   Yeah.
 5       A.   -- experience than Rhea Davis?
 6       Q.   Did you have an opportunity to review his
 7  application or his resume before interviewing him
 8  for the judicial enforcement position?
 9       A.   No.  We just went on -- we got the letters
10  and we -- basically, we talked about it, and we
11  talked about their qualifications.  Nothing was
12  produced, and I didn't see anything on Rhea Davis as
13  far as in writing, but I knew of her
14  qualifications --
15       Q.   Okay.  And --
16       A.   -- just as well as I knew that he came --
17       Q.   Are you --
18       A.   -- from the public sector.
19       Q.   Is it your testimony that you didn't know
20  the entire scope of Anthony Haynes' qualifications?
21       A.   Right.  Unless he had something that was
22  not put before me.
23       Q.   Okay.  What was put before you, if you
24  remember?
25       A.   Well, what I saw when he -- you know, like
```

Baton Rouge Court Reporters, LLC
225-292-8686

Lawrence Navarre
January 30, 2017

82

```
 1    I said, his outside work, and I knew that he did a
 2    little security work somewhere else.  Now, being a
 3    law enforcement officer, I didn't know he was a
 4    police officer.
 5         Q.  Okay.  Did you know he had been a police
 6    officer for at least eight years before coming to
 7    the constable's office?
 8         A.  No, sir.  And a lot of times, now, people
 9    don't tell you the whole scope because it depends on
10    where they left --
11         Q.  Sure.
12         A.  -- if they left in good terms or bad terms.
13    You only say what you want people to know, you know,
14    so I really --
15         Q.  Sure.  In addition to that, as a law
16    enforcement officer, did you know that he worked for
17    four years as a probation officer?  Did you know
18    that at the time?
19         A.  Yeah.  Yeah.  I knew that he worked as a
20    probation officer.
21         Q.  Okay.  But you -- okay.  Did you know that
22    he had worked for the police department at Southern
23    University?
24         A.  No, sir.  Didn't know that.
25         Q.  Did you know that he had worked for the
```

Lawrence Navarre
January 30, 2017

83

```
1    police department at the department of public safety
2    at the state?
3         A.   No, sir.  He worked all those places?
4         Q.   Uh-huh.  All right.
5         A.   And all those was on his application?
6         Q.   I don't know what was on his application
7    that was provided to you at the time.
8         A.   Oh, okay.
9         Q.   I wouldn't have that because --
10        A.   Right.
11        Q.   -- it was not a formal civil service
12   hiring.  It was something internal.  I was just
13   asking if you knew about that.
14        A.   No.  Uh-uh.
15        Q.   Do you feel like in your own separation
16   that the constable's office treated you unfairly?
17        A.   I worked at the pleasure of the constable.
18   I felt that I was treated -- not really unfair.  I
19   mean, I don't think that I was afforded my civil
20   rights and my -- you know, my human rights and my
21   appeal process, you know, to, you know -- but
22   outside of that, I --
23        Q.   Are you referring to the grievance that you
24   filed?
25        A.   Yeah.  You know, and, you know, I have
```

Lawrence Navarre
January 30, 2017

84

```
 1   no -- you know, I'm content.  I'm happy.
 2        Q.  In order for you to be treated fairly, I
 3   guess what -- what I'm hearing from you is -- is
 4   this correct -- that you weren't treated fairly
 5   because you didn't get a chance to -- for your
 6   grievance process to go to its conclusion?
 7        A.  Well, not only that; my retirement.  I
 8   had -- I was on a three-year drop.  I lost over
 9   $100,000, you know, in that process.  And then I --
10   three-year salary at $90,000 a year, you know.  But,
11   you know, I mean, I'm not mad.  God blessed me.  You
12   know, I mean, I got my health, got my life.  You
13   know, not holding no grudge.
14        Q.  Let me back up.  You -- when Travis Brooks
15   was hired, he had applied for the jail sergeant
16   position before; is that right?
17        A.  Yeah, he did.
18        Q.  And you referenced his reserve deputy
19   record --
20        A.  Uh-huh.
21        Q.  -- in testimony with Mr. Bernard's
22   questioning.  Would you consider that, his record as
23   a reserve deputy, to be exemplary?
24        A.  Yeah.  Yeah.  He's a good -- I mean, he's a
25   good officer.
```

Lawrence Navarre
January 30, 2017

85

```
 1        Q.   How many females were promoted to sergeant,
 2   that you were aware of, under Major Brown's
 3   leadership at the constable's office?
 4        A.   Kim Davis was promoted to sergeant way
 5   ahead of her time.  We went out the way to promote
 6   her.
 7        Q.   Why was the reason at that time, if it was
 8   ahead of her time?
 9        A.   Because I guess he wanted to say he had
10   promoted the first female sergeant, I guess.
11        Q.   Okay.  She was the first female sergeant?
12        A.   Yeah.
13        Q.   There were no female sergeants before --
14        A.   Oh, no.
15        Q.   -- he became the constable?
16        A.   Uh-uh.
17        Q.   Okay.  What other individual -- how many
18   females were promoted to sergeant in his tenure?
19        A.   The other one, Terrica; and I think that's
20   it.
21        Q.   Anyone else?
22        A.   That's it.
23        Q.   What about C.C.?
24        A.   That's right, but she was administrative.
25        Q.   Sure.
```

Lawrence Navarre
January 30, 2017

```
 1        A.  You know, she --
 2        Q.  But a sergeant is a promotion?
 3        A.  Yeah, sergeant was a promotion.  But she
 4   was strictly administrative.
 5        Q.  Okay.  Any other female promoted to
 6   sergeant other than Kim Davis, Terrica Williams, and
 7   C.C.?
 8        A.  That's it.
 9             MR. FOWLER:  Okay.  I have nothing
10        further.  Any followup?
11             MR. BERNARD:  Yeah.
12                 RE-EXAMINATION
13   BY MR. BERNARD:
14        Q.  Why did you make the distinction that
15   Sergeant Crump was administrative?  What's...
16        A.  Because we made -- we had to make a
17   administrative position to get her promoted to
18   sergeant.
19        Q.  You had to make a position for her?
20        A.  Yeah.  It was a created position.
21        Q.  Created position for her.  Okay.  What's
22   the difference between an administrative position as
23   opposed to a position in the jail?
24        A.  Her administrative position was -- she was
25   over all our legal paperwork with garnishments,
```

Lawrence Navarre
January 30, 2017

87

```
1   finance, and pretty much all the administrative
2   matters that came through the office.
3       Q.  And why did you have to create a position
4   for her?
5       A.  Because we didn't have it.  And because she
6   was a great assets, and she -- you know, she was
7   well versed in knowledge in that area.  She did a
8   hell of a lot for our garnish department.
9       Q.  And why was it necessary to create a
10  position for her?
11      A.  Well, we had a young lady that had done
12  some things in that office and had ripped us off,
13  and we -- I think she got arrested, and I think we
14  had to pay money back and what have you.  So we
15  needed somebody there with experience and to oversee
16  that office.
17      Q.  Okay.  She couldn't have overseen the
18  office without the promotion?
19      A.  No.  No, she couldn't have.
20      Q.  You made mention of the fact that you-guys
21  went out of your way to promote the first female
22  person to the sergeant position.  I think you
23  testified that --
24      A.  Well, there were males that were, you know,
25  way ahead of her that should have got promoted, but
```

Lawrence Navarre
January 30, 2017

88

```
 1    everybody -- you know, we wanted to have a female,
 2    and we allowed it to happen.
 3         Q.  And why was that?
 4         A.  I guess he just felt it was time to get a
 5    female promoted.  You know -- Kim Green, that was
 6    her name.  Kim Green.
 7         Q.  So it's your testimony that other males
 8    were more qualified than Kim Green was?
 9         A.  Male?  Yeah, at the time.  She had been
10    there a long time, now.  She -- but there were males
11    that were better qualified that could have gotten
12    the job.
13         Q.  Okay.  There was one question...
14              MR. BERNARD:  Hold on one second.  Let
15         me step out with Rhea.
16              MR. FOWLER:  Okay.
17              (Brief recess taken.)
18    BY MR. BERNARD:
19         Q.  Just one more question about the
20    February 4th letter.
21              Mr. Fowler asked you whether or not it was
22    customary for a sergeant to select his corporal -- a
23    jail sergeant to select the corporal that would be
24    assisting him.  And I believe you testified that,
25    yes, it is customary.  Is that accurate?
```

Lawrence Navarre
January 30, 2017

1      A.   It's customary but not all incidents.

2      Q.   Uh-huh.

3      A.   We've had incidents where, you know, a

4  sergeant didn't name his own corporal.

5      Q.   Okay.  Now -- and I believe you did testify

6  that even though it may be -- I'll say a preferred

7  custom, but it's not always -- that custom has not

8  always been followed; is that accurate?

9      A.   Right.  That's correct.

10     Q.   Now, is it customary for a letter to be

11  circulated -- have you ever seen a letter circulated

12  like this declaring that the corporal position would

13  be vacated so that the sergeant can select his own

14  corporal?

15     A.   Yeah.  It's been done before.

16     Q.   This type of letter?

17     A.   Yeah.

18          MR. BERNARD:  Okay.  All right.  No

19      further questions.

20          MR. FOWLER:  All right.  I don't have

21      anything further.

22          I want to note for the record that

23      when we're -- we've been referring to C.C.

24      For the court reporter, we're talking about

25      Sergeant Antonia Coleman-Crump.

Lawrence Navarre
January 30, 2017

90

```
 1              THE WITNESS:  Yeah.
 2              MR. FOWLER:  Right?
 3              THE WITNESS:  Yes, sir.
 4              MR. FOWLER:  And I want to also, for
 5       the record -- no objection to Plaintiff's
 6       Exhibit 2 and no objection to Plaintiff's
 7       Exhibit 1 to the extent that it reflects
 8       recollections of Mr. Navarre's personal
 9       knowledge.
10              And I'll reserve my objections at
11       trial for all other content of that.
12              MR. BERNARD:  Did we place this in the
13       record, as well?
14              MR. FOWLER:  As P-2.
15              MR. BERNARD:  P-2?
16              MR. FOWLER:  Yeah, the 4 -- the --
17              MR. BERNARD:  Right.  Okay.  Good.
18              COURT REPORTER:  And did you need a
19       copy, Mr. Bernard?
20              MR. BERNARD:  Yes.
21
22       (Deposition concluded at 11:36 a.m.)
23
24
25
```

Lawrence Navarre
January 30, 2017

```
                    REPORTER'S CERTIFICATE
 1
 2       I, GAYLE J. KEES, Certified Court Reporter in
     and for the State of Louisiana, Registered
 3   Professional Reporter, and as the officer before
     whom this testimony was taken, do hereby certify
 4   that LAWRENCE NAVARRE, after having been duly sworn
     by me upon authority of R.S. 37:2554, did testify
 5   as set forth in the foregoing 90 pages.
         I further certify that said testimony was
 6   reported by me in the Stenotype reporting method,
     was prepared and transcribed by me or under my
 7   direction and supervision, and is a true and
     correct transcript to the best of my ability and
 8   understanding.
         I further certify that the transcript has been
 9   prepared in compliance with transcript format
     guidelines required by statute or by rules of the
10   board and that I have been informed about the
     complete arrangement, financial or otherwise, with
11   the person or entity making arrangements for
     deposition services.
12       I further certify that I have acted in
     compliance with the prohibition on contractual
13   relationships, as defined by Louisiana Code of
     Civil Procedure Article 1434, and in rules and
14   advisory opinions of the board.
         I further certify that I am not an attorney or
15   counsel for any of the parties, that I am neither
     related to nor employed by any attorney or counsel
16   connected with this action, and that I have no
     financial interest in the outcome of this matter.
17       This certificate is valid only for this
     transcript accompanied by my original signature and
18   original raised seal on this page.
19       Baton Rouge, Louisiana, this 10th day of
     February, 2017.
20
21
22
23
24   _____
     GAYLE J. KEES, CCR, RPR
25   CCR NO. 2015002, RPR NO. 60581
```

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF LOUISIANA

**RHEA DAVIS**                          **CIVIL ACTION NO.16-297-BAJ-RLB**

**VERSUS**

**BATON ROUGE CITY CONSTABLE'S
OFFICE**

### NOTICE OF DEPOSITION

TO:    Larry Navarre
       5645 Howell Park Ave.
       Baton Rouge, LA 70805

**PLEASE TAKE NOTICE** that the defendant, the Baton Rouge City Constable's Office

City of Baton Rouge/Parish of East Baton Rouge, through undersigned counsel will take the

deposition of **LARRY NAVARRE** at 9:30 a.m. on the 30th day of January, 2017, before a court

reporter at the Office of the Parish Attorney, 222 Saint Louis Street, 9th Floor, Baton Rouge,

Louisiana pursuant to the Louisiana Code of Civil Procedure at which time and place you are

notified to appear and take part as you may deem advisable as the law allows.

                              **BY ATTORNEYS:**

                              **LEA ANNE BATSON**
                              **Parish Attorney**

                              **/s/ Marston Fowler**
                              **Marston Fowler T.A. (29719)**
                              **Dawn N. Guillot (19922)**
                              **Office of the Parish Attorney**
                              **PO Box 1471**
                              **Baton Rouge, LA   70821**
                              **(225) 389-3114 - Telephone**
                              **(225) 389-5554 - Facsimile**
                              **Mfowler@brgov.com**
                              **Dguillot@brgov.com**

EXHIBIT
1

# **C E R T I F I C A T E**

I hereby certify that a copy of the foregoing has this day been mailed by first class mail service, postage prepaid, or by electronic mail to all opposing counsel of record.

Baton Rouge, Louisiana, this 24th day of January 2017.

**/s/ Marston Fowler**
Marston Fowler

cc:     Baton Rouge Court Reporters of Louisiana
        brcr@batonrougecourtreporters.com



**Office of the City Constable**

Post Office Box 1471
Baton Rouge, Louisiana 70821

(225) 389-3004
Fax (225) 389-3029

**Major Reginald R. Brown, Sr.**
City Constable

To:     Jail Division

From:  Chief Deputy L. Navarre

Date:  June 19, 2013

Re:     Shift Change

Effective Monday, June 24, 2013, the Jail Supervisor's shifts will be as follows:

Sergeant Terrica Williams      0600 hrs. – 1400 hrs.
Corporal Rhea Davis             0800 hrs. – 1700 hrs. (Includes 1 hour lunch)

Thanks for your continued cooperation.

*"Service Above and Beyond"*

R. DAVIS 001
GKB & ASSOCIATES





**Office of the City Constable**

Post Office Box 1471
Baton Rouge, Louisiana 70821

(225) 389-3004
Fax (225) 389-3029

Major Reginald R. Brown, Sr.
City Constable

To:     Corporal Rhea Davis

From:   Chief Deputy L. Navarre

Date:   July 10, 2013

Re:     Light Duty Assignment

*Note, that, I chief Navarre have rescind This Letter until further notice to Review other options from Sgt Williams Letter from June 20 2013*

Effective Wednesday, July 10, 2013, you are temporarily assigned to Sgt. Coleman-Crump. You will be trained on the duties to assist the staff in the Office. Sgt. Coleman-Crump will be your Supervisor for the transition period.

Also, note that you have indicated that you would like to voluntarily step down from your assigned Corporal position. Sgt. Williams will address a replacement for those duties, effective July 10, 2013.

Sincerely,

*Lauren Navarre*

Chief Deputy L. Navarre

*Notes that Sgt within Jail Staff will be interview by me and Captain Lawton alone with Constable Brown next week. Rhose feel free to Address me chief Navarre regarding Rescind Letter.*

Cc:     Sgt. Terrica Williams
        Sgt. Coleman-Crump
        Lieutenant Thomas Wagner
        Captain John Lawton
        Constable Reginald R. Brown

*"Service Above and Beyond"*

R. DAVIS 003
GKB & ASSOCIATES



EXHIBIT
3

To: Chief Deputy L. Navarre

From: Sgt. T. Williams

Date: July 11, 2013

Re: Control Room 8a-5p shift

In response to your memo dated July 10, 2013. I received an updated memo from you advising that the letter was rescinded until further notice to review other options from Sgt. Williams's letter dated June 20, 2013. In speaking with Captain Lawton he suggested that maybe all supervisors could assist with the 8a-5p shift. I would like to be allowed the opportunity to work this in the jail. If that is not an option we can consider assigning it to supervisors. See attached schedule. Thanks for your consideration in this matter.

Sgt. T. Williams

Cc:   Major Reginald Brown

R. DAVIS 004
GKB & ASSOCIATES





**LOUISIANA COMMISSION ON HUMAN RIGHTS**

P. O. Box 94094
Baton Rouge, LA 70809
Office: (225) 342-6969
Fax (225) 342-2063



RECEIVED
JAN 2 6 2015
PARISH ATTORNEY

Rhea Davis
6630 Poinsettia Drive
Baton Rouge, LA 70812                                    Complainant

and

Charge Number: 27A-2014-00013

Baton Rouge City Constable
233 St. Louis Street
Baton Rouge, LA 70802                                    Respondent

## DETERMINATION

Under the authority vested in me by the Commission, I issue the following determination as to the merits of the subject filed under LSA-R.S. 23:301 et seq., as amended (Louisiana Employment Discrimination Law – LEDL) and Title VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, et seq. Timeliness and all other requirements for coverage have been met. Complainant alleged that she was discriminated against in violation of the LEDL and Title VII, in that she was denied a promotion for the Jail Sergeant position based on her sex (female).

Examination of evidence indicates the Complainant began her employment on January 19, 2010 as a Deputy and was later promoted to Corporal and Jail Supervisor. She alleges that in January 2014, she interviewed for the Jail Sergeant position and was denied the promotion. The Complainant states the Respondent instead hired Travis Brooks (male) whom the Complainant alleges she is more qualified.

In addition, the Complainant alleges that she subsequently applied for and was denied a position in the Judicial Enforcement Division. The Complainant alleges that Deputy Anthony Haynes (male) was hired for the position although Deputy Haynes did not have the experience or qualifications that she did.



EXHIBIT

P-1

Respondent contends that the Complainant was not offered the position of Jail Sergeant because the Constable determined Travis Brooks was more qualified. Additionally, the Respondent asserts that the position in the Judicial Enforcement Division is not a promotion and offers no pay incentives. Respondent states that this position is a transfer. Respondent further asserts that Deputy Haynes had previous experience in a law enforcement position in judicial process and the Complainant had none.

Sufficient evidence supports the fact that the failure to hire the Complainant in the deputy constable position in the Judicial Enforcement Division constitutes a tangible employment action. During witness interviews, Major Reginald Brown stated that his decision to hire Travis Brooks was in part due to Travis Brooks' diverse experience within the Constable office. Travis Brooks' diverse experience was gained due to the Respondent deciding to transfer Brooks from one division to another. Thus, based on the criteria used to make promotion decisions, the evidence shows that the decision to not hire the Complainant for the position in the Judicial Enforcement Position would make her a less qualified applicant for future opportunities.

Additionally, sufficient evidence exists that brings into question the veracity of the Respondent's explanation of its decision to not hire the Complainant for the deputy constable position in the Judicial Enforcement Division. During witness interviews, inconsistent testimony was given by three separate hiring officials as to why the Complainant was not hired for the position. Major Reginald Brown stated that Deputy Haynes' "street experience" was the determining factor. Captain John Lawton stated that it was best for the office keep the Complainant in the Jail Division because she was a "tremendous asset to the position", and he did not want to "cripple the [Jail] Division" by hiring a new corporal after recently hiring a sergeant with little Jail Division experience. Captain Lawton further stated that the experience between Haynes and the Complainant was not considered in making the decision. Chief Larry Navarre stated that the Complainant was not hired because the Constable "probably did not want to put a female in that position" because it "requires the employees to serve papers in certain neighborhoods and those areas are dangerous."

Furthermore, a genuine issue of fact exists as to the truth of the Respondent's explanation regarding the selection of Travis Brooks as Jail Sergeant over the Complainant. Many of the witnesses stated that the Complainant was the more qualified candidate. Very few witnesses state that Travis Brooks was more qualified. Additionally, Respondent's decision to not hire the Complainant in the Judicial Enforcement Division based on sex less than two months after being denied the Jail Sergeant position creates an inference that sex was a motivating factor in the selection of Jail Sergeant. Also, statements by hiring officials during witness testimony shows that applicants' sex was used as a determining factor for the Jail Sergeant position in the past.

Based on the analysis, I have determined that the evidence obtained during the investigation indicates that the Respondent improperly used sex as a motivating factor to deny the

Complainant a promotion. Additionally, the Respondent used sex as a determining factor to deny the Complainant a subsequent position for which she interviewed.

Upon finding that there is reason to believe that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practice by informal methods of conciliation.

Therefore, the Commission invites the parties to join with it in reaching a just resolution of this matter. The confidentiality provision of Title VII and the Commission regulations apply to information obtained during conciliation. If the Respondent declines to discuss settlement, or when, for any reasons, a settlement acceptable to the LCHR's Executive Director is not obtained, the Executive Director will inform the parties and advise them of the court enforcement alternatives available to the aggrieved person and the Commission.

Failure to contact the Commission within fourteen (14) business days of receipt of this letter of determination will indicate an unwillingness to engage in conciliation.

You are reminded that Federal and State laws prohibit retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in Commission investigations is also prohibited. The provisions apply regardless of the Commission's determination on the merits of the Charge.

On behalf of the Commission:

1/15/2015

Date

Loyce Pierce Wright
Executive Director

Enclosures:

Copy of the Charge of Discrimination
Proposed Conciliation Agreement



# Office of the City Constable

Post Office Box 1471
Baton Rouge, Louisiana 70821

(225)
Fax (225

**Reginald R. Brown, Sr.**
City Constable

February 4, 2014

To:     All Employees
        B.R. City Constable's Office

From:   Reginald R. Brown, Sr.
        B.R. City Constable

Re:     Promotion- Sgt. Travis Brooks

Effective February 10, 2014, Cpl. Travis Brooks will be promoted to Sergeant and assigned as the supervisor of the Baton Rouge City Jail. Lt. Thomas Wagner will assist and oversee Sgt. Brooks during his transition period to his new assignment.

Furthermore, the Corporal position in the City Jail will be vacated until Sgt. Brooks completes his transition and makes the assignment.

There will be an opening in Court Security due to Sgt. Brooks' promotion. Any deputy that has an interest in this position should submit a written request directed to the attention of Lt. Vernon Scott.

CC:     All Employees
        Chief Navarre
        Capt. Lawton
        Lt. Scott
        Lt. Wagner
        Personnel File



EXHIBIT
P-2