Rhea Franklin Davis
January 10, 2017

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

RHEA DAVIS

CIVIL ACTION NO.

VERSUS

16-297-BAJ-RLB

BATON ROUGE CITY
CONSTABLE'S OFFICE

* * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE DEPOSITION OF:
RHEA FRANKLIN DAVIS,
TAKEN ON BEHALF OF DEFENDANT, REPORTED IN THE ABOVE
ENTITLED AND NUMBERED CAUSE BY BRITTANY E. VIDRINE,
CERTIFIED COURT REPORTER FOR THE STATE OF
LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * *

REPORTED AT THE LAW OFFICES OF:
G. KARL BERNARD AND ASSOCIATES
1615 POYDRAS STREET
NEW ORLEANS, LA  70112

COMMENCING AT 10:30 A.M. ON JANUARY 10TH, 2017.

**Page 2**

APPEARANCES
FOR THE PLAINTIFF:
    G. KARL BERNARD AND ASSOCIATES
    (BY: G. KARL BERNARD, ESQ.)
    1615 POYDRAS STREET
    NEW ORLEANS, LA  70112

FOR THE DEFENDANT:
    OFFICE OF THE PARISH ATTORNEY
    (BY: MARSTON FOWLER, ESQ.)
    222 ST. LOUIS STREET, SUITE 902
    BATON ROUGE, LA  70802

ALSO PRESENT:
    DONTRELL DAVIS

**Page 3**

INDEX
                                              PAGE
STIPULATION..................................4
EXAMINATION BY:
 MR. FOWLER..................................5
CERTIFICATE.................................69
WITNESS CERTIFICATE........................70

LIST OF EXHIBITS
                                              PAGE
EXHIBIT NO. D-1.............................15
 (Notice of Deposition)
EXHIBIT NO. D-2.............................15
 (Charge of Discrimination)
EXHIBIT NO. D-3.............................15
 (Charge of Discrimination)
EXHIBIT NO. D-4.............................15
 (Petition for Damages)
EXHIBIT NO. D-5.............................33
 (Memos)

**Page 4**

STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes allowed under the Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically reserved;

That the formalities of filing, sealing, and certification are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * *

1 (Pages 1 to 4)

Baton Rouge Court Reporters
225-292-8686


EXHIBIT C

Page 5

        RHEA FRANKLIN DAVIS,
having been first duly sworn, was examined
and testified as follows:
        EXAMINATION
BY MR. FOWLER:
    Q. Thank you, Ms. Davis. My name is Marston
Fowler. I'm a lawyer. I work for the Parish
Attorney's Office, and my job is to represent the
City when the City is sued by an individual in
employment discrimination matters. I handle most
of those cases.
    I'm sure that your attorney has told you
generally what a deposition is. It's an
opportunity for the other party in the lawsuit to
ask you questions about your position and about
what your take on everything was. I'm going to ask
you questions about your case. I'm also going to
ask you some personal questions as background. I
don't mean any disrespect at all.
    And let me know if you don't understand
what I'm asking, because I do tend to talk fast.
So, you know, please -- and if you need to take a
break, you can take a break at any time.
        MR. FOWLER: Usual stipulations,
Karl?

Page 6

        MR. BERNARD: Usual stipulations.
BY MR. FOWLER:
    Q. Give me your full name.
    A. Rhea Franklin Davis.
    Q. And is this the name you've used since
birth? Or have you -- do you have a married name?
    A. Rhea -- Trellice is my middle name. Rhea
Trellice Franklin, that's my maiden name. And then
once I got married, I dropped -- I go by Rhea
Franklin Davis. That's the full name.
    Q. What's your current address?
    A. 7143 Rue Dauphine, Addis, Louisiana,
70710.
    Q. And your date of birth?
    A. December 28th, 1982.
    Q. Happy birthday. That's was recent.
    A. Thank you. It was.
    Q. And your Social?
    A. 438 --
        MR. BERNARD: Well -- just to censor
that from the public record, the Social
Security number.
        MR. FOWLER: You want to redact it?
        MR. BERNARD: Yeah.
        MR. FOWLER: Okay. That's fine.

Page 7

You can do that?
        COURT REPORTER: Yes.
        MR. BERNARD: And I'm sure you-guys
have that information anyway.
        MR. FOWLER: We probably do, but I
don't have it. And I don't know that I
need it, but I always ask it as a matter
of practice. In fact, if you'd like, it
doesn't even need to be -- it can be off
the record. You can just tell me later.
BY MR. FOWLER:
    Q. That just prevents me from having to go
back if it's something I need -- from calling Karl.
    A. Sure.
    Q. And for the record, you're a female,
right?
    A. Yes, I am.
    Q. Okay. An obvious question. Sorry. All
right. What is your highest level of educational
attainment?
    A. Bachelor's.
    Q. Okay. And where did you get that from
and what is it in?
    A. LSU here in Baton Rouge, 2004, and that
was in criminology.

Page 8

    Q. Criminology, okay.
    A. Yes.
    Q. And did you -- have you been working
since that time?
    A. Yes, I have.
    Q. And when did you -- where did you start
working --
    A. My first --
    Q. -- after school? Yeah.
    A. My first job after school was with
Wackenhut Security Company.
    Q. And was that the job that you had
immediately before being hired by the constable's
office?
    A. No, sir.
    Q. Okay. Can you give me an idea of where
you were before you got led to the constable's
office?
    A. My job prior to the constable's office
was Louisiana -- LSU P.D.
    Q. Okay. Wackenhut and then what was after
Wackenhut?
    A. After Wackenhut was LSU P.D., and then
there was a break, returned to LSU P.D. and then to
the constable's office.

Page 9

Q. And I have as a hire date, January 19th, 2010. Does that sound right?
A. Yes.
Q. No work for the City before you went to work for the constable?
A. That's right.
Q. And what was the reason that you left LSU each time?
A. The first time, I relocated; that was in 2008. I returned in 2009. And my second stint, I left to go to the constable.
Q. Okay. You relocated out of Baton Rouge?
A. Out of Louisiana.
Q. Out of Louisiana, okay. And when you worked for LSU P.D. -- and the reason I'm asking you this is because your claim is -- part of your claim is about that you weren't promoted, right? So I'm trying to get an idea of your experience. When you worked for Wackenhut Security, what job did you have?
A. Just a security guard at Blue Cross Blue Shield.
Q. And LSU P.D.?
A. LSU P.D., I was a Police Officer II.
Q. Each time?

Page 10

A. The first time I was a PO II. Then at the time that I left, I was a PO III, and upon return, I started at a PO II again.
Q. And were you a PO II when you left there to go to the constable's office?
A. Correct.
Q. When you worked in -- in your break between 2008 and 2009, did you work in law enforcement?
A. Yeah -- well, no. When I was out of state?
Q. Yeah.
A. That year, I was a child welfare -- I was a child welfare investigator --
Q. Oh, okay.
A. -- for the department in Alabama.
Q. Got you. When the constable hired you, what was your job title?
A. Deputy Constable.
Q. And where were you originally assigned?
A. The jail.
Q. And how long did you work in the jail?
A. Until I left. My entire time.
Q. What was your job title when you left?
A. Corporal.

Page 11

Q. Is that different from a Deputy Constable? I should know the answer to that, but I --
A. It is --
Q. -- want to confirm.
A. It is different.
Q. It's a promotion?
A. Yes. It's not recognized as a promotion as such as far as City-Parish. You don't have to test in for it, but it's an in-house promotion, yes.
Q. So you started working in the jail as a Deputy Constable, and then your official title at the time of your departure from employment was a Deputy Constable, right?
A. I'm not sure.
Q. I mean like HR title.
A. Yeah. I'm not sure how it reads on HR paperwork. I'm not sure.
Q. Well, let me ask you this: Did you receive any payment increase over that period of time other than your merit increase annually?
A. I received a car, a vehicle, once I made corporal and also -- it's a change in uniform to be identified as a supervisor. You get stripes.

Page 12

Q. You get a bar and a car?
A. Yeah, yeah. It's a big deal.
Q. Yeah, yeah, it is. Do you remember when that happened?
A. That was two years in. It had to be 2012.
Q. Early 2012?
A. I don't recall the month.
Q. Okay. That's fine. And when you were a corporal, you were still working in the jail?
A. Correct.
Q. And is the corporal -- as I understand it, there's a jail sergeant?
A. Correct.
Q. There's a deputy, or there's --
A. Corporal.
Q. "Corporal" is the deputy jail sergeant; is that right?
A. If you're going down in rank, after the sergeant is the corporal, and then underneath the corporal are the deputies.
Q. All right. So you were started as a deputy, promoted to corporal?
A. Correct.
Q. And who did the jail -- who was the jail

Page 13

1  sergeant at the time of your hire?
2      A. Sergeant Terrica Williams.
3      Q. And the jail sergeant at the time of your
4  departure was Travis Brooks?
5      A. Correct.
6      Q. Have you ever filed a lawsuit before?
7      A. I have not.
8      Q. Have you ever filed an EEOC complaint or
9  grievance before this -- these series of incidents?
10     A. No.
11     Q. Have you ever filed a grievance in the
12 workplace at any prior job?
13     A. No.
14     Q. And my records indicate that in this
15 particular case you filed two EEOC complaints, one
16 of which -- the basis of one was gender -- or sex
17 discrimination. They call it "sex discrimination."
18     A. Correct.
19     Q. And the other was about retaliation?
20     A. That's right.
21     Q. Did you ever file a formal grievance, if
22 there was the opportunity to do that, when you
23 worked with the constable's office other than your
24 EEOC complaint?
25     A. Yes.

Page 14

1      Q. Can you tell me about that?
2      A. I filed a complaint, and it was sent to
3  Administration regarding my light-duty service when
4  I was pregnant.
5      Q. All right. We will get to that in just a
6  few minutes. Anything else other than that issue?
7      A. No.
8      Q. And what was the date of resignation --
9      A. My date of --
10     Q. -- if you remember?
11     A. January 2nd, 2015.
12     Q. Okay. That's what I have as well. I'm
13 just making sure that my stuff is right. During
14 the time that you -- the entire time that you
15 served at the constable's office, were you ever
16 given a verbal warning?
17     A. No.
18     Q. A written reprimand?
19     A. No.
20     Q. Ever suspended?
21     A. No.
22     Q. Were you ever demoted?
23     A. No.
24     Q. Have you ever had your pay reduced --
25     A. No.

Page 15

1      Q. -- along the way?
2      A. No.
3      Q. Thank you. All right.
4          MR. FOWLER: Karl, I'm going to try
5  to introduce -- I'm going to introduce
6  all of these at once, if it's all the
7  same to you, in globo. I marked them as
8  D-1, D-2, D-3 and D-4. And I'll give
9  them to y'all to make sure D-1 is the
10 Notice of Deposition, D-2 is the first
11 charge of discrimination, D-3 is the
12 second, the retaliation charge, and then
13 the petition. Any objections?
14         MR. BERNARD: No objections.
15         MR. FOWLER: Thank you, Ms. Davis.
16 (D-1, D-2, D-3 and D-4 marked for identification.)
17 BY MR. FOWLER:
18     Q. All right. In the petition, there are a
19 number of allegations of discrimination. And I'm
20 just going to go in order from what you and your
21 attorney prepared for The Court.
22         The first issue was -- that you
23 identified was the schedule change. You mentioned
24 a few moments ago about the light-duty issue. That
25 was in June of 2013. Does that sound right?

Page 16

1      A. That sounds about right.
2      Q. Before June of 2013, did you experience
3  any discrimination in the workplace?
4      A. No.
5      Q. Tell me about, from your perspective,
6  what happened with regard to that. I mean, I know
7  that you became pregnant, and then what happened as
8  it relates to your employment after that?
9      A. Is there something specific regarding --
10     Q. Sure. Like who did -- when -- or like
11 when did you notify them? Why did they put you on
12 light duty?
13     A. Again, the date I'm not certain of.
14 June, I notified them that I was pregnant and that
15 I would be requesting a light-duty status in the
16 coming weeks. And then that was just to put them,
17 you know, on notice that I'd be coming out of
18 uniform.
19     Q. What do you mean, "coming out of
20 uniform"? What does that mean? Explain to me as
21 though I don't know the daily operation, because I
22 don't.
23     A. Sure. As a Deputy Constable, we -- you
24 know, we wear a uniform; we wear a gun belt; we're
25 armed; we deal with inmates; and when you're

Page 17

1  pregnant, you know, you can't wear the gun belt;
2  you know, you can't wear the police uniform.
3      Q. Sure. It's cumbersome; it's heavy?
4      A. Right, right, right. Not to say that you
5  can't do it, but physically it's -- right. So this
6  was my second pregnancy there with the Department,
7  so I just followed the same steps that I had
8  before, informing the --
9      Q. When was your first pregnancy?
10     A. My baby -- I had my baby in March of
11 2012, so I couldn't tell you at what point --
12     Q. No, that's okay. That's all I needed to
13 know. So what I need to know is what happened the
14 first time. You became pregnant in late 2011. How
15 did the Department respond to that? What was the
16 procedure at that time?
17     A. Basically, once I got to the point where
18 I couldn't wear my uniform, I just stayed in the
19 control room.
20     Q. Did they give you like a light-duty memo
21 at that time, or did they just advise you orally?
22     A. I know certainly it was an oral advisory.
23 I can't recall if anything was in writing.
24     Q. And when you're in the control room on
25 light duty, are you in uniform and just not wearing

Page 18

1  the belt?
2      A. No, no.
3      Q. You're in plain clothes?
4      A. Yeah. I wore scrubs. I tried to keep in
5  uniform as much as I could. I would wear the same
6  color, but I wore scrubs.
7      Q. Do you remember how long you were out of
8  uniform and in control -- in light-duty status in
9  your first pregnancy?
10     A. It was months. I worked up until
11 delivery. And from the time that I told them, it
12 was basically my second and third trimester, so six
13 months, roughly.
14     Q. And was this something that your
15 physician advised you to do, or was this something
16 that you felt like needed to happen in light of the
17 issues?
18     A. Yeah. It was something that -- you know,
19 I understood the job duties that, you know, came
20 with my position, and I didn't think that, you
21 know, it would be in my best interest to stay in
22 uniform. So between --
23     Q. Had anybody else -- when you were working
24 there the first time that you got pregnant, had
25 anybody else in the Department been pregnant? Was

Page 19

1  it a procedure that you were familiar with --
2      A. No.
3      Q. -- or was it -- okay.
4      A. This was -- this was uncharted territory
5  for both of us.
6      Q. Were you a corporal at the time of the
7  first pregnancy?
8      A. No, I was not.
9      Q. So the second pregnancy occurs. The --
10 we're back in June of 2013?
11     A. Correct.
12     Q. What steps did you take to notify your
13 employer of your pregnancy?
14     A. The same as before, written memo.
15     Q. And what was their response?
16     A. I didn't get an immediate response, but
17 when I did -- days or weeks -- it was advising me
18 that I was going to be officially on a light-duty
19 assignment, and it came with a schedule change and
20 a change of duties.
21     Q. And the schedule change was from what to
22 what?
23     A. 7:00 to 3:00 -- well, I was rotating
24 prior to this 7:00 to 3:00 some days, 6:00 to 2:00
25 some days, and they changed my schedule, 8:00 to

Page 20

1  5:00.
2      Q. And did this create a problem for your --
3      A. A huge problem.
4      Q. What was the problem?
5      A. Hardship -- personal hardship. You know,
6  my husband works out of town, and the shift that I
7  had before is the shift I had since I started.
8  And, you know, the daycares were selected around
9  such. And just all of my outside lifestyle factors
10 were surrounded around that. Understanding that
11 the job, you know, does come with, you know,
12 essential personnel. You know, you can be called
13 out at certain times, but this was an actual
14 permanent schedule change, day to day.
15     Q. And you said it also came with a change
16 of duties?
17     A. Yeah.
18     Q. What was that?
19     A. They wanted me to work with the
20 secretaries and file paperwork.
21     Q. And were they in the jail division as
22 well?
23     A. No, sir. They're just administrative.
24 They're not even commissioned officers. They're
25 civilian employees. They --

Page 21

Q. I think I know who you're referring to.
A. Uh-huh.
Q. So your understanding was they were going to place you on light duty, which was the same as they had done before —
A. Uh-huh.
Q. Say — you're supposed to say "yeah." I'm sorry.
A. Yes, yes.
Q. I should have told you that sooner. "Yes," for her (indicating).
But change your schedule from 7:30 to 3:00 and 6:00 to 2:00 rotating to 8:00 to 5:00 every day?
A. Correct.
Q. And then move you out of the jail —
A. Correct.
Q. — to go work in Administration —
A. Correct.
Q. — a desk job, essentially?
A. Correct.
Q. And this was not something that you were — I mean, I know that you didn't like the schedule change, but what about the work? Was the work change also troubling to you?

Page 22

A. It was insulting.
Q. And why was it insulting?
A. Again, following the first pregnancy — you know, that was uncharted territory for us, so that is what we kind of used to kind of set precedence at that point. Ran smoothly. No problems. I did my job, did it to perfection. And it was seamless [sic] to have the same exact situation repeat itself. Yet this go-round, my pregnancy condition, the state of my pregnancy, I'm told that I needed a lunch break and that it — you know, it's best for someone in my condition to be —
Q. Okay. All right. When was — this was something that you were not happy with? Did you make — is that correct?
A. Correct.
Q. Did you make any complaints?
A. Yes.
Q. I know I asked you before — okay. What was the result of that?
A. There was a lot of back and forth. A lot of controversy surrounding that. I did — I made it known, my disagreement or displeasure with the change in events verbally and in writing. My

Page 23

sergeant at the time also made complaints as well because she wanted her corporal in the office — in the control room. And, ultimately, after the back and forth, you know, the memos and meetings, they — they retracted. They retracted the memo.
Q. Do you remember the date of that?
A. I do not.
Q. I have in my notes June 20th, 2013. Maybe it was July. Don't answer that. Let me ask you a better question when I have it out. Okay.
    MR. BERNARD: Hey, Marston, can I get a cup of coffee real quick?
    MR. FOWLER: Of course. Do you need anything? We can take a little break.
    THE WITNESS: Oh, yeah. Let's take a break.
    MR. FOWLER: Off the record.
    (Brief recess taken.)
BY MR. FOWLER:
Q. All right. Ms. Davis, I have a couple more questions about the schedule change. And I found some documentation that might help. Take a look at this. This is a memo from Chief Navarre to the jail division about a shift change. Is that what you were referring to?

Page 24

A. Yes, yes.
Q. And this is on June 24th. It was advising you that you were to work 800 to 1700?
A. Yes.
Q. Let me also show you this document (indicating).
A. Do you mind if —
Q. Yeah, yeah, of course, of course. It looks as though this was July 10th. Let me ask you one basic question. Did you receive the schedule change and the shift reassignment at different times?
A. Okay. Say that one more time.
Q. You received a memo telling you your schedule was going to change, and then you received — you also received information that your duties were going to change. Did those occur at the same time or at different times?
A. I don't recall if that was at — on the same memo or not. But, essentially, when they sent out — first informed me that there were any changes that were going to be made, I and my sergeant at the time immediately notified the chain. And I can't recall if it was — well, I know it wasn't Lieutenant Wagner. It was either

6 (Pages 21 to 24)

### Page 25

1  Captain Lawton or Chief Navarre. And we notified
2  them of our displeasure. And Terrica -- well,
3  the -- Sergeant Williams said, "Give me some time
4  and I'll make a proposal." And they didn't -- you
5  know, they weren't on board with that, and it was a
6  lot of back and forth.
7     We had some meetings, and then I remember
8  the very last meeting, which I want to say took
9  place on this day, because when I got this letter,
10 I went to -- I went to the constable himself -- and
11 this part right here (indicating), I want to say he
12 had wrote this the same day. But it looks like --
13 yeah, the constable told him to retract this
14 (indicating) basically.
15    And then we all went into the constable's
16 office and we had a meeting. And when we were in
17 that meeting, the constable, Wagner was on this
18 side (indicating) -- Lieutenant Wagner, Captain
19 John Lawton on the other end and Chief Navarre
20 right here (indicating). And we were sitting in
21 Constable Brown's office. And we were discussing
22 this whole thing and the hardships that it had
23 placed on me. And they were really not, kind of,
24 hearing me. And then I said, "Okay, you know,
25 well, if we can't rectify this, you know, then I'm

### Page 26

1  going to have to go, you know, and talk to HR or
2  file an EEOC complaint," because to me it was just
3  pregnancy discrimination. I wasn't treated that
4  way the last time, and there was no satisfactory
5  answer that they could give me to justify why
6  things were different this go-round, you know?
7     Q. All right. So -- and just for -- let the
8  record reflect I'm showing Ms. Davis two memos from
9  the constable's office. The first is dated
10 June 19th, 2013, with the subject being "shift
11 change," and the second, a memo to Corporal Davis
12 dated July 10th, 2013, a light-duty assignment.
13    A. And there was a lot of correspondences
14 between these two.
15    Q. Right. I'm only using these two for the
16 moment to try to get a timeline.
17    A. Okay, okay.
18    Q. Did you ever actually work 8:00 to 5:00?
19    A. Uh-uh.
20    Q. Did that start, or was it sort of in
21 limbo during this period?
22    A. It started, and I did do some shifts 8:00
23 to 5:00, but they were still in the control room.
24 I never went to -- to Admin.
25    Q. Okay. The July 10th memo seems to

### Page 27

1  indicate that that was when you were reassigned to
2  Sergeant Coleman-Crump?
3     A. Yes. When they gave me a new sergeant.
4     Q. But you never reported to --
5     A. No.
6     Q. -- Sergeant --
7     A. Because once I --
8     Q. Because of this being --
9     A. Once I got this -- this letter, the
10 sergeant and I were completely, you know, in
11 disarray, and we immediately went to the
12 Administration and confronted this. And then the
13 constable said that, you know, well, Chief Navarre
14 had put this out without his notice, so he told
15 Chief to go and retract that and we're going to
16 have a meeting. And I want to say all of that was
17 done in one day, if my memory serves me correctly.
18    Q. If I told you that date appears to be
19 July 10th, is there anything in your memory that
20 contradicts that happening at that time?
21    A. Not that I recall.
22    Q. Okay. The handwriting on this -- on the
23 July 10th memo is Major Brown's, to the best of
24 your knowledge?
25    A. Uh-uh.

### Page 28

1     Q. Okay. Whose is it?
2     A. This is Larry Navarre.
3     Q. In that meeting where you were there with
4  the constable, did he resend that -- order a
5  resending of that during that meeting?
6     A. At that meeting his -- once we talked
7  about how we were going to have to take things
8  further, I told him, "Okay, just give me some
9  time." Because he was saying that, "Well, you can
10 stay in the control room, but we still need you to
11 work 8:00 to 5:00." I mean, they just would not
12 bend any which way. And then I said, "Well, okay,
13 what's the reasoning for having, you know, someone
14 in there from 8:00 to 5:00?" They said, "Well, we
15 need a supervisor to cover control" -- to be in the
16 control room from the time it opens to the time it
17 closes. Okay, that's unprecedented, but this is
18 the rule we're going to go with right now, okay?
19 All right."
20    So when I told him that I didn't want --
21 if it came with that -- if the position now holds
22 at 8:00 to 5:00, I need to think about if I want to
23 take this, if I want to stay as a corporal, or if I
24 just want to be a deputy in there and work my 7:00
25 to 2:00 -- or 6:00 to 2:00, 7:00 to 3:00 and go

Page 29

home.

And he said, "Well, no, no, no, we're not going to do that just yet. I tell you what, we'll give you and Sergeant Terrica some time to come up with a proposal or some idea to where the whole control room can be covered until that 5:00. And y'all will submit it to me, and, if I approve, you know, then go ahead." But it wasn't that easy.

Like I said, I mean, that meeting was almost two hours, and he didn't just give in that easy. I mean, I -- I had to ask -- or really not ask, but threaten to bring in the union rep, because I really did feel like I was, you know, cornered. I'm here with all of the administrators, all of the higher-ups, and, you know, I asked if -- if we can't, you know, come to some type of resolution, then am I entitled to call in my union rep, which at the time was Alvin Jackson; if not, you know, HR. I'll have to go to EEOC, whatever it is that I need to do. And then he said, you know, that's when he made that suggestion about give us some time, let me see what you and Terrica can come up with. And then we -- we did. We came up --

Q. So the handwriting here on the July 10th memo was designed to revoke the typewritten

Page 30

content --

A. Exactly.

Q. -- and was done so, from your memory, on the same day or the next day?

A. Very, very close in time, yes.

Q. All right. The memo also indicates -- it looks like Chief Deputy Navarre wrote, "You," meaning Rhea Davis, "have indicated you would like to voluntarily step down from your assigned corporal position."

A. Yeah. And that was a conversation that -- Chief Navarre called me after business hours on the night before we had our meeting. And he said that -- he was basically telling me more of this, more of just rehashing. "Well, you know, now that, you know -- the supervisor -- well, you being the supervisor and you don't want to go into Administration; so for you to stay in there, you know, as supervisor, we have to have this shift covered. And, you know, most agencies, they don't have to accommodate someone in your -- you know, in your position -- well, 'condition,'" and -- of the pregnancy. And he said, "You know, but we -- this is all you need to do is just to cover it from 8:00 to 5:00."

Page 31

And I said, "Well, Chief, if it has to be all of that, I really have to consider whether I want to continue with that position, because it's now causing me more stress than it's worth." And I said -- you know, we ended that conversation. Because, again, that was after-hours, and it had to have been on the night -- it had to have been on that night, but it was after-hours.

And so the next day, that's when I -- you know, in our meeting with everyone, I informed them of that phone call that Chief Navarre had, you know, told to me. I did not in any way voluntarily step down.

Q. This was a conversation, as I'm understanding you, where you said, if I have to work 8:00 to 5:00, I may decide to be a deputy so I don't have to work 8:00 to 5:00?

A. Yeah. It may have to be -- yeah, exactly.

Q. And what was the specific issue for you personally, without getting into personal details -- but why -- why was 8:00 to 5:00 more problematic for you than the 7:00 to 3:00 or 6:00 to 2:00? And I ask that from the perspective of someone that works 8:00 to 5:00. So, like, I don't

Page 32

really -- I don't know what about that created a hardship.

A. Well, it's a major difference, although you may see a couple of hours difference. But getting off at 2:00 in the afternoon is quite a bit different than 5:00. Getting to the kids' daycare, you know, it was just -- by the time we -- we had a routine down pat, and at the time we were building a family; everything was just already in place. Getting off at 5:00, you know, and then going and picking up the other -- you know, my daughter at the time, I had, she was a baby; I'm pregnant, settling down, by the time we did that, it was 7:00 at night, and it just -- it did not work well with my homelife at all.

Now, if it was -- if it was a sacrifice with the job or something that I had to do, then by all means. But not one of them could give me a satisfactory reason as to why. They just said that --

Q. How did it get covered before?

A. The deputies. The deputies and --

Q. There wasn't a supervisor that was designated to cover the 5:00 shift?

A. No, no. This was a rule they made up.

## Page 33

1    MR. FOWLER: I'll introduce these,
2  Karl, as D-5 —
3    MR. BERNARD: No objection.
4    MR. FOWLER: — together. Thank
5  you, Ms. Davis.
6    (Exhibit No. D-5 marked for identification.)
7  BY MR. FOWLER:
8    Q. All right. The next item in the petition
9  that you filed was the failure to promote. And my
10 understanding is that in your complaint with the
11 EEOC, there were actually two instances. So we'll
12 discuss the first one, which identified you had
13 applied for the jail sergeant position.
14   A. Correct.
15   Q. So my questions will be about the jail
16 sergeant position.
17   A. Okay.
18   Q. And — so I presume that there was an
19 opening?
20   A. Correct.
21   Q. And you applied at HR for this position?
22   A. I did.
23   Q. Okay. And were you selected for an
24 interview?
25   A. Yes.

## Page 34

1    Q. Okay. Do you know who else was
2  interviewed?
3    A. Sergeant Brooks, and I know Deputy
4  Morris' name was on the list; however, they didn't
5  even ask her for an interview. So as far as my
6  knowledge, we were the only three test scores.
7    Q. And let me — I was going to — I need to
8  ask you that. Because that, I don't understand,
9  because there's a different — sometimes there's
10 different exams from HR, from law enforcement.
11 When you said — you wrote, "I took the civil
12 servant sergeant test," is there like a specific
13 law enforcement test that you took at Human
14 Resources?
15   A. Right, right. They were down on Florida.
16   Q. So you took a test at HR that you had to
17 take to be able to interview for this?
18   A. Correct.
19   Q. You were selected for an interview?
20   A. Uh-huh.
21   Q. And you did not receive the offer? It
22 was offered to Travis Brooks, correct?
23   A. Yes.
24   Q. You wrote that, "Mr. Brooks did not have
25 the same experience and qualifications as I did."

## Page 35

1  Can you be specific about what you meant?
2    A. Sure. As reiterating from the
3  commencement of my employment, 2010, I started off
4  in the jail. Most deputies — well, now — and
5  starting at that point, you start off in the jail
6  and you do, you know, a couple of months in the
7  jail, and then they funnel you up to different
8  divisions. But I liked the jail, and I stayed
9  there, and I worked there the entire time. I did
10 my job very, very well. I was promoted in two
11 years. The following year, I was nominated, not
12 only Jail Deputy of the Year, but Deputy of the
13 Year. As far as —
14   Q. What is that? I'm not familiar with
15 that.
16   A. Which one?
17   Q. Deputy — are there two different awards?
18   A. Yes.
19   Q. So you were nominated for both?
20   A. Correct.
21   Q. Deputy of the Year and Jail Deputy of the
22 Year?
23   A. Uh-huh.
24   Q. What is that — who gives this award?
25 It's internal?

## Page 36

1    A. The constable's office.
2    Q. Okay. It's a department — it's not a
3  regional — okay.
4    A. Well, the Deputy of the Year, that's
5  actually by Sunshine Rotary Club or something. And
6  an outstanding representative from all of the first
7  responders, oh, gosh, every agency in Louisiana
8  that you can think of — Wildlife and Fisheries,
9  EMT, firefighters, everyone is selected, you know,
10 that their employer — Officer of the Year.
11   Q. So this is other people nominated for
12 Deputy of the Year? Did not — it's not just a
13 constable's office award?
14   A. No. We just came — I was nominated to
15 represent the constable and there is — there is
16 a —
17   Q. He selected you —
18   A. Correct.
19   Q. — and nominated you to this group?
20   A. Correct. And we were invited there,
21 honored at the banquet. I accepted my award.
22   Q. Did you win the award?
23   A. Well, yeah. I had won — I had won the
24 award. Everyone from each agency wins.
25   Q. Oh, I see what you mean.

Page 37

A. For instance, the Fire Department --
Q. So Chief -- so Constable Brown selected you --
A. An outstanding --
Q. -- to receive an award from this organization as the Deputy of the Year for 2013?
A. Correct. And represent his --
Q. And how is the Jail Deputy of the Year award different?
A. That's in-house. That's -- that year they were starting the first ever -- what was supposed to be an annual constable's banquet. And each division -- he asked each lieutenant to talk to his sergeants and below and nominate a deputy from each division. And that's four different divisions, the jail, judicial enforcement, courtroom security and the D.A.R.E Program, community services.
     And so each division has nominated a deputy to represent that division. And I was nominated for the jail.
Q. By whom?
A. I don't know who nominates it, but the constable does the selection.
Q. And this was something that you won also?

Page 38

A. Yes.
Q. You received the award? You weren't just nominated, but you received the award?
A. I received the award. I was honored at another banquet. There were two separate banquets.
Q. Other than your experience in the jail, your promotion to corporal in 2012 and these two awards, what other things do I need to know about your qualifications? I mean, we covered your education as well. What else -- what do I not have yet?
A. The formal education, the top score on that sergeant's test, the -- and, actually, to me, what I would think is the most important is the hands-on experience. And I worked that position --
Q. Where was Mr. Brooks at the time?
A. He was a bailiff.
Q. So he was in court security?
A. Correct. And I wanted to point out another important point there. A few years prior, in 2012 when I got my promotion, Sergeant Terrica Williams also got her promotion to the sergeant. Sergeant Terrica Williams and Sergeant Travis Brooks also applied for that position. And in her interview, she was asked if Sergeant Brooks gets

Page 39

the position, would you train him. And she's a little bit more brash than myself. She said no.
Q. I know Ms. Williams.
A. Yeah, yeah, yeah. Well, she said absolutely --
     MR. BERNARD: We all know Ms. Williams.
A. -- absolutely not. However, that question wasn't asked in mine, and I don't -- you know?
BY MR. FOWLER:
Q. When she was hired, did you apply at that time for the jail sergeant position?
A. No, because I hadn't even made corporal.
Q. So '13 was the first time?
A. Yes.
Q. I see.
A. Yes. I applied to fill her shoes. And it wasn't a position that initially I wanted. I was actually on maternity leave, and my guys kept calling me. And others can attest to this and the deputies themselves, they called and begged me to apply. You know, please, just, just, you know -- because I -- you know, not to brag, but I did treat all of my guys with respect. I was fair, and I

Page 40

actually cared about that position. I was one of the few that stayed in the jail that long. And so they asked and, you know, I -- after sleeping on it, praying on it, I obliged. And I was like, yeah. I went out for it.
Q. All right. I don't have any other questions on that. The second thing on the failure to promote issue was judicial enforcement?
A. Uh-huh.
Q. Okay. What was this job? What job were you seeking?
A. That's a -- that was a lateral position, and that's --
Q. It's still a deputy constable in a different division?
A. Yes, yes. Well, you know, I wouldn't lose anything. I would just be transferred. I would still be corporal, but those are the ones who do, you know, serving.
Q. So you would have kept your -- you would have kept your corporal bar and the car?
A. Correct.
Q. And the constable's office, you alleged they hired Anthony Haynes?
A. Correct.

10 (Pages 37 to 40)

Page 41

1  Q. It said that, "He did not have the same
2  experience and qualifications as I did."
3  A. Correct.
4  Q. Can you elaborate?
5  A. Sure. Deputy Anthony Haynes, he -- prior
6  to coming to the constable's office, he was a -- a
7  hospice -- I'm not sure what they call them. The
8  hospice minister. And, you know, he came over to
9  the constable's office shortly before this -- this
10 position availability. He came in. I trained him
11 in the jail, and then he also applied for the
12 opening that they had in judicial enforcement.
13     Now, mind you, at this point, I am almost
14 certain that Anthony Haynes had not made his full
15 year yet. I'm almost certain he was at 11 months.
16 Q. Yeah. That's what you wrote, "He had
17 only been employed with the constable's office for
18 11 months."
19 A. And the reason that that is important is
20 because on the previous position that I was
21 overlooked, I had questioned it. And, again, I was
22 still on maternity leave. I had came off of -- you
23 know, came out of maternity leave for the interview
24 or what have you, but I was still out of work,
25 work. And so I didn't find out about the position

Page 42

1  except from a coworker of mine. I was out on...
2  Q. Did you interview for both of these jobs
3  while you were on maternity leave?
4  A. I was back for the second one, yeah.
5  Q. What about Haynes' background that you
6  know made his qualifications and experience below
7  yours?
8  A. Well -- and that's what I was --
9  Q. And, I mean, I know that you're not going
10 to know all this. I'm just asking like what you
11 know personally about his background that -- that
12 formed the basis of that statement.
13 A. Right. And it seems like I'm rehashing
14 it, but I'm answering your question in a roundabout
15 way. When I questioned why I didn't get the first
16 position, although I had more qualifications than
17 Sergeant Brooks, Lieutenant Wagner said it came
18 down to the constable. He made the final decision
19 based on seniority. We -- that's kind of
20 unprecedented as well.
21     So going out for this position, you know,
22 the sergeant of that division -- Sergeant Jimoh
23 said, you know, he wanted me to come over. He was
24 losing his only female deputy in there from
25 retirement, and he wanted me. He told me to apply.

Page 43

1  I went there and when questioned again --
2  Q. Jimoh was the head of judicial
3  enforcement at the time?
4  A. Correct. Yeah, and he was the one who
5  vetted me really to apply. And it was an
6  attractive option at that point.
7  Q. What was the job functions of judicial
8  enforcement?
9  A. To serve subpoenas, basically.
10 Q. And had you done some of this while you
11 worked in the jail?
12 A. I served warrants.
13 Q. You served warrants? Okay.
14 A. We would do warrant sweeps regularly.
15 Q. Was there an exam for this?
16 A. No.
17 Q. Because it was lateral?
18 A. Uh-huh.
19 Q. The next thing in the petition alleges a
20 demotion February 4th, 2014.
21 A. Uh-huh.
22 Q. What was that?
23 A. That was the initial memo sent out saying
24 that Travis Brooks was now the jail sergeant, and
25 the corporal position will remain vacated or vacant

Page 44

1  until he, you know, completes his -- his -- I
2  forgot the word that they used, but basically until
3  he gets acclimated into the position.
4  Q. Okay. On February 3rd of 2014, the day
5  before, were you the corporal?
6  A. Yeah.
7  Q. So did they take your car away?
8  A. I don't recall if I had my car on
9  maternity leave or not.
10 Q. All right. Did they tell you that you
11 were no longer the corporal in the jail?
12 A. No. I had no contact with them. After
13 the interview, they didn't even tell me that I
14 wasn't selected.
15 Q. All right. When did you return to work
16 after maternity leave?
17 A. I don't know the exact date.
18 Q. When you returned --
19 A. Sure.
20 Q. -- were you corporal?
21 A. Yes. Sergeant Brooks, they gave him the
22 option to choose the corporal. And he talked to me
23 while I was still on maternity leave, and he said,
24 you know, "I just don't think it would be fair how
25 they do" -- "you know, how they did that." And

Page 45

you're -- "you know, you're a good corporal, so I'm going to ask, would you still be my corporal." It was not because...

Q. So this was not something that Mr. Brooks did -- as much information that you received -- while you were on maternity about -- they were going to let him pick his own corporal?

A. Yes. They sent out a memo, circulating the office, but...

Q. Do you have that?

A. I have it.

Q. You do? Okay. I haven't seen that, which doesn't mean anything. I'm not familiar with it.

MR. BERNARD: Yeah. Just request it --

MR. FOWLER: Yeah, okay.

MR. BERNARD: -- and if we have it, we'll forward it to you.

BY MR. FOWLER:

Q. So this memo was -- to the best of your recollection, it was February 4th?

A. Uh-huh.

Q. And it stated that the corporal position was vacant?

Page 46

A. It will remain vacant until further notice. Also another unprecedented occurrence.

Q. But because you came back in that position, there wasn't any issue with your bar or your car, right? In other words, you came back as corporal? The issue with regard to the demotion was this memo that purported to demote you when you were on maternity leave?

A. Correct.

Q. When you actually returned -- it didn't ever actually occur? You were the corporal when you came back?

A. Because of Sergeant Brooks' selection, had he chose someone else, I would have been demoted to a deputy. But for that time being, yes, I was demoted.

Q. All right. I have one other area to question you on. And this was -- this relates to your second charge of discrimination. This was the placement on administrative leave. You wrote, [As read]: "According to Constable Reginald Brown, I was placed on administrative leave pending the outcome of the investigation over an insubordinate issue with Carol Edwards. On the same day, an Internal Affairs investigation was initiated. I

Page 47

had to take a drug test, which included a breathalyzer and urinalysis, in addition, a hair follicle test, which is not typically done and requires special clearance." That's what I'm going to ask you about.

A. Sure.

Q. When were you placed on administrative leave, if you remember?

A. October 20th, 2014.

Q. Okay. Did you ever actually return physically to the workplace? Let me ask you a different question. Were you on administrative leave from October 20th until the date of your resignation?

A. Yes. I was on administrative leave.

Q. That's what I'm getting at, is that you were placed on administrative leave, and it was never concluded that you resigned?

A. Yeah, yeah.

Q. As part of this administrative leave, they asked you to go take a drug and alcohol screening?

A. Uh-huh.

Q. That's a "yes"?

A. I'm sorry. Yes, yeah.

Page 48

Q. No, you're fine. I do the same thing. In fact, I probably only caught like one out of ten of those.

A. Yes.

Q. What was the issue with the hair follicle test? This was something that is not clear to me from the records. You were ordered to take a hair test?

A. Yes.

Q. By whom?

MR. BERNARD: Your boss?

A. I -- yeah. I was physically there with Sergeant Crump. So I was driven there straight from the office, and she was on the line with Lieutenant Scott. And Lieutenant Scott was getting clearance from the City-Parish attorneys' office.

BY MR. FOWLER:

Q. Okay. Did you actually give them a hair sample?

A. I gave them a lot of hair, patches of hair, yeah, like 600 hairs, to be exact.

Q. Oh, Lord. All right. Is that how they do that? Did they ask for that many?

A. Yes.

Q. I'm curious. I'm just not familiar with

Page 49

1   the process.
2       A.  Yeah.  Because I was just like, "Oh, you
3   know, you may just take" -- like, "Here you go
4   (indicating), this is a good strand."  And she
5   said, "Oh, no, no, no, baby, we got to get it from
6   a, you know, couple of different areas."
7       Q.  Do you know why the hair sample was
8   ordered instead of just the urinalysis?
9       A.  I could take my guess at why they wanted
10  it.
11      Q.  Did they tell you?
12      A.  No, they did not tell me.
13      Q.  Why do you think that they wanted that
14  instead of the urinalysis?
15      A.  The hair follicle testing goes further.
16      Q.  Okay.  Did they tell you they were taking
17  that measure in response to a complaint by a
18  coworker?
19      A.  Specify that.  Like what do you mean?
20      Q.  Well, I wasn't -- just so that you know
21  for context, I didn't work here at the time.  I'm
22  relatively new to the City.  I'm familiar with our
23  drug testing procedures, but I don't -- I'm not
24  familiar with why the decision was made in this
25  case to ask for hair.  I'm aware that there was a

Page 50

1   complaint made that led to the administrative leave
2   that led to your being sent for a test.  And I'm
3   wondering if that was the reason.  And what I'm
4   asking you is, did they ever actually tell you why
5   they wanted you to give a hair sample?
6       A.  No.  I didn't know that I was getting a
7   hair sample until we were there.
8       Q.  Until you got there?
9       A.  Yeah.
10      Q.  The clinic told you that with orders --
11  okay -- as ordered by the constable's office?
12      A.  Yes.  They took me straight from there.
13  And that has -- that, again, is unprecedented.
14  They -- they do not do hair testing -- hair
15  follicle testing.  But the --
16      Q.  What was -- do you know what the
17  investigation -- Internal Affairs investigation
18  when you were on administrative leave was about?
19      A.  Well, it initially started out for that
20  reason, for the allegation.
21      Q.  Okay.  And the allegation, as I
22  understand it, was illegal drug use?
23      A.  Correct.  The following week -- well,
24  actually, the urinalysis and the breathalyzer, I
25  could completely get with that, because that's what

Page 51

1   we typically do.  The hair follicle test, again,
2   that was taking it out of the box, which is -- mind
3   you, the first EEOC complaint had already been
4   made; so that's why I made the second one, because
5   that was -- I mean, tearing patches of hair --
6       Q.  So the retaliation complaint is about
7   being ordered to give a hair sample?
8       A.  And the treatment thereafter, which we'll
9   get to.
10      Q.  All right.  Yeah.  And in the -- so the
11  administrative leave -- it appears as though you
12  were placed on administrative leave based on a
13  complaint by a coworker of illegal drug use.
14      A.  Yes.
15      Q.  Is that your understanding as well?
16      A.  And unfounded, yes.
17      Q.  I understand that.  This was leave with
18  pay?
19      A.  Uh-huh.
20      Q.  And you complied and donated a breath
21  sample, a urine sample and a hair sample?
22      A.  Uh-huh.
23      Q.  And then what happened next?
24      A.  And then the following week the results
25  came in, and they were, you know, vindicated.  And

Page 52

1   then I inquired several times about returning to
2   work, because, although I was getting paid, this
3   was football season where our big money comes from.
4       Q.  Extra duty?
5       A.  Oh, yeah.  LSU pays very handsomely.  We
6   look forward to that every year.  So, although I
7   was getting my regular salary, a lot of it during
8   football season stems from the extra duty that we
9   work.  And I had a --
10      Q.  And you can't work extra duty when you're
11  on administrative leave?
12      A.  No.  They take your gun and your
13  commission.  And the day -- the day --
14      Q.  They take your car?
15      A.  The day this happened --
16      Q.  I'm assuming they did.
17      A.  -- the complaint -- well, this stemmed
18  from a disciplinary action.  I was disciplining a
19  subordinate, and while that subordinate was being
20  questioned, the allegation came out.  And then
21  immediately -- it was done that morning.  By that
22  afternoon, I was in an Internal Affairs
23  investigation.  I completely submitted.  Sure,
24  let's drug test.
25      Q.  Were you ever interviewed?

Page 53

1   A. Yes, yes. I was questioned.
2   Q. Was it that day, or was it --
3   A. It was all that day.
4   Q. All that day?
5   A. It was streamlined, yes. And I answered
6   all of the questions. I complied with everything,
7   and, you know, submitted to a drug screen. And
8   even after that, before they even took me to get a
9   drug screen, I got a memo saying that you're
10  immediately placed on administrative leave. And
11  they took me into the Administrative office and
12  stripped me of all of my gear. I had to turn in my
13  gun, my badge, my car. I had to go and get all of
14  my belongings out of my car. You're talking about
15  an extremely humiliating process. And I was driven
16  to Occupational Health.
17  Q. After you got the results back from
18  the -- the drug test, what was -- what happened
19  next with regard to your communication with the
20  constable's office about your return to work?
21  A. They couldn't give me an answer.
22  Q. Do you know why?
23  A. No. They didn't -- they didn't give me
24  an answer initially. I -- I don't remember if I
25  had spoke with -- I don't remember the attorney's

Page 54

1   name at that time. But she just said, "We'll be in
2   contact with you."
3   Q. Okay. Were they -- did they ever ask you
4   to do a fit-for-duty to return to work?
5   A. Two months later, I finally heard back
6   from them. Because after the second week of the
7   results getting back, I'm thinking when they say,
8   "We'll get back with you," like you're putting me
9   on my detail, like can I be prepared to work it
10  this weekend and get my money or the following
11  week. Weeks went by, months went by, and then
12  they're telling me that they need a fit-for-duty
13  examination by one of their selected doctors.
14  Q. And who did they -- were they going to
15  send you to? Do you know?
16  A. They gave me a list of doctors.
17  Q. Okay. My understanding is that there was
18  an appointment scheduled; is that right?
19  A. They scheduled an appointment for me.
20  Well, I -- they gave me the list, first of all, and
21  I made an appointment in -- the earliest, it was
22  going to be after the first of the year. But now
23  this -- at this point, they were scrambling because
24  there's apparently a timeline that they have to
25  have -- you know, you can be put on administrative

Page 55

1   leave without pay. So they took it upon themselves
2   to find another doctor who could take me in, and
3   then they informed me, your appointment time is at,
4   you know, such and such.
5   Q. Okay. My records -- just so you know
6   where I'm coming from, my records indicate that
7   there were two appointments, both of which you
8   missed.
9   A. That's incorrect.
10  Q. What is your recollection of -- I had a
11  December 16th appointment.
12  A. Okay.
13  Q. And then one that was scheduled on
14  December 31st.
15  A. Okay. I'm not sure which date. One of
16  them, I did miss. One of them, I did report to.
17  My attorney and their attorney agreed to the terms
18  on which I would report. They wanted me to do a
19  full-out psychological evaluation. I went to my
20  doctor and had my doctor submit proper paperwork to
21  them letting them know that in her medical opinion
22  there was no need for any psychological testing.
23  And my doctor had been treating me for years. And
24  I submitted that to them. And, however, I still,
25  you know, was willing to -- to, you know, to do --

Page 56

1   meet them halfway. I did not want to do that three
2   hour paper-based testing, but I said, "Sure, I'll
3   go and talk to whomever, you know, you want me to
4   talk to." My attorney and their attorney agreed on
5   the terms and then...
6   Q. The oral -- this was -- the records
7   indicate an oral exam only --
8   A. Correct.
9   Q. -- was your understanding of the
10  agreement?
11  A. Yes.
12  Q. And not the paper psychological profile?
13  A. Uh-huh. Which because being in law
14  enforcement, I took that test twice, and it is no
15  fun. That's like four hours of just -- yeah.
16  Q. Yeah, but if you wanted to come back to
17  work, why wouldn't you just take it?
18  A. Because there was no reason to take it.
19  There was no reason to have to subject myself to
20  that. The initial cause of me going on
21  administrative leave had been resolved. If that
22  were an issue, that would have been discussed on
23  day one in the meeting. My fit-for-duty was never
24  questioned. There's no blemishes in my record.
25  There's no incidents that would make them think

14 (Pages 53 to 56)

Page 57

1  that I was not fit for duty. Never a complaint,
2  never a write-up. Only accolades. So why would
3  it --
4      Q. Okay. So the refusal was because you
5  thought it was unjust?
6      A. Correct. And then I also --
7      Q. Was that the first or the second
8  appointment when you went and said, I'm not doing
9  the paper?
10     A. I -- no. I'm not doing -- that was
11 done -- that wasn't going. That was when I was
12 talking to my attorney and we decided, you know,
13 okay, I will meet with someone as long as we can
14 agree that it's not going to be that God-forsaken
15 test. No one enjoys that test. It's -- yeah. If
16 I can go and talk to someone, and they can ask me
17 whatever they want, I'll be completely transparent,
18 sure. And they're attorney said, "We can do that,
19 and it was scheduled."
20     I went -- I showed up for that
21 appointment. I don't remember the date. I signed
22 in, waited. When they called me, they said,
23 "Follow us, Ms. Davis; you can come right this
24 way." And they had a stack of papers this big
25 (indicating), and I said, "Whoa, whoa, whoa, I was

Page 58

1  just supposed to meet with the doctor." And she
2  said, "No, ma'am." She said, "We're doing a
3  psychological evaluation and that's not how we do
4  them." And I said, "That's what we agreed to."
5  And she said, "Well, hold on a second," and then
6  she checked her paperwork. She said, "Well, I have
7  Lieutenant Vernon Scott here as my contact, and it
8  says they want the full" -- and I said, "Well, you
9  might want to call Vernon Scott's attorney." And
10 she called Vernon.
11     And then Vernon was -- spoke through her,
12 and he was saying, "No, she needs to do the full
13 test." And she was -- he asked her, "Let me speak
14 with her." And I said, "No, he can speak with my
15 attorney." And then, you know, she told me to take
16 a seat and wait. And, you know, no. I left, and
17 then if -- when the attorneys got it together then
18 I would happily oblige.
19     Q. Which is why there was a second scheduled
20 appointment, right, because you left the first one?
21     A. Well, the first one is --
22     Q. The first one is when you arrived,
23 stated -- or then understood there was a
24 misunderstanding as to what you were going to do or
25 what you were not going to do. This is what I

Page 59

1  have. And I want you to tell me if my stuff is
2  wrong.
3      A. No, no, no. I just don't remember the
4  dates.
5      Q. Okay. That's fine. And then the second
6  appointment was scheduled December 31st. This
7  was -- there was some indication that it was going
8  to be after the first of the year, but then some
9  phone calls were made to get you an appointment
10 before the end of the year. Is this refreshing
11 your memory?
12     A. I'm not sure. How was that -- how was
13 that confirmed?
14     Q. I don't know. That's why I'm asking you.
15     A. I don't know. I don't have notice.
16     Q. Okay. Did you have an appointment on
17 December 31st of 2014?
18     A. I don't recall the date. I know I went
19 there in December. I don't remember the date.
20     Q. Do you remember if you had one or two
21 appointments scheduled?
22     A. One for sure, and I know they were
23 supposed to schedule a second.
24     Q. And were you aware of the second one
25 before you didn't appear? You understand what I'm

Page 60

1  getting at, right? I'm trying to find out if you
2  were advised to go on December 31st to take the
3  exam.
4      A. Okay. Yeah. No. I was not given a
5  follow-up. After the appointment when we -- I told
6  Lieutenant Vernon Scott he needs to contact my
7  attorney, that was the last I've heard of it, to my
8  knowledge. I do not recall being given another
9  date to -- to show up.
10     Q. Okay. Give me just a second.
11     A. Yeah. If you could let me know if
12 they -- if they tried to email that, or if that
13 was -- because I didn't speak with anyone from the
14 Department the entire time I was on administrative
15 leave.
16     Q. All right. And then after that on
17 January 2nd, 2015, that I have as your date of
18 resignation; is that right?
19     A. That's correct.
20     Q. Why did you resign?
21     A. Because I did receive a letter saying
22 that they would allow me to come back, but my
23 position would change. I would be -- I would go to
24 courtroom security, and I would answer to
25 Lieutenant Vernon Scott.

## Page 61

Now, at this point, Lieutenant Vernon Scott is the -- the person who has conducted this entire investigation, which I've already agreed -- I mean, disagreed with the whole handling of it. So going back and working under him as my supervisor was not my ideal situation.

And, again, the reason I never left the jail is because I liked my job, and I liked what I did. I never applied for courtroom security, despite the several vacancies that were there. I never once was interested. That was known to them. And, again, this was also a form of retaliation.

But, furthermore, I couldn't understand that why the person, who did everything I was supposed to do, and was -- you know, like I said, vindicated myself, and what I was initially put on administrative leave for panned out to not be true, why would I be the one penalized. Why should I have to move from the department where I had senior as opposed to the subordinate deputy who initiated the -- you know, laid the groundwork for this retaliation?

Q. I'm going to ask you a question and I really -- I don't intend to offend you in any way.

A. Absolutely.

## Page 62

Q. But you may know this and you may not know this. Are you aware that the coworker's -- that part of the coworker's complaint was that you were having routine panic attacks?

A. No, I didn't know that that was a complaint. I know that it was stress, yeah. I am aware of the stress, not panic attacks.

Q. All right. Let's talk about damages, and then I'll be done in about two minutes. Thank y'all.

In your petition, you alleged that you were entitled to backpay?

A. That's correct.

Q. During this period of time that you were employed, did you lose any of your regular pay or benefits?

A. Could you tell me that --

Q. Yeah. During the period of time -- it appears from the record that it all started in June 2013, and then there's some things that happened along the way, but it ended at the end of 2014, and you resigned January 2nd, 2015. During this period of time, did you ever lose any pay, regular pay?

A. Well, as far as -- again, I'm a little confused on that question.

## Page 63

Q. Your regular paycheck, just your regular paycheck that you get for the 40 hours that you work every week, did you miss any of those?

A. And so you're not talking about the promotion or anything? We're not talking about that?

Q. Right. No, no. That's -- I am asking you about that.

A. Including that, absolutely I missed --

Q. The promotion, the pay and the promotion?

A. Oh, yes.

Q. I guess what I was asking you first was that was there any period of time where you suffered -- you missed a paycheck or they suspended you for a period of time?

A. I never missed a paycheck where they did not -- if the -- where there was a payday that I did not get paid. I never missed a payday.

Q. So the backpay is related to the failure to promote?

A. Yes. And the opportunity of my overtime that I was deprived.

Q. Extra duty. Okay.

A. I had a regular assigned extra duty that paid very handsomely, and I missed out the entire

## Page 64

remainder of football season.

Q. You also alleged lost benefits. What did you mean by that?

A. Do you mind if I take a look?

Q. Oh, no, sure right here (indicating). Absolutely. It's just in the damages portion, and to be quite candid with you, the lawyers kind of do the -- we have a trade, and we use the same language to describe the same damages in every case. I was just trying to figure out if there was something that was missing.

A. Where's the benefits part in there?

Q. It just says it right here (indicating). It says back and front pay. I understand the front pay. Lost benefits. Is there anything specific that -- other than the failure to promote and the extra duty -- loss of extra duty that that could mean?

A. Let me come back to that one. That means benefits as in the essential term of the word, like medical?

Q. Well, first I want to make sure that you didn't actually, like, miss anything, right? That you didn't miss any of your regular benefits. And then if -- the lost benefits is in the context of

Page 65

```
1   the failure to promote and the extra duty. I get
2   that. I'm asking if there's anything other than
3   that --
4       A. Okay. Well, benefits --
5       Q. -- that I'm not aware of.
6       A. Yeah. Benefits in the context of it, as
7   in medical, you know, dental, vision, yeah, I lost
8   that from the time I resigned until the time I
9   found -- or was eligible for new benefits with the
10  next employer.
11      Q. And my last question, and then I'll turn
12  it over to Karl. You alleged mental anguish,
13  humiliation and embarrassment. I know we covered,
14  along the way, what happened. Did you have any
15  out-of-pocket medical expenses related to this?
16      A. Yes.
17      Q. Or any specific medical treatment related
18  to this?
19      A. Yes.
20      Q. Can you elaborate on that?
21      A. Sure. It wasn't until the offset of
22  these events that I was diagnosed with General
23  Anxiety Disorder.
24      Q. When were you diagnosed with this?
25      A. That was -- it was prior -- it was after
```

Page 66

```
1   I filed the first EEOC complaint. I want to say
2   April -- that month of April.
3       Q. And who diagnosed you with this?
4       A. My PCP, Dr. Casey Carlisle.
5       Q. In Baton Rouge?
6       A. Uh-huh. I was placed on medication as a
7   result.
8       Q. Did Dr. Carlisle attribute your work
9   conditions to this disorder?
10      A. Yes.
11      Q. Do you still suffer from this disorder?
12      A. Yes.
13      Q. Do you have more favorable working
14  conditions now?
15      A. Yes.
16      Q. Where do you work?
17      A. Well, actually after I left there, I went
18  to the probation and parole office, and then I --
19      Q. City or state?
20      A. State, state.
21      Q. Okay.
22      A. In adult.
23      Q. Adult? Okay.
24      A. Uh-huh. And I was there for about a year
25  and a half doing that and law school. And it was
```

Page 67

```
1   hard keeping up with all of it, so I quit work and
2   now I am just a student.
3       Q. What medication do you take?
4       A. What is that called? Xanax and --
5       Q. And this was after the first complaint,
6   you said?
7       A. Yeah. Xanax and Zoloft were what I was
8   put on as a result of it.
9       Q. And is this medication that you're still
10  on?
11      A. No, not the Zoloft. Xanax is as needed,
12  and -- and also at that time -- it was another
13  medication, and I can get that for you. But it was
14  debilitating headaches that was also described with
15  chronic tension headache.
16      Q. And just so that you know, I'm only
17  asking you this stuff because I have to, because
18  it's at issue in this suit as to what your mental
19  health damages flowed from the workplace incident.
20  I wouldn't normally have any interest in your
21  business at all.
22      A. Oh, yeah. No. Just before that I just
23  took my vitamins.
24          MR. FOWLER: Okay. Karl, I don't
25      have anything else.
```

Page 68

```
1       MR. BERNARD: No questions here.
2       COURT REPORTER: Would you like to
3   read and sign?
4       MR. BERNARD: Yeah, read and sign.
5
6   (DEPOSITION CONCLUDED AT 12:26 P.M.)
```

Page 69

REPORTER'S CERTIFICATE

I, BRITTANY E. VIDRINE, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that RHEA FRANKLIN DAVIS, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing 68 pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript accompanied by my original signature and original raised seal on this page.

Baton Rouge, Louisiana, this 26th day of January, 2017.

BRITTANY E. VIDRINE, CCR, RPR
CCR NO. 2014025, RPR NO. 963689

Page 70

RHEA DAVIS
    CIVIL ACTION NO.
VERSUS
    16-297-BAJ-RLB
BATON ROUGE CITY
CONSTABLE'S OFFICE

WITNESS CERTIFICATE

I, RHEA FRANKLIN DAVIS, have read or have had the foregoing testimony given on JANUARY 10TH, 2016 read to me and hereby certify that it is a true and correct transcription of my testimony with the exception of the following corrections or changes, if any:

Page  Line       Correction
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

_____
RHEA FRANKLIN DAVIS

ROUTING: Marston Fowler, Esq.
REPORTER: BRITTANY E. VIDRINE, CCR, RPR