# In The Matter Of:

*Rhea Davis vs*
*Baton Rouge City Constable's Office*

---

*Reginald R. Brown*
*January 30, 2017*

---

*Associated Reporters, Inc.*
*201 St. Charles Avenue*
*Suite 4315*
*New Orleans, LA 70170*
*(504) 529-3355*

Original File 013017C.txt

Min-U-Script® with Word Index



EXHIBIT
D

Page 1

1           UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF LOUISIANA
2

3  CIVIL ACTION NO. 16-297-BAJ-RLB

4  MAG. JUDGE RICHARD L. BOURGEOIS, JR.

5
   RHEA DAVIS,
6           PLAINTIFF,

7  VERSUS

8  BATON ROUGE CITY CONSTABLE'S
   OFFICE,
9           DEFENDANT.
   * * * * * * * * * * * * * * * * * * * *
10

11

12

13

14

15         Deposition of REGINALD R. BROWN,

16  233 St. Louis Street, Room B-46, Baton

17  Rouge, Louisiana 70802, taken in the Office

18  of the Parish Attorney, 222 St. Louis

19  Street, Room 902, Baton Rouge, Louisiana

20  70802, on Monday, the 30th day of January,

21  2017.

22

23

24

25

Page 2

1  APPEARANCES:

2

3           FOR THE PLAINTIFF:
            G. KARL BERNARD & ASSOCIATES
4           G. KARL BERNARD, ESQUIRE
            1615 POYDRAS STREET - SUITE 220
5           NEW ORLEANS, LOUISIANA  70112

6

7           FOR THE DEFENDANT:
            OFFICE OF THE PARISH ATTORNEY
8           MARSTON FOWLER, ESQUIRE
            PERSONNEL SECTION CHIEF
9           222 ST. LOUIS STREET - ROOM 902
            BATON ROUGE, LOUISIANA  70802
10

11
   ALSO PRESENT:
12

13         RHEA DAVIS

14
   REPORTED BY:
15

16         ROBERT K. TUCKER
           CERTIFIED COURT REPORTER
17         STATE OF LOUISIANA

18

19         *    *    *    *    *

20

21

22

23

24

25

Page 3

1                    INDEX

2

3  EXAMINATION BY:

4
   MR. BERNARD                           5
5

6

7  EXHIBITS:

8  1 (BROWN FEBRUARY 4, 2014, MEMORANDUM)
                                        80
9  2 (NAVARRE JUNE 19, 2013, LETTER)
10                                      95

11 3 (WILLIAMS JUNE 20, 2013, LETTER)
                                      101
12
   4 (NAVARRE JULY 10, 2013, LETTER)
13                                    103

14 5 (LOUISIANA COMMISSION ON HUMAN RIGHTS
           LETTER)                   117
15

16 6 (BROWN LETTER TO RHEA DAVIS)  126

17

18

19

20

21

22

23

24

25

Page 4

1        S T I P U L A T I O N

2

3  It is stipulated and agreed by and

4  between counsel for the parties hereto that

5  the deposition of the aforementioned

6  witness is hereby being taken under the

7  Federal Rules of Civil Procedure, for all

8  purposes, in accordance with law;

9  That the formalities of reading,

10 signing, sealing, certification, and filing

11 are specifically waived;

12 That all objections, save those as

13 to the form of the question and the

14 responsiveness of the answer, are hereby

15 reserved until such time as this

16 deposition, or any part thereof, may be

17 used or sought to be used in evidence.

18

19

20

21 ROBERT K. TUCKER, Certified Court

22 Reporter, in and for the Parish of Orleans,

23 State of Louisiana, officiated in

24 administering the oath to the witness.

25

Page 5

1      REGINALD R. BROWN, who, after
2  having been first duly sworn, was examined
3  and testified as follows:
4      EXAMINATION BY MR. BERNARD:
5  Q.  My name is Karl Bernard.  I'm
6  here representing Ms. Rhea Davis in a
7  lawsuit against the Constable's Office.
8  And I'm going to ask you a number of
9  questions about Ms. Davis and your
10  employment with -- as a constable for the
11  City of Baton Rouge.
12      Have you ever been deposed
13  before?
14  A.  Yeah.
15  Q.  Okay.  All right.  The ground
16  rules hasn't changed in a hundred years,
17  but a deposition is considered a formal
18  process primarily because you were
19  administered an oath and because the court
20  reporter's here to record everything that I
21  say and everything that you say.  And thus
22  everything I say and everything that you
23  say can and probably will be used at a
24  later time during this proceeding.
25      On the other hand, the

Page 6

1  deposition is informal in the sense that
2  there is no judge or jury present and that
3  if you need to take a break for whatever
4  reason, I know you're a very busy man, you
5  can take a break.  But if phone call,
6  bathroom, water break, whatever.  The only
7  thing that I request is that if there's a
8  question pending, that you answer the
9  question first prior to -- prior to us
10  recessing the deposition so that you can
11  take a break.
12      And the court reporter, as I
13  mentioned, is here to record whatever I say
14  and whatever you say, thus it's very
15  important that we verbalize our answers.
16  It's very, very difficult for the court
17  reporter to take down nods and hand
18  gestures and uh-huhs (Affirmative Response)
19  and uh-uhs (Negative Response).  And even I
20  know here in south Louisiana, we talk with
21  our body a lot.  But I want you to promise
22  to do your best to verbalize all your
23  answers.  You're going to do that, Mr.
24  Brown?
25  A.  No problem.

Page 7

1  Q.  And I'll do the same,
2  verbalizing my questions.  Also, there will
3  be a tendency during the deposition for you
4  to anticipate my questions and for me to
5  anticipate your answers, and if that
6  happens, we're going to talk over one
7  another and, again, it's going to be very,
8  very hard for the court reporter to record
9  who's saying what and when.  And so I will
10  do my best not to ask a question until
11  you've completed your answer and I'm going
12  to ask that you do your best not to give an
13  answer until I complete the question.  Do
14  you agree to do that, sir?
15  A.  Completely understood, yes, sir.
16  Q.  Okay.  All right.  During this
17  deposition I'm going to ask probably a
18  question or two that will not make any
19  sense to you simply because I don't know
20  what you do, I don't know your business
21  like you know it.  And if I ask a question
22  that you do not understand, that doesn't
23  make any sense to you, I want you to either
24  agree that you will not answer the question
25  but, rather, you will say, ask me to

Page 8

1  rephrase the question or just indicate that
2  you do not understand the question.  You
3  agree to do that, sir?
4  A.  Yes, sir.
5  Q.  Okay.  On the flip-side, if I
6  ask a question that you do understand, I
7  want you to agree that to give a complete
8  answer and a truthful answer.  You agree to
9  do that?
10  A.  Yes, sir.
11  Q.  Okay.  And to ensure the
12  deposition doesn't take any longer than it
13  should, I want you to do your best to
14  confine your answers to my question.  If I
15  ask you what your name is, just say your
16  name, but not nicknames and that type of
17  thing.  And just kind of answer the
18  questions that I ask, that I'm asking you.
19  If in fact there's a need for an
20  explanation, you can do that after you've
21  answered my question.  Okay?
22  A.  Okay.  I can ask you to speak up
23  just a little louder because in my right
24  ear, I got it stopped up a little bit from
25  a sinus infection.

Page 9

1  Q.  Okay.  I will.  I will do that.
2  A.  All right.
3  Q.  As you know, in America, we
4  don't take the law into our own hands.  If
5  there's a dispute that the parties cannot
6  work out amicably amongst themselves, every
7  citizen in this country has a right to
8  bring a lawsuit to get the matter resolved.
9  It is my hope that you're not holding it
10  against Ms. Davis for exercising her rights
11  as a citizen of this country by bringing
12  the lawsuit.
13  A.  Most definitely not.
14  Q.  All right.  However, in the same
15  vein, the only way this process works is if
16  we all do our best to tell the truth.  And
17  the only encouragement that we have other
18  than your own integrity is a charge called
19  perjury.  You know what perjury is, sir?
20  A.  Yes, sir.
21  Q.  What is perjury?
22  A.  As I understand, being
23  untruthful.
24  Q.  Under oath?
25  A.  In testimony, yes.

Page 10

1  Q.  And under oath.  And so you have
2  any questions of me?
3  A.  No, sir.
4  Q.  Well, the deposition will
5  proceed thusly.  I'm going to ask you some
6  personal background questions, nothing
7  intrusive, a little bit about your
8  educational background and a little bit
9  about your work history, and then we'll
10  move right into the facts that are relevant
11  for this particular case, okay?
12  A.  Yes, sir.
13  Q.  All right.  Let us begin.
14     Will you please state and spell
15  your name for the record?
16  A.  Reginald R. Brown, Sr.,
17  R-E-G-I-N-A-L-D, R, period, Brown,
18  B-R-O-W-N, Sr., S-R period.
19  Q.  Okay.  Are you taking any
20  medication that would impede your ability
21  to understand or to give truthful answers?
22  A.  No, sir.
23  Q.  All right.  What is your home
24  address?
25  A.  Home address is 900, 9-0-0,

Page 11

1     Wooddale, W-O-O-D-D-A-L-E, Boulevard, Baton
2     Rouge, Louisiana, 70806.
3  Q.  Okay.  And how long have you
4  lived at that address?
5  A.  Approximately ten years.
6  Q.  Are you married?
7  A.  Yes, I am.
8  Q.  What's the name of your spouse?
9  A.  My spouse's name is Gayle,
10  G-A-Y-L-E.
11  Q.  Do you have any children?
12  A.  I have three living, one
13  deceased.
14  Q.  Okay.  Are your children majors,
15  adult children?
16  A.  All of them are grown, yeah.
17  Q.  Okay.  Have you ever been
18  arrested before, sir?
19  A.  No, sir.
20  Q.  Ever been convicted of a crime?
21  A.  No, sir.
22  Q.  Okay.  Have you ever been sued
23  before in your individual capacity?
24  A.  Have I been what?
25  Q.  Sued before in your individual

Page 12

1  capacity.
2  A.  No.  No.
3     MR. FOWLER:
4     You personally.
5     THE WITNESS:
6     No.
7     EXAMINATION BY MR. BERNARD:
8  Q.  Okay.  Have you ever filed a
9  lawsuit before against anyone?
10  A.  I can't recall doing so.
11  Q.  Okay.  All right.  You've
12  indicated that you've been deposed before.
13  When was the last time you were deposed?
14  A.  I think it was in a case, I'm
15  thinking, with the Constable's Office.  I
16  don't remember which one because I've
17  been -- we've been through several that I
18  can recall.
19  Q.  All right.  Well, what did you
20  do to prepare for this deposition?
21  A.  Basically nothing other than to
22  adhere to the subpoena that I was given.
23  Q.  Did you review any documents?
24  A.  Not really.
25  Q.  I mean, did you or did you not?

Page 13

1  A.  Huh?
2  Q.  Did you review any documents?
3  A.  Not to my knowledge, no.
4  Q.  Okay.  Did you talk to anyone?
5  A.  I've talked to a number of
6  people, my lawyer here, and that's about
7  it.
8  Q.  Who did you talk to?
9  A.  Marston Fowler.
10  Q.  And who else?
11  A.  Probably maybe I think my
12  secretary, my executive assistant, when she
13  got the paperwork, advised me that we had a
14  court appearance because she gets the
15  paperwork in and the young lady, everybody
16  in the office -- well, not everybody, but
17  the persons that receive the mail in the
18  office get it, look at it, and they are
19  knowledgeable.
20     But there's been no discussion
21  with me and them about any matters
22  involving this and any others when it comes
23  to that.
24  Q.  Okay.  So is it your testimony
25  that you didn't speak to anyone about this

Page 14

1  particular deposition other than
2  Mr. Fowler?
3  A.  And Ms. Dawn Guillot and the --
4  well, Captain Jimoh and Sergeant Brooks
5  because they were also part of the
6  deposition and when something of this
7  nature comes about it has to come to me
8  first and then I have it distributed like
9  it's supposed to be distributed.
10     And when it came, I had the
11  captain give the subpoenas to the sergeant
12  and have the sergeant provide the paperwork
13  process to each person.  Sergeant Brooks
14  and Captain Jimoh and myself.
15  Q.  Okay.  What did you talk to
16  Captain Jimoh about?
17  A.  Oh, nothing, no more than to
18  have this paperwork processed.
19  Q.  Okay.  Did you discuss with
20  Captain Jimoh that you had also been
21  required to testify?
22  A.  He knew it because he got the --
23  he got all three of the subpoenas.
24  Q.  Okay.
25  A.  I gave him -- I e-mailed them to

Page 15

1  him and told him to print them and give
2  them to Sergeant Cunningham and have
3  Sergeant Cunningham process the service.
4  Q.  Since the events that have given
5  rise to this particular lawsuit more than
6  three to four years old, did you talk to
7  Mr. Jimoh or Captain Jimoh about the facts
8  of this case?
9  A.  Not to my knowledge, I haven't,
10  no.
11  Q.  Okay.  What about Sergeant
12  Brooks?
13  A.  No.
14  Q.  Okay.  So, again, other than
15  discussing the matter with attorney Fowler,
16  you didn't talk to anyone about this case?
17  A.  Other than Dawn Guillot.
18  Q.  So the two lawyers?
19  A.  Yeah.
20  Q.  And that's it.  Okay.  All
21  right.  Okay.
22     We'll dispense with your
23  educational background, Major Brown.
24     Just how did you become the
25  constable and how long have you been the

Page 16

1  constable?
2  A.  I've been the constable, this
3  again my 17th year, and I became the
4  constable when I was elected in October of
5  2000 and took office January the 2nd, 2001,
6  through the election process.
7  Q.  Okay.  And when were you last
8  elected to this particular position?
9  A.  Five years ago.
10  Q.  And how long is your term?
11  A.  Six years.
12  Q.  Six-year term?  So you're up for
13  re-election?
14  A.  Next year.
15  Q.  Next year?
16  A.  Yes, sir.
17  Q.  Are you planning on running?
18  A.  Yes, sir, unless I'm six feet
19  under.
20  Q.  Prior to becoming the constable,
21  what type of job did you hold?
22  A.  I worked at the East Baton Rouge
23  Sheriff's Office as administrative
24  assistant to Sheriff J. Al Amiss, Sheriff
25  Fred Sliman and Sheriff Elmer Litchfield as

Page 17

1  a major in the East Baton Rouge Parish
2  Sheriff's Office for 25 years.
3  Q.   Now, let's talk about your job
4  as a constable.  Have your duties and
5  responsibilities -- I know you've indicated
6  that you've been the constable for 17
7  years.  Have your duties and
8  responsibilities changed over that
9  timeframe or have they pretty much remained
10 the same?
11 A.   Basically the same, expanded,
12 not changed, but expanded.
13 Q.   Okay.  Well, today, what are
14 your duties and responsibilities?
15 A.   Duties, my responsible duties
16 are as the enforcement arm of Baton Rouge
17 City Court; in other words, every court
18 order that comes out of Baton Rouge City
19 Court, we are the enforcement office that
20 handles those -- those duties and
21 responsibilities.
22 Q.   Okay.  And what other
23 responsibilities?
24 A.   The other responsibilities are
25 those that aside from that have been

Page 18

1  allocated to us through the mayor, the
2  chief of police and others under and
3  agreeable circumstances, such as assuming
4  administering of the DARE program in the
5  City of Baton Rouge.  We took that program
6  over from the Baton Rouge Police
7  Department.  And we administer that.
8     We have with the DARE program a
9  community services office that is located
10 in Cortana Mall where we do various
11 projects out there, the NTLR, our Reserve
12 program, our volunteers program and various
13 other services that rendered to the
14 community from under an initiative of
15 Operation Safe Streets in the Baton Rouge
16 City Police Constable's Office.
17 Q.   Okay.  Any other
18 responsibilities that you have?
19 A.   Basically, whenever the -- well,
20 the sheriff's office and our office and
21 several other agencies engage in operations
22 such as the Delta Narcotics Task Force.  We
23 have a K9 division now that has a drug dog.
24 That was at that time initiated under
25 Captain John Lawton, and he operated that

Page 19

1  program up until he passed it on to now
2  Sergeant Randall Cunningham, who was at
3  that particular time Deputy Randall
4  Cunningham.  And the Delta narcotics
5  program is a program where we interact with
6  other sheriff's offices and police
7  departments in this three-parish area to
8  administer the Delta narcotics program.
9  Q.   What about hiring and firing and
10 promoted?
11 A.   That, that, that all comes under
12 the scope of the administration of the
13 Baton Rouge City Police Constable's Office.
14 Q.   In terms of administration of
15 the Baton Rouge City Police Constable's
16 Office, what are your duties and
17 responsibilities?
18 A.   Hiring, promoting,
19 recommendations for other improvements in
20 the office in terms of expanded personnel,
21 expanded operations in the office position
22 wise.
23 Q.   Anything else?
24 A.   Right now, that's as far -- as
25 we go along the scope of the operation, I

Page 20

1  mean, the daily operation, occasionally
2  you'll run through different procedures and
3  things that you feel that might need to be
4  addressed and sometimes it takes constable
5  action, it takes recommendations and
6  support from the Parish Attorney's office
7  to present to the council and things of
8  that nature, and to the personnel board,
9  particularly when you're going to increase
10 positions, increase the promotional
11 opportunities and things of that nature,
12 and occasionally I've done it that.
13 Q.   Okay.  Well, in terms of your
14 administrative responsibilities, you
15 mentioned hiring, promoting and
16 recommending improvements.
17 A.   Yeah.
18 Q.   Are there any other categories
19 that you deal with directly as an
20 administrator?
21 A.   When the -- if the time or
22 conditions or the situation presents
23 itself, we recommend taking the necessary
24 steps to reprimand and suspend and take
25 necessary steps to do that.  And of course

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

---

Page 21

1  that's done with the close scrutiny and
2  communication with the Parish Attorney's
3  office.
4  Q.  All right.  In terms of hiring
5  individuals for the Constable's Office,
6  what role do you play?
7  A.  I make the final decision on --
8  I am the appointing authority.
9  Q.  Okay.
10  A.  I make the final decisions on
11  promoting.  I make the final decisions on
12  hiring.  I make the final decisions on
13  recommendations for other improvements.
14  Q.  Okay.  Now, when you say you
15  make the final decision, what does that
16  mean?
17  A.  That means if we are going to
18  get -- we get a list when a recommendation
19  comes up or a request comes up for a
20  promotion, we send it to Civil Service and
21  they allocate the persons who are
22  qualified.  They send you -- they can send
23  you a list of -- excuse me -- from one,
24  two, I guess ten or 12.  It just depends on
25  the list that they compile and they send.

Page 22

1      When they send you a list of
2  persons that you are to consider for a
3  promotion, they send you that list for
4  everybody on that list is a qualified
5  individual for that particular position.
6  So you have a choice.
7      Of course, I always have been
8  included -- have included other personnel
9  in the office depending on what the hiring
10  is, what the promotion is, and what the
11  consideration is going to be.  Then we, for
12  example, if it's a clerical position, then
13  I'm going to have clerical people involved
14  in the process of consideration,
15  particularly for hiring and promoting.
16      If it's a deputy's position,
17  then we're going to have deputies involved
18  in the process of interviewing,
19  consideration, recommendation for hiring
20  and promoting.
21  Q.  Okay.  Do you depend upon
22  your -- the people that you supervise --
23  well, let me back up.
24      In hiring and promoting, I'll go
25  back to your last statement, you indicated

Page 23

1  that you include people that are involved
2  with the position or had that position in
3  helping you to make the selection; is that
4  accurate?
5  A.  No.  No.  I have -- I have -- if
6  it's in a clerical area, I'm going to get
7  clerical people.  If it's a deputy area,
8  they don't have to be necessarily involved
9  in that particular position, but they can
10  be -- most all our deputies -- we're such a
11  small office, everybody in that office
12  basically has almost -- if they've been
13  there for any length of time, they've
14  worked throughout the entire process.
15      They start off in the jail, so
16  they basically have either worked from the
17  jail to the courtroom building security.
18  They may be a jail officer, they may in
19  judicial enforcement.  But I always have
20  used my chief deputy and basically the
21  chief of operation and maybe a lieutenant
22  or two or sergeant or two in the interview
23  process.
24  Q.  Okay.  Are these individuals --
25  you indicated you use your lieutenants,

Page 24

1  your sergeants, and your captains?
2  A.  And your chief deputy.
3  Q.  And your chief deputy in the
4  hiring and promoting process; is that
5  accurate?
6  A.  Right, in the hiring and
7  promoting, yeah.
8  Q.  Okay.  And what role do they
9  play?
10  A.  They -- they basically recommend
11  or suggest to me.
12  Q.  Okay.  All right.
13  A.  They can -- they can -- at the
14  end of the day, I have the final decision
15  to make that, that, the final decision.
16  Q.  Okay.  Well, just describe for
17  me, for instance, if I were applying for a
18  position, deputy's position with the
19  Constable's Office and I've met the
20  qualifications via Civil Service and my
21  name is placed within the pool of
22  applicants for the position, what would I
23  experience?
24  A.  You would experience a series of
25  questions being asked from -- and I can't

Page 25

1    tell you what the lieutenant, the sergeant,
2    the chief deputy may ask you because I
3    don't tell them what to ask.  They
4    formulate, develop their own questions when
5    we are getting ready to hire deputies.  I
6    can't tell you what they would ask.
7         I sit back and listen and then I
8    look at the -- I look at the background of
9    the individual myself in making the final
10   decision because, keep in mind, when we get
11   the list, unless we determine something on
12   that list is not accurate or not good, then
13   everybody on that list is qualified.
14   Q.   Okay.  I understand that.  But
15   in terms of making, getting recommendations
16   from your -- the group that you rely upon,
17   how does that work?
18   A.   Well, sometimes the deputies
19   will look up whoever is on the interview,
20   they will rank some people, depending on
21   what the situation is in the hiring.  They
22   may rank them and say, look, I would
23   consider this person here first or second
24   and third or in that order, depending,
25   coming on down the list.  And the other

Page 26

1    one, depending on who all's in there and
2    there's no particular number, it might be
3    anywhere, depending on availability, maybe
4    three to five in there.  But they'll look
5    at it.  They'll make the -- they'll make
6    recommendations.
7    Q.   Do these individuals conduct an
8    interview?
9    A.   They sit in on the interview at
10   the same time I'm on the interview.
11   Q.   So all?
12   A.   All of us are sitting there
13   together.
14   Q.   Together?
15   A.   Yeah, yeah.  It's not a separate
16   interview.
17   Q.   Okay.  Let me ask you this:  Is
18   that group of individuals that are gathered
19   together to interview a potential employee
20   or someone that's applied for a promotion,
21   what is that group of people called?  Do
22   you have a name for those people?
23   A.   No.  No.  Because depending on
24   if the position becomes available for,
25   well, let's say the chief deputy -- not

Page 27

1    chief deputy, the chief of operations
2    position came available and we got a list
3    of -- it was 10 people, so 10 people that
4    were being interviewed were from deputy to
5    sergeant to lieutenant.  So just about
6    everybody was in on that.  I mean, in terms
7    of consideration.  So there was only two
8    people there to interview, me and the chief
9    deputy.  And we selected the chief of
10   operations.
11   Q.   Okay.  Now, when you indicated
12   that you're the final appointing authority,
13   what does that mean?
14   A.   That means my name is as the
15   elected official, as the city constable for
16   the City of Baton Rouge, I have to sign off
17   on the person that is being promoted, that
18   is being hired, that is being given a
19   raise, that is being reprimanded as the
20   appointing authority under city parish
21   government, the appointing authority has
22   the responsibility of doing that.  And
23   that's my position.
24   Q.   Do you take the recommendations
25   of those persons that you have selected to

Page 28

1    interview the candidates for a particular
2    position or promotion?
3    A.   Sometimes I do and sometimes I
4    don't.
5    Q.   Okay.
6    A.   It just depends.
7    Q.   Okay.  What's the determining
8    factor?
9    A.   Well, an evaluation of the time,
10   the position, the person, their overall --
11   you know, each -- we consider each position
12   as an individual position.  There's no
13   global means by which they said this or
14   they said that and this is what you have to
15   do.  That's not the case.  I make the final
16   decision after they make their
17   recommendations.
18        Now, I'll stand back and wait
19   until recommendations and suggestions are
20   made.
21   Q.   What reason, what scenario --
22   because you described for me whereby you
23   would not accept the recommendation of your
24   chief, your lieutenant, your captains in a
25   hiring or promoting situation.

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

Page 29

1  A.  Well, I could go back and give
2  you any specific reason other than the fact
3  that when I'm sitting there listening, it
4  may be that they may have not heard
5  something that I've heard, they may not
6  detect something I've detected, they may
7  not have the opportunity to fully evaluate.
8  But we've never had what we call a real
9  disagreement.  There may be a difference of
10 opinion, but I think that is something that
11 is open in any opportunity of fairness, we
12 can agree to disagree, and then move on.
13 But I've never had one to tell me that they
14 totally disagreed with the decision that I
15 made.
16 Q.  But I guess my question is:
17 Basically, what scenario can you describe
18 for me where you would not accept the
19 recommendation of your supervisors when it
20 comes to hiring or promoting?
21 A.  Well, that would be hard to say,
22 pick out a particular scenario because, for
23 example, when the list is sent to us, as I
24 said before, the list is sent.  Once the
25 list is sent from Civil Service -- and let

Page 30

1  me explain, when Civil Service sends a
2  list, they don't do background checks.  My
3  office does all the background checks.
4  Just about every law enforcement agency, I
5  know they do their own background checks.
6    Give you a good hypothetical
7  situation:  If a person sent -- well, the
8  interviewing panel is sitting there and
9  they looking at this person, this person,
10 they say, oh, I like this person, they look
11 good, I may even agree with them.  Once I
12 get the background investigation
13 information and it's finalized through IA
14 and the background people, it may reveal
15 something that I can't hire that person.
16 And it could run the gamut from a record
17 that is not -- because as I said, HR
18 doesn't do that.  So if they got a criminal
19 record, I'm not going to -- I'm going to
20 give serious consideration, but I may
21 decide that it's in our best interest that
22 we don't.
23 Q.  Okay.
24 A.  They may not know that.  So
25 that's just one hypothetical situation.

Page 31

1    And I can tell you that's not one that has
2  happened often.
3  Q.  And I can appreciate that when
4  it comes to hiring an individual.
5  A.  Okay.
6  Q.  What about promoting your own
7  people and these people that are already on
8  the job, they've all been vetted, you know
9  them, you've worked with them?  What
10 scenario can you describe for me where you
11 would not adhere to the recommendation of
12 your supervisors when it comes to promoting
13 your own individual?
14 A.  Well, basically --
15 Q.  Employee, I should say.
16 A.  I don't know of one right now at
17 this particular point that would -- that
18 would -- if a supervisor brought it to my
19 attention that this is a person that
20 they're -- and, remember, just one
21 supervisor doesn't make the -- doesn't make
22 a -- I mean, they make a recommendation.
23 If you've got four supervisors or four
24 people, not necessarily just supervisors,
25 you might have four persons that are on the

Page 32

1  interview and if they're on the interview
2  and one suggests that this person be
3  promoted and two others say, well, I would
4  prefer seeing this person, I may -- to make
5  sure my supervisors understand that they
6  have the right to make recommendations and
7  suggestions, but at the same time at the
8  end of the day I will make the final
9  determination.  And I couldn't tell you any
10 particulars that would exist in that
11 particular area that would come to mind
12 right now.
13 Q.  Let me ask you a question.
14 You're the city constable.  Describe your
15 daily, a typical day in the life of Major
16 Brown in terms of your -- what do you do
17 during the day?
18 A.  First thing I, I wake up in the
19 morning and call control, which is the
20 center, the office where the jail is housed
21 and we call it control because it's where
22 the cameras, the monitors and everything is
23 and the doors are operated with the key
24 personnel that's right there.
25    The first thing I do in the

Page 33

1   morning is call that particular area to
2   find out if anybody by seven o'clock, if
3   anybody's going to call in for sick leave,
4   emergency vacation, a day off or whatever,
5   they would have done so within that
6   reasonable period of time, between seven,
7       7:15, maybe 7:30 at the latest.  That's the
8   first thing I do.
9       Then the next question I'll ask
10  the supervisor or whoever answers the
11  phone, how many prisoners are we
12  transporting that day and where are they
13  coming from.  That begins my day.
14      Then when I begin the day
15  rolling, I may roll to the Cortana Mall
16  office to make sure everything is rolling
17  fine at the community service office, then
18  head down to the main office, which is 233
19  St. Louis Street, in the basement there to
20  make sure that everything is going on fine
21  there, or either communicate with one of
22  the supervisors, the chief of operation,
23  the chief deputy, to make sure that things
24  are working well there.
25      And then from there on, it could

Page 34

1   be just a variety of things, being
2   available to make decisions on maybe some
3   operation matters, but basically making
4   sure that the -- because we probably have
5   one of the most diverse operations, I
6   guess, in city parish government.  We
7   collect over nearly a million dollars a
8   month in garnishments.
9       So I have to make sure the
10  constables section is up and rolling,
11  making sure that if the mails come in, they
12  have taken care of getting the checks open,
13  getting them processed.  And then take
14  calls from people, receive visitors that
15  come in, talk to people about other
16  concerns and requests from the community,
17  because we get a bunch of those for parades
18  to speaking engagements to making
19  appearances in other areas with our DARE
20  program, our community services and our
21  Reserve program.  So it's a lot to do in a
22  day's time.
23  Q.  From what I understand, there
24  are three departments within the
25  Constable's Office.  There's a jail; is

Page 35

1   that accurate?
2   A.  There's a jail.
3   Q.  There's a front door security,
4   or courtroom security?
5   A.  No.  Front door security, you're
6   right, that's separate.
7   Q.  Front door security?
8   A.  Yes.
9   Q.  And then courtroom security?
10  A.  Courtroom security.
11  Q.  And then you have judicial
12  enforcement?
13  A.  Judicial enforcement.  You have
14  community services with the DARE program.
15  You have the garnishment section that
16  handles the checks that come in.  Basically
17  now that's being handled by clerical.  Then
18  you have a warrant operation, not a warrant
19  division, a warrant operation, because at
20  one time it was handled by one person.  You
21  have a warrant operation.  Then you have a
22  special services operations.
23  Q.  Okay.
24  A.  And IA, internal affairs.
25  Q.  Now, in terms of the jail, how

Page 36

1   much time do you spend on a daily basis in
2   the jail?
3   A.  Well, the jail, to spend in the
4   jail, I don't think no one -- you mean if
5   it's going through the control center,
6   checking in and out, I go through the jail
7   upon a need, when there is a need we've
8   had.  I guess here in the past five years
9   maybe or so, we've had some situations with
10  the jail having mold, having other
11  situations in there that may not be
12  conducive for prisoners or inmates
13  maintaining, being maintained there, the
14  commode stoppage and things of that nature.
15      I'll approve for those
16  particular areas.  At one particular time
17  we had to close that area down because of
18  that.  So, you know, back and forth between
19  communications, the jail, I don't -- I'm
20  just -- I'll run the gamut.  I hardly ever
21  sit in my office because my office is dead
22  in the back out of sight of everybody.  So
23  I'm basically always in the middle of the
24  office, in the front, either in the chief
25  deputy's office, my executive assistant's

Page 37

1  office, the chief of operations or in
2  special services.
3  Q.  Okay.  Would you be qualified to
4  evaluate the job performance of the jail
5  employees?
6  A.  Basically, with the assistance
7  of personnel.
8  Q.  Without the assistance of
9  personnel, could you evaluate the deputies?
10 A.  Without, without, without
11 assistance, I could do so.  But now, there
12 may be some things that are missing.
13 Q.  I mean, do you spend enough time
14 in the jail to accurately and adequately
15 evaluate the job performance of the
16 deputies and the corporal and the sergeant
17 that works in the jail?
18 A.  I spend -- first of all, I'm
19 experienced enough where I've worked in the
20 capacity at the Sheriff's Office for 25
21 years and when I came to the Constable's
22 Office I was the one that reorganized the
23 jail.  I was the one that reorganized
24 courtroom and building security so I had to
25 do that based on my own knowledge and the

Page 38

1  application process of knowing what needs
2  to be done.
3      And every -- of course, every
4  day there's a need for improvement.  For
5  example, we just made some changes in front
6  door security, which is FDS, in the last
7  year, year and a half because of the front
8  door being the very, very first and focal
9  point of an attack on that operation if
10 somebody wanted to do so.  So we made
11 changes there based on my recommendation
12 and the review.  And then the jail's the
13 same.
14 Q.  Okay.
15 A.  As a matter of fact, I've spent
16 enough time in the jail to know that
17 certain things that were in the jail that
18 needed to be removed out of the jail, I
19 made sure that that was done and to
20 rearrange certain sections.  I've been down
21 there enough when we've had inmates in
22 there during Katrina and even before
23 Katrina that made me aware of the fact that
24 there were certain things that we needed to
25 do to be prepared.  That's why I was able

Page 39

1  to make the decision the district attorney
2  and city parish that that jail is not one
3  that is designed to be open 24/7, 365 days
4  a year.  Under no condition would I open
5  it.  When they asked me about consideration
6  I'd say absolutely not.
7  Q.  Okay.  Major Brown -- and I
8  really appreciate your -- the thoroughness
9  of your answer but we're going to be here
10 all day if -- if we continue to -- you're
11 giving me more than I asked for.
12 A.  Okay.  All right.
13 Q.  A whole lot more than I asked
14 for, and what I'm asking for specifically
15 deals with the employees in the jail.
16 A.  I know enough about the jail to
17 evaluate the employees in the jail.
18 Q.  That's not what I asked you.
19 A.  What did you ask?
20 Q.  Do you know enough about the job
21 performance of each employee in the jail to
22 evaluate the jail deputies, corporal and
23 sergeant?
24 A.  I know enough about it based on
25 the P mass recommendations that are given

Page 40

1  by their supervisors and to evaluate them
2  based on that.  I don't micromanage, so
3  that way, I'm not the direct supervisor.
4  Q.  So you have individuals in place
5  to evaluate the job performance of the
6  deputies, the corporal and the jail
7  sergeant?
8  A.  Up to a certain point we had
9  just the lieutenant and a sergeant in the
10 jail, I mean, a lieutenant operated, that
11 basically was over --
12 Q.  Major, look at me.  Let me
13 interrupt you.  For instance, I just asked
14 you a question.  I said so you have someone
15 in place to evaluate the job performance of
16 the deputy, the corporal and the sergeant.
17 To me, that's a yes or no answer.
18 A.  Yes.
19 Q.  Okay.  All right.  Now, you
20 depend upon those individuals that you have
21 in place, the lieutenant and the captain,
22 to evaluate the job performance of the
23 deputies, the corporal and the jail
24 sergeant; isn't that accurate?
25 A.  Yes.

Case 3:16-cv-00297-BAJ-RLB   Document 16-5   04/12/17   Page 12 of 51

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

Page 41

1  Q.  Okay.
2      MR. FOWLER:
3      Did you want to elaborate?
4      THE WITNESS:
5      Yes.  First of all, the captain
6  has to look at the overall operation given
7  to him by the lieutenant as he observes
8  because there's sometimes the lieutenant
9  may not have all the details.  We've had
10 certain things to happen where the
11 lieutenant did not have the full picture
12 and the captain had to go in and get more
13 detailed information so we could better
14 evaluate a particular situation.
15     Now, first of all, the corporal
16 is a ceremonial position that is appointed,
17 that is put in place by -- that was put in
18 place by me and the sergeant, to pick his
19 own corporal, he or she.
20     MR. BERNARD:
21     You going to --
22     MR. FOWLER:
23     Yeah.  When Mr. Bernard asks you
24 a question and he's going to be looking for
25 an answer and if you want to elaborate on

Page 42

1  it, you can elaborate on it within the
2  scope of the original question.  He's not
3  going to cut you off.  You're going to be
4  able to elaborate.
5      THE WITNESS:
6      Okay.  All right.
7      MR. BERNARD:
8      If we can stay confined to the
9  question.
10     THE WITNESS:
11     Yeah, all right.
12     MR. BERNARD:
13     Because I know you've been in
14 this position for a long time and you've
15 got a wealth of information and knowledge,
16 but we don't need it all in the deposition.
17     THE WITNESS:
18     All right.
19     MR. BERNARD:
20     Okay?
21     EXAMINATION BY MR. BERNARD:
22 Q.  And so my specific question is,
23 is that as the city constable, you depend
24 upon your captains and your lieutenants and
25 your sergeants to evaluate the deputies and

Page 43

1  corporals; is that accurate?
2  A.  That's accurate up to a point
3  where I depend on them to give me the
4  information that they have.
5  Q.  When's the last time you've
6  evaluated a deputy's performance?
7  A.  A deputy?
8  Q.  Yes.
9  A.  When we -- out at the courtroom.
10 Well, first of all, in building and
11 courtroom security.
12 Q.  So it's your testimony, Major
13 Brown, that you actually conducted a
14 performance evaluation of a deputy in
15 courtroom security?
16 A.  I have done an evaluation of
17 deputies in courtroom security.
18 Q.  When was the --
19 A.  Observation.
20 Q.  No.  I said evaluation.
21 A.  Oh, no.
22 Q.  Performance evaluation.
23 A.  No.  No.  No.  No.  Observation,
24 not evaluation.  Observation.
25 Q.  So would it be accurate to say

Page 44

1  since you've been the constable at least
2  for the last ten years, that you have not
3  evaluated the job performance of any deputy
4  under your supervision?
5  A.  That would be partly yes, partly
6  no, because I evaluate at some point in
7  time, I evaluate a deputy upon their
8  individual performance in a particular task
9  that they are performing.  It may not be in
10 the capacity that they -- for a promotional
11 position.  But I may just observe and look
12 at a deputy.
13     For example, when you say
14 evaluate, evaluate comes all the way from
15 appearance all the way up to performance.
16 Q.  That's not what I'm talking
17 about.  It's been testified to here by
18 several of your employees that you guys
19 give annual evaluations.
20 A.  Yes, they do, the supervisors do
21 that.  Yeah.  Yes, they do.
22 Q.  That the --
23 A.  That's the P mass and
24 supervisors give that.
25 Q.  That the evaluations are in

Page 45

1  writing?
2  A.  Yes.
3  Q.  Okay?  And that they occur once
4  a year.
5  A.  They occur -- I sign off on them
6  once I get them, yes, they do evaluate
7  them.
8  Q.  My question --
9  A.  Yes.
10  Q.  -- to you, Major Brown, is that
11  isn't it a fact that you do not physically
12  conduct a written evaluation, an annual
13  evaluation of the deputies that are
14  employed by the city Constable's Office?
15  A.  Well, that, again, is partly yes
16  and no, because when you say physically,
17  when I have to sign off on it, I have to
18  read through these evaluations and
19  determine if there's something there that I
20  feel that may or may not be accurate, after
21  the sergeant, the lieutenant or the captain
22  that signs off on it, then I sign off on
23  it, yes, I do that.  But I don't evaluate
24  them, no.
25  Q.  Okay.  So you do not evaluate

Page 46

1  deputies that are employed by the city
2  Constable's Office?
3  A.  I'm at a crossroads when you say
4  that because I evaluate every employee at
5  the office.  Now, physically written
6  evaluations, no.
7  Q.  Okay.
8  A.  I manage them and I evaluate
9  them.  No, I don't.  I don't physically
10  write it up and put it, no.
11  Q.  Okay.  So when it comes to
12  evaluating the deputies that are employees
13  for the city Constable's Office, you do
14  not -- you do not write up or evaluate
15  their performance and place it in
16  written -- on a written form that's
17  provided by Civil Service; isn't that
18  accurate?
19  A.  That would be accurate, that I
20  don't write it up, but I sign off on it
21  based on what the supervisors have provided
22  to me.  Now, if I'd have reason to disagree
23  with it for some reason, I will, but I
24  haven't, no.
25  Q.  Right.  Okay.

Page 47

1  So when it comes to the job
2  performance of your deputies, their
3  evaluation, their annual written
4  evaluation, you do not perform that task?
5  A.  No.
6  Q.  Yes or no?
7  A.  No.
8  Q.  Okay.  When it comes to the
9  evaluation of your corporals, those
10  individuals that are in the corporal
11  position, their written job performance
12  evaluation, you do not perform that task?
13  A.  No, I don't.
14  Q.  Okay.  When it comes to the
15  evaluation of your sergeants, the written
16  job performances of your sergeants, you do
17  not perform that task; isn't that accurate?
18  A.  Basically, it is.
19  Q.  Is it accurate?
20  A.  Yes, it is.
21  Q.  Okay.  You depend upon your
22  lieutenants and your captains to provide
23  you with the evaluation forms and you
24  review them, you review the forms that are
25  given to you that are already filled out,

Page 48

1  you review them and either you sign off on
2  them or you send them back and indicate
3  that you have an objection or a concern
4  about the evaluation process; is that
5  accurate?
6  A.  Yes.
7  Q.  Okay.  All right.  So when
8  dealing with promotions, when a position is
9  available and you have candidates or
10  employees that are applying for the
11  position, do you in fact depend upon your
12  lieutenants, your captains and even your
13  sergeants to evaluate and give you a
14  recommendation as to who should fill that
15  position?
16  A.  No.  They don't -- no.  They
17  don't -- I don't depend on them to give me
18  a written evaluation.
19  Q.  Not a written evaluation.
20  A.  I offer them the opportunity to
21  give me suggestions.
22  Q.  Okay.  All right.
23  A.  Suggestions.
24  Q.  Okay.
25  A.  Again, I make the final

Page 49

1  decision.  I offer them the opportunity to
2  participate.  I don't -- basically, I don't
3  even have to have them in if I desire not
4  to.
5  Q.  I know.
6  A.  But I do, because to a degree of
7  fairness, I want them to hear, understand
8  and know the ground rules of why we're
9  doing what we're doing and at the end of
10  the day, I make the decision.
11  Q.  Isn't it a fact that you have
12  your lieutenants and your sergeants and
13  your captains participating in the
14  promotion process, the process of promoting
15  an individual because they are at ground
16  zero and they see these employees on a
17  day-by-day, moment-by-moment basis?
18  A.  Well, that's a no to that answer
19  because there have been times we didn't
20  have a captain.  There have been times
21  where I've had to take the position of the
22  captain, the chief deputy and act in both
23  capacities.  Only there have been times
24  when I was only left with two lieutenants
25  and six sergeants.

Page 50

1  Q.  But isn't it a fact, Major
2  Brown, that you depend upon your
3  supervisors to make a recommendation when
4  it comes to a promotion because they see
5  these -- they interact with these employees
6  on a day-by-day basis?
7  A.  No, I don't.
8  Q.  You do not?
9  A.  No, I don't.
10  Q.  Okay.  Okay.
11  A.  I depend on them to offer
12  suggestions.
13  Q.  Okay.  Okay.
14  A.  Yeah.
15  Q.  All right.  Good enough.
16      In terms of promotion, do you as
17  the constable have any written policies or
18  procedures that you follow in determining
19  who should be promoted and who should not
20  be promoted?
21  A.  We don't have any -- we don't
22  have any -- all policies and procedures on
23  promotions basically begin with Human
24  Resources and Civil Service, because
25  whoever's qualified to apply for a position

Page 51

1  once we open it up, we have a policy that
2  when a position, a promotion is open,
3  particularly for sergeant and lieutenant
4  and captain, we put it in writing and let
5  it be known that this position is open, you
6  can go to the Human Resources and apply and
7  take the steps that they have in place for
8  you to take.
9  Q.  Now, isn't it true that the
10  application process that, I believe --
11  aren't you describing the application
12  process?
13  A.  No.  I'm describing the
14  promotion, because when there is an opening
15  for a promotion, I don't know what they did
16  before I got there.  I came up with the
17  plan that we're going to put it in writing
18  where you want to apply, you go to Civil
19  Service, and if you qualify -- because I
20  can't tell them if you've been there a
21  number of years or you pick the category,
22  and if it's a sergeant, a lieutenant, you
23  have to take a test.  And if it's a
24  captain, there's a grade process they go
25  through.  Those are the three processes

Page 52

1  that we promote on.
2      A corporal, which is a
3  ceremonial position, we let the sergeant
4  generally select the corporals themselves
5  in terms of recommending.  And, again, they
6  don't make that corporal and say you're
7  going to be corporal.  They're going to say
8  I suggest, I'm going to offer you up as a
9  suggestion.  So, yes, that's how that
10  process goes.
11  Q.  Okay.  Now, just try to stay
12  with me and just so we can get through
13  this, this deposition.
14  A.  Okay.
15  Q.  Now, if a promotion or a
16  position -- or put it this way:  If a
17  position is available, an in-house position
18  is available and you have several
19  individuals that would desire -- let me
20  back all the way up.
21      If a position becomes available,
22  let's just say the jail sergeant's
23  position, let's be specific, it becomes
24  available, what happens first?
25  A.  Same process I just mentioned:

Page 53

1    It is put in writing.
2  Q.   The position is --
3  A.   It's put in writing.
4  Q.   Okay.
5  A.   And the person who wants to
6    apply for it can.
7  Q.   Okay.  So is that written
8    description of the position placed --
9  A.   It is written that the position
10    is open, it's available.
11  Q.   Is it posted?
12  A.   When you say posted, it's
13    normally distributed through the office or
14    put on the board or on the table where
15    people pick up their information and it
16    doesn't take but a matter of one to really
17    be printed.
18  Q.   So once the position becomes
19    available, that information is disseminated
20    in some form or fashion throughout the
21    department?
22  A.   Yes, uh-huh (Affirmative
23    Response).
24  Q.   Okay.  That's step one.  Is that
25    accurate?

Page 54

1  A.   Yeah.
2  Q.   Step two, and you have
3    applicants who apply for the position; is
4    that accurate?
5  A.   That's accurate.
6  Q.   Okay.  And that application is
7    in written form, right?
8  A.   Yeah.
9  Q.   Okay.  And step three, they must
10    go to Civil Service and submit their
11    application to HR, which essentially
12    qualifies these individuals via the Civil
13    Service rules and regs; is that accurate?
14  A.   Accurate.
15  Q.   Okay.  Now, those applicants who
16    come out, those applicants that are deemed
17    qualified are basically applicants that
18    have met minimum qualifications; is that
19    accurate?
20  A.   That's accurate.
21  Q.   Okay.  Because you stated
22    earlier that you can have a deputy apply, a
23    sergeant apply --
24  A.   Whoever Civil Service says that
25    can apply, that's who they determine.  I

Page 55

1    don't determine that.
2  Q.   Exactly.  But those applicants
3    that are deemed qualified are applicants
4    who have met the minimum qualifications for
5    a particular job; is that accurate?
6  A.   They meet the minimum
7    requirements and Civil Service sends them
8    to me, yes, sir.
9  Q.   Okay.  Now we've got step three
10    out of the way.
11    Now, after you receive the group
12    of qualified applicants -- and to qualify,
13    they have to take a test; is that accurate,
14    many times?
15  A.   They are, depending on the
16    position, I don't think captain.  I think
17    captains' positions are graded on paperwork
18    that is submitted.  Lieutenant and
19    sergeants take a test, yeah.
20  Q.   Okay.  All right.  So there are
21    certain positions that you have to -- that
22    the applicant has to take a written test?
23  A.   Take a written test.
24  Q.   Now going back to our original
25    hypothet, we're talking about the jail

Page 56

1    sergeant position.
2  A.   Okay.
3  Q.   So that particular applicant who
4    applies for that job has to submit
5    themselves or to take a Civil Service
6    examination to be deemed qualified to at
7    least be interviewed for the job?
8  A.   They have to successfully, yes,
9    complete it and be submitted to me.  They
10    have to present it.  The Civil Service then
11    has to send me the qualified applicant.
12  Q.   Okay.
13  A.   Yeah.
14  Q.   All right.  Now, when you get
15    the qualified applicants, what happens
16    next?
17  A.   When I get the qualified
18    applicants, I generally at some point in
19    time I would put it on the chief deputy's
20    desk where my executive assistant would get
21    it.  I'd put it on the chief deputy's desk,
22    let them know let's get ready to set these
23    interviews up.  We generally set the
24    interviews up based on the number of people
25    and the time so that we can interview.  And

Page 57

1  depending on the interview process, we may
2  have -- if it's the jail sergeant and
3  that's the one that you're referring to, it
4  would probably be the captain, the two
5  lieutenants.
6  Q.  Well, let's break this down a
7  little bit.
8      Now, just from your testimony,
9  you've indicated to me that once Civil
10 Service provides you with those applicants
11 who are qualified, who have met minimum
12 qualifications for the vacant position,
13 that you provide that list to your chief
14 deputy?
15 A.  The chief deputy or the chief of
16 operations.
17 Q.  The chief of operations?
18 A.  It would be one of my
19 subordinates.
20 Q.  One of those two?
21 A.  Yeah.
22 Q.  And it's their job to set up an
23 interview with the list of qualified
24 applicants?
25 A.  And I go back.  It may not be.

Page 58

1  It may not be one of them.  My executive
2  assistant may set the interviews, either
3  one of the three.
4  Q.  It's not you?
5  A.  No, I don't.
6  Q.  Okay.
7  A.  No, I don't.
8  Q.  Okay.  It's somebody else?
9  A.  Somebody else does that.
10 Q.  Somebody that reports to you?
11 A.  Right.
12 Q.  Does that?
13 A.  Uh-huh (Affirmative Response).
14 Q.  And everybody that's on that
15 list that are deemed qualified applicants
16 receives an interview; is that accurate?
17 A.  Now, are we speaking just
18 strictly on the sergeant?
19 Q.  Yes.
20 A.  And the jail?
21 Q.  Yes.
22 A.  In that particular case, yes.
23 That's not always the case.
24 Q.  We were just talking about --
25 A.  I'll go back and preface that,

Page 59

1  because if I got a list of eight on that
2  list for sergeant in the jail, I don't have
3  to take but a percentage of that eight.
4  Q.  Okay.
5  A.  I don't have to take -- I don't
6  have to take all eight.  I don't have to
7  interview all eight.
8  Q.  Okay.
9  A.  I forgot what the percentage is,
10 but I think if it was eight on there, I
11 could take three.
12 Q.  Who makes the determination on
13 who gets interviewed?
14 A.  If that's the case, me and my
15 subordinates would do that.  But I only say
16 that so that can clarify that just because
17 your name is on the list doesn't mean you
18 get interviewed.
19 Q.  Okay.
20 A.  And that's the same thing with
21 all processes.  But to clarify that, I
22 interview everybody on the promotion list
23 because I think in all fairness, if these
24 people took the time to take the test, get
25 their name on the list, I at least deserve

Page 60

1  to give them the opportunity to present
2  themselves.  So I interview everybody.  I
3  have never taken a list and taken part to
4  interview and part not to interview,
5  although I have that option.  I interview
6  them all.
7  Q.  Okay.  So when it comes to the
8  jail sergeant's position, you interview all
9  qualified applicants?
10 A.  That said they wanted to be
11 interviewed.  If memory serves me
12 correctly, in the last promotion we had in
13 the jail, I think there were four on the
14 list, I think, and one declined.
15 Q.  Okay.  All right.  With the
16 exception of those that would decline an
17 interview, you interviewed everybody?
18 A.  Interviewed everybody.
19 Q.  Everybody?
20 A.  Yes.
21 Q.  You interview everybody?  You
22 interviewed everybody?
23 A.  I interviewed everybody --
24 Q.  When it comes to the jail
25 sergeant position, all applicants that are

Page 61

1    seeking a promotion, you testified that if
2    they take the time to take a test, that
3    you're going to interview all of them.  Is
4    that accurate?
5    A.  That's accurate.  Those that I
6    can, I preface it with the fact that those
7    that want to be interviewed, because one
8    didn't.
9    Q.  Okay.  Good enough.
10        Now, you also testified that
11   someone that reports to you, direct-reports
12   to you sets up the interview?
13   A.  Yes.
14   Q.  The time, the location of the
15   interview.
16   A.  Yeah.
17   Q.  Okay.
18   A.  Yes, that's correct.
19   Q.  Now, you also testified that you
20   sit in on the interview.
21   A.  I participate in all the
22   interviews.
23   Q.  Okay.  We're dealing with the
24   jail sergeant position.
25   A.  Yeah, with the jail sergeant.

Page 62

1    Yes, I did.
2    Q.  Okay.  Not only do you sit in on
3    the interview, but some individuals that
4    report directly to you sit in on the
5    interview; is that accurate?
6    A.  That's correct.
7    Q.  And would it be a fair statement
8    to make that those individuals that are
9    within the chain of command on the jail
10   side of your business would be a part of
11   the interview process?
12   A.  Well, those that were -- no,
13   because you have a -- you had two -- I
14   think if I'm not mistaken I had two
15   lieutenants and one's not on the jail side.
16   The other one is.  And I had a captain of
17   chief operations and a chief deputy.  So
18   the one, the lieutenant that was not on the
19   jail side also participated.
20   Q.  Okay.  But is it a fact that
21   those persons that are in the chain of
22   command on the jail side, the lieutenant,
23   the captain and possibly the chief of
24   operations --
25   A.  Yeah, the captain.  The captain

Page 63

1    is the chief of operations.
2    Q.  Okay.  The captain's chief of
3    operations?
4    A.  And the chief deputy.
5    Q.  And the chief deputy would
6    participate in the interview, because all
7    of these people are in the chain of command
8    on the jail side; is that accurate?
9    A.  That would be accurate.
10   Q.  And all of these people
11   participate in evaluating those employees
12   that work on the jail side; is that
13   accurate?
14   A.  They would -- that's partially
15   accurate and partially not, because the
16   lieutenant that is over the jail is also
17   judicial over enforcement and is also over
18   warrants.  So he's not just a lieutenant
19   just for the jail.  The captain and the
20   lieutenant, we have -- we have six
21   departments within our operation.
22   Q.  I'm focusing --
23   A.  And you're focusing on the jail.
24   Q.  -- on the jail.
25   A.  Well, no, we had two lieutenants

Page 64

1    that were there on one was -- one worked --
2    one supervises the jail and the captain
3    definitely does and the chief deputy does,
4    also.
5    Q.  These individuals participate --
6    A.  Right.
7    Q.  -- in the interview process?
8    A.  Right.
9    Q.  Okay.
10   A.  No.  They participated in that
11   particular process.  And the reason why I
12   keep emphasizing that is because they don't
13   have to always be the only ones that
14   participate.
15   Q.  I never said that.
16   A.  No, I know you didn't, but I
17   want to make it clear that that's not
18   always the case.
19       For example, I might not be
20   there and it's going to still go on.  So if
21   one of them are not there, it's going to
22   still go on.
23   Q.  I never said that.
24   A.  I know.  No.  I wanted to make
25   it clear, though.  Okay.  All right.

Page 65

1  Q.   Anything I'm not clear about,
2  believe me, I'm going to ask about, all
3  right?
4  A.   All right.
5  Q.   Now, because they participate in
6  the interview process, you have them or you
7  invite them or ask them to participate
8  because you value their opinion; is that
9  accurate?
10  A.   I certainly do.
11  Q.   Okay.
12  A.   I value their opinion.
13  Q.   You value their opinion?
14  A.   Uh-huh (Affirmative Response).
15      MR. FOWLER:
16      Say yes or no.
17      THE WITNESS:
18      Yes.
19      EXAMINATION BY MR. BERNARD:
20  Q.   And you value their opinion --
21  is this accurate that you value their
22  opinion because they're boots on the
23  ground, they are there watching and
24  observing these individuals that you may
25  see maybe once a week, maybe once every two

Page 66

1  weeks, but they see these people every day
2  and you value their opinion because they
3  see, they are with these individuals on a
4  day-to-day basis?  Is that accurate?
5  A.   Not accurate, because they're
6  not there on a daily basis to see them and
7  sometimes they don't and sometimes they're
8  out -- they're in training, so they don't
9  see them on a daily basis.
10  Q.   They see them more often than
11  you see them?
12  A.   They may see them working in
13  that environment more often, I mean, more
14  than I do, but I see them basically on a
15  daily basis because I pass through there
16  just about every day.  But I don't see them
17  in the venue that they see them in, no,
18  sir.
19  Q.   Right.
20  A.   Okay.
21  Q.   That's why you -- isn't that a
22  fact that that's why you have these
23  individuals --
24  A.   Yes, it is.
25  Q.   -- on the interview process

Page 67

1  because they can add things or they know
2  things that you may not know, because
3  you're a busy man?
4  A.   That's a possibility, yes.
5  Q.   You are a busy man.  You're not
6  just over the jail.  You're over six
7  divisions, plus community service, plus
8  parades, you mentioned.
9  A.   Yes.
10  Q.   That's why the Army is set up
11  the way it is?
12  A.   Yes.
13  Q.   That's why the sheriff office is
14  set up with hierarchy and chains of
15  command.  That's why your office has a
16  chain of command; isn't that accurate?
17  A.   That's accurate, yes.
18  Q.   Because you can't do it by
19  yourself?
20  A.   No.  Nobody can.  They can't,
21  either.
22  Q.   Okay.  So you depend upon them
23  to provide you with information that you
24  don't have?
25  A.   We depend upon each other.  I

Page 68

1  think that would be more accurate, and work
2  together as a team.
3  Q.   I'm not debating that.  I'm
4  saying you depend upon them to provide you
5  with information that you don't have?
6  A.   I do depend on them to provide
7  me with some information upon, yes, I do.
8  Q.   Okay.  All right.  Let's talk
9  about Ms. Rhea Davis, okay?  You know
10  Ms. Rhea Davis?
11  A.   Yes.  I hired Ms. Davis.  I
12  certainly know her.
13  Q.   Okay.  Ms. Rhea Davis worked in
14  the jail department for you?
15  A.   Yes.
16  Q.   She worked in the jail
17  department, she began as a deputy?
18  A.   Yes.
19  Q.   And she eventually was promoted
20  to the corporal position; is that accurate?
21  A.   Yes.
22  Q.   Okay.  And she worked in the
23  jail division for approximately five plus
24  years; is that accurate?
25  A.   I'm not exactly sure the year,

Page 69

1  but I'll accept that as your suggestion,
2  verified be correct, but probably so.
3  Q.   Okay.
4  A.   If you say five, it's five
5  unless the records will reflect that.  But
6  I'm not exactly sure of the length of time.
7  Q.   Right.
8      Ms. Rhea Davis served as a
9  corporal under the -- under Ms. Terrica
10  Williams?
11  A.   Yes.
12  Q.   Okay.  When Ms. Terrica Williams
13  resigned, Ms. Rhea Davis was the acting
14  jail supervisor?
15  A.   That's correct.
16  Q.   Okay.  She was in that interim
17  position for approximately five months?
18  A.   I'm not sure exactly how long
19  she was in it.
20  Q.   But she was in the position?
21  A.   She was in the position, yes,
22  sir.
23  Q.   Ms. Rhea Davis applied for the
24  promotion, or, rather, the jail sergeant
25  position?

Page 70

1  A.   Yes, she did.
2  Q.   She took the test?
3  A.   She did.
4  Q.   She performed well on the test?
5  A.   Yes, she did.
6  Q.   She was interviewed?
7  A.   Yes, she was.
8  Q.   Some members in your chain of
9  command, Chief Larry Navarre recommended
10  her for the job?
11  A.   I don't recall that, but if
12  he -- if he did, that was within his
13  parameters.
14  Q.   Well, he's testified that he
15  recommended her for the job.
16  A.   That's within his parameters,
17  yes.
18  Q.   Right.  Okay.
19      Another officer applied for the
20  job named Travis Brooks.
21  A.   Another deputy.
22  Q.   Another deputy.
23  A.   Yes, sir.
24  Q.   Right.
25  A.   He did.

Page 71

1  Q.   A deputy, right?
2  A.   Yes, sir.
3  Q.   This particular deputy worked in
4  courtroom security?
5  A.   He worked in courtroom security
6  at the time that he applied, yes.
7  Q.   Right.  He worked in courtroom
8  security for seven years?
9  A.   At the time he was in courtroom
10  security, but everybody starts off in the
11  jail, which he had already been.
12  Q.   Uh-huh (Affirmative Response).
13  A.   Yes, sir.
14  Q.   He testified that he was in jail
15  for eight months.
16  A.   Yes, sir.
17  Q.   And then he went to courtroom
18  security.
19  A.   Yes, sir.
20  Q.   And served as a bailiff for, I
21  forget which judge he was responsible for.
22  A.   Judge Ponder.
23  Q.   Judge Ponder, exactly.
24  A.   Right.
25  Q.   And he was in that position for

Page 72

1  seven years?
2  A.   Yes, sir.
3  Q.   He also testified that
4  periodically, if they were short-handed in
5  the jail or short-handed at the front door
6  security, that he would fill in a deputy's
7  position periodically during that
8  seven-year period; is that accurate?
9  A.   That's accurate.  And I add to
10  it, if you don't mind, he was also a member
11  of the Delta Narcotics Task Force and many
12  other operations that we called upon him.
13  He was -- as a matter of fact, he was so
14  valuable to the operation he was given a
15  utility vehicle because he was called our
16  utility person for the office.
17  Q.   Okay.
18  A.   Yes, sir.  I promoted him in
19  that position and he was a corporal then,
20  too.
21  Q.   Okay.  Let's talk about the job
22  duties, since you mentioned narcotics, what
23  position did he hold?
24  A.   Delta Narcotics.
25  Q.   Delta Narcotics?

Page 73

1  A.  Uh-huh (Affirmative Response).
2  Q.  Let's talk about the job duties
3  of a jail sergeant.
4  A.  Yes, sir.
5  Q.  What are those job duties and
6  responsibilities?
7  A.  Those duties of the jail are to
8  receive, document, maintain, house,
9  transport to court, transport back to the
10  various facilities that they go through to
11  process them while they're there, to
12  allocate manpower and personnel, to -- if
13  they have to go to the hospital, for
14  example, if a prisoner in that jail has to
15  go to the hospital, we receive them and
16  they have to be hospitalized before they
17  are released or transported out of there,
18  it becomes our main responsibility to make
19  plans to put them in the hospital and then
20  to put people around the clock to guard
21  them at the hospital until they are
22  released from the hospital and able to go
23  back into the main population.  That's part
24  of the jail.
25      Aside from pulling down the

Page 74

1  printout sheets on a daily basis of people
2  that have to be brought to court, people
3  that are on callout, people that are on the
4  transportation list, and to help coordinate
5  the detainers and to write bonds.  That's
6  part of the jail process.
7  Q.  Okay.  Part of the jail process.
8  Booking inmates?
9  A.  Yes.
10  Q.  Fingerprinting?
11  A.  Certainly.
12  Q.  Is part of the jail process?
13  A.  That's part of it.
14  Q.  Calculating bonds?
15  A.  Calculating, that's exactly
16  right.
17  Q.  Writing a bond?
18  A.  Yes.
19  Q.  Collecting fees?
20  A.  Certainly.
21  Q.  Depositing different sorts of
22  fees, depositing them, knowing where to
23  deposit the fees, is that a part of the
24  responsibility?
25  A.  Certainly, yes.

Page 75

1  Q.  Logging each posted bond, making
2  sure there's a log of who's bonded out, is
3  that a part of it?
4  A.  Yes.
5  Q.  How to use a jail management
6  system, is that a part of the
7  responsibilities of the jail supervisor?
8  A.  And main adjusters, yes.  And
9  look up warrants, verify warrants, yes,
10  sir.
11  Q.  How to prepare transmittals and
12  to send them to the First District?
13  A.  Yes, sir.
14  Q.  Going through the morning
15  checklist; is that accurate?
16  A.  Yes, sir.
17  Q.  Dealing with the various
18  deputies that he would, he or she would now
19  supervise?
20  A.  Yes, sir.
21  Q.  And transporting prisoners from
22  court back to jail and, as you described,
23  to the hospital if there's an emergency?
24  A.  Yes, sir.
25  Q.  Okay.

Page 76

1  A.  That's right.
2  Q.  Okay.  Now, what type of
3  qualifications do you need in order to
4  perform those particular tasks?
5  A.  First of all, you can -- you can
6  get two types of qualifications.  First
7  qualification, you have to be qualified to
8  be a deputy.
9  Q.  Okay.
10  A.  That's the first thing.
11      Second thing, you have to have
12  at least experienced working in the jail,
13  which everybody that has worked at the
14  Constable's Office since I've been there
15  have had that opportunity to work in the
16  jail at some point in time.  You gain it by
17  what I call OJT, supervision, management of
18  individuals who are there.  Nobody knows,
19  nobody comes there knowing that.  Nobody
20  knows everything even after they leave
21  there.  And sometimes you can be there 10
22  or 15 years and you still learn something.
23      So it takes a lot and you still
24  continue to learn because things change
25  every day.

Page 77

1 Q.  Okay.  So the number one
2 qualification, at least the first
3 qualification that you mentioned, and I may
4 have gotten distracted there a minute, was
5 to take the test.  I think you mentioned
6 that?
7 A.  Be a deputy.
8 Q.  Being a deputy.
9 A.  Yeah.
10 Q.  What was the second
11 qualification?
12 A.  Second qualification is to have
13 the work experience or the work ethic to
14 want to work there and do not mind working
15 in the jail to do what needs to be done to
16 accomplish that job and manage it.
17 Q.  Okay.  What's the third
18 qualification?
19 A.  The third qualification is to
20 then, after developing the knowledge, you
21 gain continuous experience through work
22 knowledge and collaborative working ethics
23 with your co-workers that are there and the
24 supervisors that are above you who have
25 been there and know it, such as your

Page 78

1 lieutenant and your captain.
2 Q.  Okay.  What other
3 qualifications?
4 A.  Basically, to be on the job
5 and --
6 Q.  Show up?
7 A.  -- show up to work.
8 Q.  On time?
9 A.  In a very timely manner.
10 Q.  Any other qualifications?
11 A.  I'm sure there are quite a few
12 others that I won't -- I won't -- and the
13 list could go on, but as you say, we'd be
14 here all night if we wanted to.  But
15 basically it's the -- as you a go along the
16 job working, you're going to get OJT,
17 on-the-job training as you go.
18 Q.  Uh-huh (Affirmative Response).
19 A.  And you get that from a variety
20 of sources.  The people you work -- you're
21 surrounded by as well as the supervisors.
22 Q.  Okay.
23 A.  And then of course you're going
24 to -- from time to time things change.
25 Parish prison policies and procedures

Page 79

1 change, you got to know that, because you
2 have to understand that everything that
3 goes on there is basically coordinated
4 through Parish Prison, particularly when
5 you're picking inmates up from there and
6 First District.  Not picking up inmates
7 from First District, but picking up
8 paperwork from First District to bring in.
9 Q.  Okay.
10 A.  And maintaining the fleet,
11 because if you don't have that fleet
12 maintained properly, you out of
13 transportation.
14 Q.  Okay.  All right.  All right.
15 Is that all?
16 A.  I'm sure it's not, but right
17 now, for the time being, that's what I can
18 recall.
19 Q.  Okay.  All right.  Now, when
20 this jail sergeant position was open,
21 vacant, you decided had to appoint
22 Mr. Travis Brooks to fill that position.
23 Isn't that accurate?
24 A.  No, not when it opened, I
25 decided to promote Travis Brooks.  After it

Page 80

1 was open and the process went through the
2 means of interviewing everybody that was
3 there, gathering all of the facts and
4 looking at the lay of the land, the final
5 decision rested with me and I decided to
6 promote Travis Brooks.
7 Q.  Right.
8 A.  Uh-huh (Affirmative Response).
9 Yes, I did.
10 Q.  Yeah.  You promoted Travis
11 Brooks to be the next jail sergeant?
12 A.  Yes, I did.
13 Q.  As a matter of fact, he's the
14 jail sergeant today?
15 A.  He is.
16 Q.  Okay.  Now, I'm going to show
17 you this document that we're going to mark
18 as Plaintiff Exhibit 1 and I'm going to ask
19 you to look at that document.
20 A.  You'll have to excuse me because
21 I've just -- I'm about to have eye surgery
22 tomorrow and I basically can't read this at
23 all.
24 Q.  Okay.
25     MR. FOWLER:

Page 81

1     You want me to read it to him?
2     THE WITNESS:
3     Yeah.
4     MR. FOWLER:
5     All right.  It's on your
6  letterhead dated February 4th, 2014, to all
7  employees, Baton Rouge City Constable's
8  Office, from Reginald R. Brown, Sr., Baton
9  Rouge City Constable.  And you signed it.
10  Regarding promotion, Sergeant Travis
11  Brooks.  Effective February 10th, 2014,
12  Corporal Travis Brooks will be promoted to
13  sergeant and assigned as a supervisor of
14  the Baton Rouge City jail.  Lieutenant
15  Thomas Wagner will assist in overseeing
16  Sergeant Brooks during his transition
17  period to his new assignment.
18     Furthermore, the corporal
19  position at city jail will be vacated until
20  Sergeant Brooks completes his transition
21  and makes the assignment.  There will be an
22  opening in court security due to Sergeant
23  Brooks' promotion.  Any deputy that has an
24  interest in this position should submit a
25  written request directed to the attention

Page 82

1  of Lieutenant Vernon Scott.
2     Cc'd at the end of the memo are
3  all employees, Chief Navarre, Captain
4  Lawton, Lieutenant Scott, Lieutenant Wagner
5  and the personnel file.
6     THE WITNESS:
7     That's correct.  I wrote that.
8     MR. BERNARD:
9     Okay.
10     EXAMINATION BY MR. BERNARD:
11  Q.  Now, you testified that you
12  appointed Travis Brooks to become the jail
13  sergeant.
14  A.  Uh-huh (Affirmative Response).
15  Q.  Yes?  Yes?
16  A.  Yes.
17  Q.  And it's also contained in this
18  memo that we're going to mark as
19  Plaintiff's Exhibit Number 1 where you
20  state that effective February 10th, 2014,
21  Corporal Travis Brooks will be promoted to
22  sergeant and assigned as a supervisor of
23  the Baton Rouge City Police jail.
24     Did I read that correctly?
25  A.  That's correct.

Page 83

1  Q.  Okay.  Prior to you appointing
2  Mr. Travis Brooks as the sergeant, jail
3  sergeant, you named Ms. Rhea Davis deputy
4  of the year for the Constable's Office?
5  A.  I did.
6  Q.  Prior to you -- the year before
7  appointing Mr. Travis Brooks as the jail
8  sergeant, you named Ms. Rhea Davis as the
9  jail deputy of the year?
10  A.  I don't -- I don't recall being
11  jail deputy of the year.  I think it was
12  deputy of the year by the Rotary Club.  I
13  don't think it was jail deputy.  I'm not
14  sure.  Now, if they had jail, it may have
15  been.  That's where she worked, but she was
16  named deputy of the year because, if my
17  memory serves me correct, the Rotary Club
18  selected -- asked us to submit names -- and
19  not just me, the Sheriff's Office and
20  everybody else -- as their officer, deputy
21  of the year, not for a particular area.
22  Q.  And you selected?
23  A.  She was selected.
24  Q.  Rhea Davis?
25  A.  Not deputy of the jail, but

Page 84

1  deputy of the year, yes, she was.
2  Q.  She was.  Okay.
3  A.  Yes, I did.
4  Q.  Now, also in this memo dated
5  February 4th, 2014, you wrote after
6  appointing Mr. Wagner to the jail sergeant
7  position --
8  A.  Not Wagner.
9  Q.  I'm sorry.  Mr. Brooks.  Captain
10  Corporal Brooks -- thank you -- to the jail
11  sergeant position, you vacated the corporal
12  position in the jail?
13  A.  I did.  That's correct.
14  Q.  Okay.
15  A.  Yes.
16  Q.  Now, when you vacated this
17  position, Ms. Rhea Davis was out on leave,
18  wasn't she?
19  A.  I don't recall.  If you say she
20  was, then I'd to accept that.  I don't -- I
21  don't really know.
22  Q.  Okay.  She was out on leave
23  because she had just had a baby?
24  A.  Okay.
25  Q.  In December.

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

Page 85

1 A.  I remember when she was
2 interviewed, she was pregnant.  I don't
3 recall the particulars of when he was
4 promoted and that took place, I didn't
5 remember the circumstances.  But, yes, if
6 you say so, that was correct.
7 Q.  So her position for her was
8 vacated while she's on maternity leave;
9 isn't that accurate?
10 A.  Yes.  Yeah.
11 Q.  Okay.  And you gave Mr. Brooks
12 the opportunity to select his own corporal?
13 A.  That's the normal way we do it.
14 Q.  That is a way you do it?
15 A.  No, that's the normal way we do
16 it, because the corporal position is a
17 ceremonial position that I created and put
18 in place and let the sergeant that's in the
19 particular area of supervision select his
20 or her corporal.  Terrica Williams selected
21 her corporal.  Brian Furman selected his
22 corporal and Mark Chaver selected his
23 corporal and all those were jail sergeants.
24 Each one had the opportunity.
25    So it was done no different from

Page 86

1 -- for Travis Brooks than it was done for
2 the others that were there.  He may have
3 chosen to select her as his corporal and
4 that's perfectly fine.
5 Q.  Let me ask you this question.
6 A.  Yes, sir.
7 Q.  You mentioned Terrica Williams.
8 When she became the jail sergeant, she
9 selected a corporal?
10 A.  Uh-huh (Affirmative Response).
11 Q.  Okay.  The corporal position was
12 vacated when she became the jail sergeant,
13 right?
14 A.  I would -- I guess so.  I'm not
15 sure.
16 Q.  Wasn't Terrica Williams the
17 corporal?
18 A.  Oh, yeah, she was the corporal.
19 Yeah.  You mean when she got promoted to
20 sergeant, yes.  She became the sergeant,
21 yeah, she had to.
22 Q.  So her becoming the sergeant by
23 promotion?
24 A.  Yes.
25 Q.  The corporal position was

Page 87

1 naturally vacated, it was vacated because
2 she moved on, she moved up?
3 A.  Yes, correct.
4 Q.  It wasn't via an act by you
5 vacating a position via a correspondence,
6 you didn't have to do anything to vacate
7 the position when Terrica Williams became
8 the sergeant of the jail; isn't that
9 accurate?
10 A.  I didn't have to do anything in
11 terms of what?
12 Q.  In terms of issuing a letter
13 indicating to all of your reportees and the
14 folks and all employees that the corporal
15 position in the city jail will be vacated
16 until Sergeant Brooks completes his
17 transition and makes the assignment?
18 A.  That's right.  He made that
19 decision.  He makes that decision.
20 Q.  But you vacated the position?
21 A.  That was the -- yes, I did.
22 Q.  You vacated the position --
23 A.  Yes, I did.
24 Q.  -- that was already filled by
25 the deputy of the year?

Page 88

1 A.  Makes no difference.  It was --
2 I did that, yes.
3 Q.  Okay.  All right.  Would you
4 agree with me that Mr. Travis Brooks had
5 very little experience working in the jail
6 prior to being promoted as the supervisor
7 of the jail?
8 A.  It depends on what you call
9 prior experience.  I don't agree with you,
10 no.  No, I don't agree with you.
11 Q.  Less than a year?
12 A.  If you -- I mean, I don't agree
13 with that.
14 Q.  Is one year or one and a half
15 year's time working in the jail considered
16 extensive experience working in the jail,
17 to you?
18 A.  That was because -- I'll answer
19 that with a statement, and that statement
20 is, Corporal Travis Brooks came to the
21 office as a volunteer and worked for
22 several years as a volunteer where he not
23 only worked in the jail, he worked in
24 courtroom security and he worked in other
25 areas of operation as a reserve deputy

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

Page 89

1  giving of his time to the office during
2  that time.  And then he was hired and
3  promoted.  And, by the way, he's not the
4  only person that came to the office by way
5  of the Reserve program and was promoted.
6  We have three sergeants that came to the
7  Baton Rouge City Constable's Office by way
8  of the Reserves giving and donating their
9  time and excelling and going to school and
10  getting training and valuable experience
11  and then taking the test and then becoming
12  a deputy and being hired and have excelled
13  up the ranks.
14     So if you call the eight months
15  of on the payroll, you're probably right,
16  you're accurate, eight months.  But the
17  time before that not on the payroll, that
18  counts, also, and that's paperwork that we
19  have that we make sure that we consider.
20  Q.  Travis Brooks sat in your seat
21  about an hour and a half ago and -- or,
22  rather, I take that back.  It's been about
23  two and a half hours ago and he testified
24  about his experience in the jail when he
25  was a Reserve officer.  He's told us very

Page 90

1  clearly that it was voluntary.  He also
2  told us that some days, some weeks he may
3  work one day in the jail, some days he may
4  work two days in the jail, and some months
5  he may not work at all in the jail.  It
6  depends on availability.
7  A.  Yes, that's correct.
8  Q.  Okay.  And he also said that
9  much of the time, or at least some of the
10  time he spent shadowing a senior deputy in
11  the jail, because he was in training.
12  A.  Yes.
13  Q.  He said that he spent
14  collectively over a period of time about a
15  year and a half in the jail as a Reserve
16  officer and eight months as a -- as a
17  full-time deputy.  And so when you add that
18  together you're looking at two years of
19  service, with the first year and a half
20  being intermittent, every now and again.
21  So the total time that based upon my
22  recollection is about a two-year timeframe
23  that is intermittent for the first year and
24  a half, not consistent.
25     Is it your testimony that that

Page 91

1  is extensive experience, extensive
2  experience working in the jail?
3     MR. FOWLER:
4        Objection to the form.  You can
5  answer it.
6     THE WITNESS:
7        First of all, let me just say
8  that is my testimony that he at that
9  particular time was the best person for
10  that position and seniority and seniority
11  alone does not carry the full weight of the
12  promotion in that particular area.
13     MR. BERNARD:
14        Okay.
15        EXAMINATION BY MR. BERNARD:
16  Q.  All right.  You told me what the
17  qualifications were.
18  A.  Yes.
19  Q.  Earlier.  And I agreed with you
20  that seniority is not a major criteria
21  because you didn't mention that.
22  A.  I didn't.
23  Q.  You mentioned being a deputy, a
24  good deputy.  You mentioned work
25  experience.

Page 92

1  A.  Work ethic.
2  Q.  Work ethic.  You mentioned OJT,
3  on-the-job training, and you mentioned
4  showing up, being on time.  That's what you
5  declared, that's what you testified to?
6  A.  Exactly.  And I told you there
7  were some others I could add to it in due
8  time.  But that was the -- that was the
9  decision that I made based on his ability,
10  his talent and my knowledge of his work
11  ethic.
12  Q.  Mr. Brown.
13  A.  Yes, sir.
14  Q.  Isn't it a fact that Rhea Davis
15  was the first female employee that you had
16  that went out on maternity leave?  Isn't
17  that a fact?
18  A.  That, I can't recall.  I don't
19  know.
20  Q.  Isn't it a fact that not only
21  did she go out on maternity leave one time,
22  but she went out on maternity leave two
23  times?
24  A.  You say the first employee I
25  had?

Page 93

1 Q.  First employee?
2 A.  No, she's not.
3 Q.  To go out on maternity leave.
4 A.  No, she's not.
5 Q.  I'm not talking about the
6 administrative side of your business.  I'm
7 talking about the deputies and the folks
8 that are in the jail, courtroom security,
9 and judicial enforcement.  Isn't it a fact
10 that she's the first female employee --
11 A.  She may have been.  I don't
12 know.  That, I don't know.  But I know she
13 wasn't the first employee.  Now, she may
14 have been the first deputy.  I haven't been
15 keeping up with that because that wasn't
16 something of an importance to me in terms
17 of other than granting them the opportunity
18 to do what they needed to do.
19 Q.  Okay.  Now, when she was out on
20 maternity leave or she was pregnant again,
21 Chief Navarre, who testified under your
22 direction, wanted to change her shift
23 hours.  I want to ask do you recognize this
24 document here from Chief Navarre?
25     MR. FOWLER:

Page 94

1     Read it to you?
2     THE WITNESS:
3     Yeah.
4     MR. BERNARD:
5     Dated June 19th, 2013.
6     MR. FOWLER:
7     I'll read it.  It's on
8 letterhead to the jail division from Chief
9 Deputy Larry Navarre and it has his
10 signature this morning, date, June 19th,
11 2013, regarding shift change.
12     The content reads:  Effective
13 Monday, June 24th, 2013, the jail
14 supervisors' shifts will be as follows:
15 Sergeant Terrica Williams, 0600 hours to
16 1400 hours; Corporal Rhea Davis, 0800 hours
17 to 1700 hours, open parenthesis, includes
18 one-hour lunch, close parenthesis.  Thanks
19 for your continued cooperation.
20     MR. BERNARD:
21     Okay.
22     THE WITNESS:
23     That's probably accurate.
24     EXAMINATION BY MR. BERNARD:
25 Q.  Do you recognize this document?

Page 95

1 A.  I recognize it.
2 Q.  Okay.  Isn't it a fact -- and
3 we'll go ahead and mark this as Plaintiff's
4 Exhibit Number 2 --
5 A.  Okay.
6 Q.  -- that when Ms. Davis was with
7 child --
8 A.  Was with what?
9 Q.  She was pregnant --
10 A.  Okay.
11 Q.  -- that Chief Navarre, under
12 your direction, recommended -- no, not
13 recommended, but effectively changed her
14 shift time from 0600 hours to 1400 hours to
15 0800 to 1700 hours?
16 A.  Well, only thing I can say, I
17 can't tell you whether it was -- obviously
18 I had to approve it but it was not just --
19 it didn't come through me first.  It was
20 probably recommended by the chief of
21 operations and the lieutenant and then they
22 brought it to the chief and he ran it by me
23 and if he told me that they had discussed
24 this, then certainly I would have had no
25 objections to it.  But as far as me

Page 96

1 instructing him to do that, no.
2 Q.  Would it shock you if I told
3 that you Chief Navarre sat in my seat right
4 now and said pointblank on several
5 occasions during his deposition that all he
6 did was do -- he was appointed at your
7 authority or at your -- at the -- I forget
8 the term, the will of the constable and his
9 job was to carry out your recommendations?
10 A.  That would have been carrying
11 out a recommendation, not necessarily
12 directed from me, but with my approval
13 after going through the chain of command.
14 Because we have always used the chain of
15 command, the lieutenant and the captain
16 would have recommended that and they
17 brought it to the chief deputy and the
18 chief deputy would bring it to me and I
19 would say it's okay, it's approved.
20 Q.  Okay.
21 A.  Unless of course there's some
22 concerns, I mean, some problems with it.
23 Q.  After it was approved, as a
24 matter of fact, an effective date was
25 given, Rhea Davis complained, didn't she,

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

Page 97

1  about her hours being changed?
2  A.  If I remember correctly, I think
3  she did --
4  Q.  Yeah.
5  A.  -- mention it.  I think she came
6  in the -- I think, I'm not sure -- I think
7  she came in the chief deputy's office when
8  I was in there to complain about the shift
9  change because of creating some difficulty
10  or something for her in some way.  I'm not
11  sure.
12  Q.  Exactly.  She wanted her hours
13  to stay the same?
14  A.  Yes.
15  Q.  And the reason that was given to
16  her as to why her hours were not or why the
17  recommendation was made to change her hours
18  is because she was pregnant and she needed
19  an hour off for lunch; isn't that accurate?
20  A.  I'm not sure about that.  I'm
21  not sure.
22  Q.  Isn't it a fact that Ms. Davis
23  complained and not just complained, but
24  told you and Chief Navarre that what you
25  guys were doing was a violation of her

Page 98

1  rights?
2  A.  I don't recall.  I don't recall
3  that.
4  Q.  So much so that Terrica
5  Williams, who was the jail sergeant at the
6  time, wrote this memo dated June 20th,
7  2013, one day after the --
8  MR. FOWLER:
9  Want me to read it to you?
10  THE WITNESS:
11  Yeah.
12  EXAMINATION BY MR. BERNARD:
13  Q.  Chief Navarre wrote the letter
14  about the shift change.
15  MR. FOWLER:
16  Want me to read it for him?
17  THE WITNESS:
18  Yeah.
19  MR. BERNARD:
20  Yeah.
21  MR. FOWLER:
22  June 20th, 2013, to Chief Deputy
23  Larry Navarre from Sergeant T. Williams,
24  referencing shift change.  To whom it may
25  concern:  This is in response to the memo

Page 99

1  in reference to shift change dated June
2  19th, 2013, from Chief Deputy L. Navarre to
3  jail division.  The memo states that
4  effective Monday, June 24th, 2013, the jail
5  supervisors' shift will be as follows:
6  Sergeant Terrica Williams, 0600 to 1400
7  hours and Corporal Rhea Davis, 0800 hours
8  to 1700 hours, open parenthesis, includes
9  one-hour lunch, close parenthesis.  I would
10  like to ask if this decision would be
11  reconsidered and give me a chance to
12  present a plan that will better accommodate
13  all deputies working in the jail, a plan
14  that is convenient for everyone in the
15  jail.  By all means, I want to be a
16  supervisor who can accommodate all the
17  deputies in the division.  Please see
18  attached schedule.  Thanking in advance for
19  your consideration in this matter,
20  respectfully yours, Sergeant Terrica
21  Williams.
22      It's not signed.  It's cc'd
23  Captain John Lawton, Lieutenant T. Wagner.
24  EXAMINATION BY MR. BERNARD:
25  Q.  Do you recall --

Page 100

1  A.  I don't recall it per se, but
2  based on that being done, it only indicates
3  to me one thing, if in fact that was the
4  case, then when Chief Navarre presented it
5  and he had talked, gotten the approval of
6  me after getting it from Captain Lawton and
7  Lieutenant Wagner, then Sergeant Williams
8  had not been included in the process of
9  discussion.
10      And if that would have been the
11  case, then that would have been a reason
12  for me to reconsider or to ask, to let them
13  know we would -- I would reconsider
14  reversing that decision to accommodate,
15  because never are people moved from one
16  shift to another for any reason other than
17  to be more efficient in the operation of
18  the office and having a person that's in
19  the position on the job when they're most
20  needed.  So that's possible.
21  MR. BERNARD:
22  Okay.
23  EXAMINATION BY MR. BERNARD:
24  Q.  And as a result of that
25  particular letter that we've marked as

Page 101

1  P-2 --
2      MR. FOWLER:
3      No objection to either.
4      MR. BERNARD:
5      And as a result of that
6  particular letter written by Ms. Terrica
7  Williams, which we've identified as P-3,
8  Chief Deputy Larry Navarre wrote this
9  letter.  Let the record reflect I'm handing
10 Constable Brown a letter from Chief Deputy
11 Larry Navarre dated July the 10th, 2013,
12 regarding light duty assignment.
13     MR. FOWLER:
14     This is on letterhead, Karl, I'm
15 just going to read the typed-written part
16 first.
17     MR. BERNARD:
18     Yes.
19     MR. FOWLER:
20     Okay.  To Corporal Rhea Davis
21 from Chief Deputy L. Navarre, date, July
22 10, 2013, regarding light duty assignment.
23     Effective Wednesday, July 10,
24 2013, you are temporarily assigned to
25 Sergeant Coleman Crump.  You will be

Page 102

1  trained on the duties to assist the staff
2  in the office.  Sergeant Coleman Crump will
3  be your supervisor for the transition
4  period.  Also, note that you have indicated
5  that you would like to voluntarily step
6  down from your assigned corporal position.
7  Sergeant Williams will address a
8  replacement for those duties effective July
9  10, 2013.  Sincerely, Chief Deputy L.
10 Navarre.
11     It's signed and then identified
12 on the carbon copy are Sergeant Terrica
13 Williams, Sergeant Coleman Crump,
14 Lieutenant Thomas Wagner, Captain John
15 Lawton and Constable Reginald R. Brown.
16     You want me to continue with the
17 handwritten?
18     MR. BERNARD:
19     Yes.
20     MR. FOWLER:
21     Okay.  Then on the right side of
22 the memo there's a handwritten component to
23 the letter.  That reads, Note that I, Chief
24 Navarre, have rescind this letter until
25 further notice to review other options from

Page 103

1  Sergeant Williams, letter from June 20th,
2  2013.  Note that Sergeant Williams' jail
3  staff will be interviewed by me and Captain
4  Lawton alone with Constable Brown next
5  week.  Please feel free to address me,
6  Chief Navarre, regarding rescind letter.
7      EXAMINATION BY MR. BERNARD:
8  Q.  Do you recognize that?
9  A.  I think I recall this, yeah.
10 Q.  Okay.  We'll call this
11 Plaintiff's Exhibit Number 4.
12     MR. FOWLER:
13     No objection.
14     MR. BERNARD:
15     All right.  Let me ask you a
16 couple more questions and I think we'll be
17 ready to wrap this up here.
18     EXAMINATION BY MR. BERNARD:
19 Q.  Not long after Ms. Davis applied
20 for the jail sergeant position, she also
21 applied for a position in judicial
22 enforcement.  Is that accurate?
23 A.  Yeah.  I think I do recall her
24 mentioning it, I think.  I'm not sure.
25 Q.  Okay.

Page 104

1  A.  Was it written?
2  Q.  Say again.  Yeah.
3  A.  Did she write something?
4  Q.  As a matter of fact, there
5  were -- she wasn't the only applicant.
6  A.  Oh, okay.  All right.
7  Q.  It was Mr. Haynes that also
8  applied for that position.
9  A.  Okay.
10 Q.  Do you recall now?
11 A.  Yes.
12 Q.  Okay.  And Ms. Davis was
13 interviewed by two people that report
14 directly to you, and that is Mr. Navarre
15 and also Jimoh, Mr. Jimoh.
16 A.  Was he a sergeant?
17 Q.  Yes.
18 A.  Well, he didn't report directly
19 to me.
20 Q.  Okay.  But she was interviewed
21 by Mr. Navarre and Mr. Jimoh.
22 A.  Okay.
23 Q.  Both of these individuals
24 recommended that Rhea Davis receive that
25 judicial enforcement position.

Page 105

1  A.  I don't -- I don't recall both
2  of them recommending that.  And if they did
3  or if they didn't, the final decision would
4  have been something that I would have
5  evaluated based on the need at that
6  particular time.
7  Q.  Right.  Right.
8  A.  Uh-huh (Affirmative Response).
9  Q.  Right.
10      Now, you as the final appointing
11  authority, selected Deputy Haynes for that
12  position.
13  A.  Yes.
14  Q.  Now, at the time Deputy Haynes
15  was selected, he had only been with the
16  constable's office for one year.
17  A.  Okay.
18  Q.  Is that accurate?
19  A.  I'm not sure.  If you say so,
20  I'll have to agree with that.
21  Q.  Okay.  As a matter of fact, he
22  probably had not even participated in a job
23  evaluation at the time he was recommended
24  for the job, or given the job.
25  A.  I'm not sure of that, either.

Page 106

1  Q.  Okay.  But you are sure of the
2  fact that Rhea Davis applied for the
3  position?
4  A.  I think I recall her, from what
5  I can gather --
6  Q.  She was qualified for the
7  position?
8  A.  Well, first of all, that was a
9  lateral, that was more of a lateral
10  transfer for Rhea Davis.
11  Q.  Right.
12  A.  And not a promotion.
13  Q.  All right.
14  A.  It would have been more of a
15  promotion for Deputy Haynes than it would
16  have been for her, because Corporal Davis
17  at the time was already a corporal driving
18  a unit.  The only difference there in the
19  position in judicial enforcement, she would
20  have lost corporal stripes.  She could have
21  possible, she didn't have to, but she could
22  have possibly lost corporal stripes and
23  just been transferred parallel, no pay
24  hike, nothing else, and she already had a
25  vehicle.

Page 107

1      Deputy Haynes, I think, has been
2  there and he's still a deputy and the
3  benefits that were a vehicle, something
4  that Corporal Davis already had.
5  Q.  Okay.
6  A.  Right.
7  Q.  So Corporal Davis applied for
8  the position?
9  A.  Yes.
10  Q.  She was qualified for the
11  position?
12  A.  Let's say that everybody that
13  applied was qualified, because they were
14  already deputies.
15  Q.  Okay.
16  A.  And that's what you have to be
17  in order to even apply to move over to any
18  place around in the office, you're a deputy
19  first.  So you're all -- everybody's
20  qualified and seniority does not pave the
21  only road there.
22  Q.  And she was recommended to fill
23  the position?
24  A.  I think, if memory serves me
25  correctly, I think, if I'm not mistaken,

Page 108

1  either Captain Lawton or Sergeant Jimoh,
2  one, I'm not sure, indicated differently,
3  maybe because they were -- the captain who
4  would have been chief of operations would
5  have been in close communications with the
6  chief deputy, the lieutenant and the
7  sergeant in that particular move.
8  Q.  What we know for a fact that
9  based on testimony here today that Chief
10  Larry Navarre recommended her, Ms. Davis,
11  for that position?
12  A.  I thought you said Sergeant
13  Jimoh, too.
14  Q.  Say again.
15  A.  I thought you said Sergeant
16  Jimoh, too.
17  Q.  Yes, I did.
18  A.  Well, he was a sergeant in that
19  particular area, but if memory serves me
20  correctly, I might be wrong, but I think
21  Captain Lawton, who's the chief of
22  operation, mentioned that either Corporal
23  Davis was not interested or didn't want it
24  or had been offered and turned it down or
25  something to that nature.  I'm not exactly

Page 109

1  sure of the details and the particulars.
2  But neither of them pursued it to the
3  extent that they made me aware of the fact
4  that they were 100 percent supportive of
5  that position, I mean, her being promoted
6  to that position or transferred in that
7  particular area.
8      MR. FOWLER:
9      My, just -- I'll have a chance
10  to question Major Brown as well.  I'm just
11  letting you know that my notes on some of
12  those recommendations are different.
13  Obviously we have the transcript that we
14  can deal with later, but I think that --
15  anyway, I'll leave it at that.
16      MR. BERNARD:
17      Uh-huh (Affirmative Response).
18      MR. FOWLER:
19      All right.
20      EXAMINATION BY MR. BERNARD:
21  Q.  Based upon my notes and the
22  testimony that was given in this chair,
23  Larry Navarre said that he recommended Rhea
24  Davis for the position.  Larry Navarre also
25  said that she was interviewed by two

Page 110

1  people:  Himself and Mr. Jimoh.
2  A.  Okay.  I can accept that if
3  that's what he said.
4  Q.  And Larry Navarre said that they
5  both recommended Rhea Davis for the
6  judicial enforcement position.
7      MR. FOWLER:
8      Objection to the form.  Go ahead
9  and answer.
10      THE WITNESS:
11      I -- if they did, then so be it.
12  I make the final decision and I have that
13  authority to make that decision based on
14  the fact on the person that I felt would be
15  better in that position at that particular
16  time.
17      EXAMINATION BY MR. BERNARD:
18  Q.  And instead of choosing Rhea
19  Davis for that position, you chose
20  Mr. Haynes?
21  A.  Obviously I did because Mr.
22  Haynes -- Deputy Haynes is in there.
23  Q.  Another male with less
24  experience, with less commendations by you
25  in your department than Ms. Davis.

Page 111

1  A.  Well, you're talking about in my
2  department, I mean, my office.
3  Q.  Yeah, your office.
4  A.  We have offices, not department.
5  In my office.  We don't just take the
6  contributions of an individual who come to
7  work in the Baton Rouge City Constable's
8  Office with only their performance of
9  duties in the Constable's Office, but also
10  in the offices that they've come from
11  before with prior experience, and --
12  Q.  Tell me about that.  Let's talk
13  about that just for a minute.
14  A.  Okay.
15  Q.  You mentioned that you don't
16  just take the job performance of an
17  individual?
18  A.  On that particular job in the
19  Constable's Office.
20  Q.  On that particular job, just
21  what they've done in the Constable's
22  Office, but you look at their job
23  experience elsewhere.  Did I characterize
24  your testimony?
25  A.  That's exactly right.

Page 112

1  Q.  Okay.  Now --
2  A.  Do you need an example?
3  Q.  Say again.
4  A.  Do you need me to give you a
5  example.
6  Q.  I think we have one, Mr. Haynes.
7  A.  No.  I'm going to give you
8  another one.  But that's fine.  Go ahead
9  on.
10  Q.  Mr. Haynes.  Because the
11  testimony that has been provided here is
12  that Mr. Haynes was on the job for less
13  than a year and he was promoted or received
14  the judicial division job over Ms. Davis.
15  That's accurate, right?
16  A.  You're going to have to -- the
17  transfer from a parallel position, yeah.
18  Q.  Right.  Okay.
19  A.  Yeah.
20  Q.  It's also been testified that he
21  had other work experience.
22  A.  Yeah.
23  Q.  He worked other places.  And
24  that's what you're referring to as you sit
25  here today?

Page 113

1  A.  Well, I referred to that one,
2  but also when you mentioned another male, I
3  was going to show you Terrica Williams came
4  from the East Baton Rouge Parish Sheriff's
5  Office.
6  Q.  Let's just confine it to the
7  case at hand, okay?
8  A.  All right.
9  Q.  You mentioned that you as the
10 constable don't just look at what a person
11 does as a constable employee, but also what
12 they've done elsewhere?
13 A.  When it comes to the job of
14 promotions.
15 Q.  Right.
16 A.  And even consideration in
17 hiring.  But it doesn't prevent us from
18 taking the necessary steps to hire, as I
19 hired Ms. Davis after she had left LSU and
20 went somewhere else and then came back and
21 applied and came, but she, too, was
22 qualified and post certified when she came
23 to work for the office, just like Deputy
24 Haynes was qualified and post certified
25 before he came to the office.

Page 114

1  Q.  Because that is true?
2  A.  Both.
3  Q.  Ms. Davis worked for the LSU
4  Police Department?
5  A.  Absolutely.  I know that.
6  Q.  She worked there for years?
7  A.  And she moved to another state
8  and came back.  She wasn't there when we
9  hired her.
10 Q.  Right.
11 A.  I know.
12 Q.  Okay.
13 A.  I take all of that in
14 consideration and I look at that.
15 Q.  What did you do when you looked
16 at Ms. -- when you were looking at
17 Ms. Davis in terms of whether allowing her
18 to fill this vacant position or not, what
19 did you look at?
20 A.  The total situation.  She was in
21 the jail where she already had the unit,
22 she was driving, and the only -- the only
23 change there for her, it wasn't a
24 promotion.  It wasn't an elevation.  It was
25 more of a lateral transfer and reduction

Page 115

1  possibly in rank from a corporal to a
2  deputy.
3  Q.  Okay.
4  A.  As Deputy Haynes is.
5  Q.  Okay.
6  A.  That's what I looked at.
7  Q.  In terms of her qualifications,
8  what did you look at?
9  A.  She was qualified.
10 Q.  What did you look at?
11 A.  I looked at everything.  She was
12 qualified.
13 Q.  Did you look at her record as a
14 constable employee?
15 A.  I looked -- I looked at
16 everything, I said.
17 Q.  But I want you to talk to me
18 about, what did you examine and how did you
19 examine her background?
20 A.  How did I what?
21 Q.  How did you determine that --
22 A.  I knew what she had already
23 done.  Remember, I'm the one that
24 recommended her for deputy of the year, so
25 I didn't have to -- I didn't have to look

Page 116

1  at that.
2  Q.  Well, what about her outside
3  employment, her employment away from the
4  Constable's Office?
5  A.  She had done exemplary job.
6  Q.  What you do to find out there?
7  A.  I did that before we hired her.
8  Q.  What did you do?
9  A.  I talked to people at LSU.
10 Q.  Okay.  You talked to who?
11 A.  I don't know the exact people I
12 talked to down there, not at the time.  We
13 always do that when we are doing
14 background.
15 Q.  So you are responsible for doing
16 background checks?
17 A.  I can take the liberty to call
18 and talk to anybody I want in any
19 department when, and I did talk to someone
20 at LSU at some point in time when she was
21 hired.
22 Q.  I was given the distinct
23 impression, and possibly wrongfully so,
24 that there was another person or department
25 that was responsible for background, for

Page 117

1  vetting, doing background checks on --
2  A.  When we hire, there is.  But
3  then I can persist and make a call and
4  communicate myself.
5      As a matter of fact, I've talked
6  to Ms. Davis's present employer, and I
7  didn't -- and that was not just -- that was
8  by coincidence.  He walked up to me and
9  said we swapped employees.  He say you got
10  my employee from my office and I got your
11  employee from your office.  I didn't even
12  know what he was talking about.
13  Q.  Just to correct you, Ms. Davis
14  is not employed at this time.
15  A.  Huh?
16  Q.  She's not employed.
17  A.  Oh.
18  Q.  She's a law student at Southern
19  University Law School.
20  A.  Well, when she was employed, the
21  probation, the probation officer,
22  supervisor, whomever, mentioned that to me
23  then.
24  Q.  All right.  I'm going to mark
25  this as Plaintiff's Exhibit Number 5.  And

Page 118

1  this is a letter from Louisiana Commission
2  on Human Rights.
3      MR. FOWLER:
4      Can we take a break and step out
5  and call my wife?
6      MR. BERNARD:
7      Okay.
8      (Short Break)
9      EXAMINATION BY MR. BERNARD:
10  Q.  Okay.  Major Brown, do you
11  recognize this particular document here
12  that we've marked as Plaintiff's Exhibit
13  Number 5?
14  A.  I remember.  I remember when it
15  was, same thing, I think, from the human
16  rights?  Is that it?
17      MR. FOWLER:
18      Yes.  This is the determination
19  by the Louisiana Commission on Human Rights
20  regarding one of Rhea Davis's charges.
21      THE WITNESS:
22      Uh-huh (Affirmative Response).
23  Yeah.  I remember that.
24      MR. BERNARD:
25      Okay.

Page 119

1      EXAMINATION BY MR. BERNARD:
2  Q.  I'm going to direct your
3  attention -- I'm going to direct your
4  attention to paragraph 3 on the -- on the
5  second page of that document that's been
6  marked as P-5, second page, paragraph 3.
7  A.  Okay.
8  Q.  And I'm going to ask Marston to
9  read that for you.
10      MR. FOWLER:
11      Starting with Furthermore, Carl?
12  That paragraph?
13      MR. BERNARD:
14      No.
15      MR. FOWLER:
16      Or is it Additionally?
17      MR. BERNARD:
18      Additionally.
19      MR. FOWLER:
20      Okay.  I couldn't tell if it was
21  the top ran over.
22      Additionally, sufficient
23  evidence exists that brings into question
24  the veracity of the Respondent's
25  explanation of its decision to not hire the

Page 120

1  complainant for the deputy constable
2  position in the judicial enforcement
3  division.
4      During witness interviews,
5  inconsistent testimony was given by three
6  separate hiring officials as to why the
7  complainant was not hired for the position.
8  Major Reginald Brown stated that deputy
9  Haynes, open quote, street experience,
10  close quote, was the determining factor.
11  Captain John Lawton stated that it was best
12  for the office to keep the complainant in
13  the jail division because she was a, open
14  quote, tremendous asset to the position,
15  close quote.  And he did not want to, open
16  quote, cripple the division, close quote,
17  by hiring a new corporal after recently
18  hiring a sergeant with little jail division
19  experience.
20      Captain Lawton further stated
21  that the experience between Haynes and the
22  complainant was not considered in making
23  the decision.  Chief Larry Navarre stated
24  that the complainant was not hired because
25  the constable, open quote, probably did not

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

Page 121

1  want to put a female in that position,
2  close quote, because it, open quote,
3  requires the employees to serve papers in
4  certain neighbors and those areas are
5  dangerous, close quote.
6      EXAMINATION BY MR. BERNARD:
7  Q.  Is that -- are those statements
8  that were just read by Attorney Fowler
9  accurate?
10 A.  I don't know.  I can't speak for
11 the other person, but one that directly it
12 says Constable Brown probably, that's
13 totally inaccurate.
14 Q.  What do you mean?
15 A.  Well, that's -- my decision to
16 put Deputy Haynes in a position had nothing
17 to do with male or female or black or
18 white.  We had a female in the position and
19 the judicial enforcement that I put there.
20 As a matter of fact, when I came there,
21 there was no male in there.  I mean female.
22 Never not a female nowhere in the office.
23 Q.  Let me just ask you this
24 question.
25 A.  Uh-huh (Affirmative Response).

Page 122

1  Q.  Chief Larry Navarre made that
2  statement.
3  A.  Yes.
4  Q.  Okay?
5  A.  Yeah.
6  Q.  Isn't it a fact that not long
7  after participating in this investigation,
8  that Chief Larry Navarre's responsibilities
9  were removed?
10 A.  Yeah.
11 Q.  Okay.
12 A.  Some of them, yes.
13 Q.  Isn't it a fact that after
14 removing many of his responsibilities, he
15 was later terminated?
16 A.  No, he wasn't terminated.
17 Q.  He's no longer your chief?
18 A.  And he works at my pleasure.
19 Q.  Yeah.  Well, you ended his --
20 your pleasure ceased with him being around?
21 A.  That may or may not be.  But the
22 fact of the matter was neither one had
23 anything to do with the other, and the fact
24 that he made the remark had nothing -- I
25 corrected that, because I told him first of

Page 123

1  all that that did not reflect my feelings.
2  I had too much -- too many people in
3  various positions and my work record shows
4  that and the persons that have been hired,
5  promoted and put in positions, female,
6  black and white reflect that.
7  Q.  And what about John Lawton's
8  statement?
9  A.  John Lawton's statement, as the
10 chief of operation and each one of these
11 individuals have their own reason, and God
12 bless John, he's dead and gone, I can't,
13 you know, ask him for what reason, but
14 nevertheless, either one of these
15 individuals don't necessarily carry my
16 sentiments when it comes to making
17 decisions.
18     That's why I said from the
19 beginning, sometimes I agree and sometimes
20 I disagree.  And I act accordingly.
21 Q.  John Lawton stated that Rhea
22 Davis was a tremendous asset to the jail
23 division.  Is that accurate?
24 A.  He obviously has to know because
25 he was chief of operations.

Page 124

1  Q.  Well, don't you know that?  You
2  spent a lot of time talking about it.
3  A.  Well, based on my experience, as
4  a matter of fact, I know she was valuable
5  to the office.  Remember, I hired her.
6  Secondly, I promoted her after being -- I
7  mean, I approved promotion to corporal, and
8  then I recommended her as deputy of the
9  year.  So I know a lot about her, enough
10 about her to make those type of decisions.
11 So I'm not going to ever discriminate
12 against her.
13 Q.  Was John Lawton's statement that
14 she was a tremendous asset to the position
15 accurate?
16 A.  As corporal in the jail?
17 Q.  As corporal?
18 A.  As corporal in the jail?
19 Q.  As corporal.
20 A.  I would imagine it is.
21 Q.  Okay.  Is it accurate that if
22 Rhea Davis had been moved from that
23 position and given the judicial enforcement
24 position, that the jail division would have
25 been crippled?

Page 125

1  A.  I don't think it would have been
2  crippled, because no one person serves as a
3  person on an island anyway.  If I leave,
4  the office is not going to stop operating.
5  So no, I disagree with that.
6  Q.  This is why he says that.
7  A.  I can't tell you why he says
8  that.
9  Q.  I'm going to read it, why he
10  says that.  He says By hiring a new
11  corporal after recently hiring a sergeant
12  with little jail division experience.
13      Is that accurate?  Did in fact
14  Mr. Brooks have little jail experience?
15  A.  Obviously from Mr. Lawton's
16  perspective, he probably thought so.
17  Q.  Okay.  All right.  Now, last
18  section, not long after Ms. Davis was
19  not -- did not receive the jail sergeant
20  position or the judicial enforcement
21  position, she was placed on administrative
22  leave.  Is that accurate?
23  A.  I would imagine you have
24  documents showing that, I'm sure she was.
25  I don't know the -- right now, I'm hazed

Page 126

1  about the administrative leave, but if you
2  say so, when you bring me up-to-date on it,
3  I'll be able to answer those questions.
4  Q.  Okay.  Let me mark as
5  Plaintiff's Exhibit Number 6, I believe it
6  will be, ask if you're familiar with this
7  document.
8      MR. FOWLER:
9      This is a letter, on your
10  letterhead from you to Rhea Davis, signed
11  by you, and I'll read the first sentence to
12  trigger his memory.
13      MR. BERNARD:
14      Yeah.
15      MR. FOWLER:
16      Dear Corporal Davis, you were
17  placed on administrative leave with pay
18  because I was presented information that
19  you engaged in illegal drug use and did so
20  in a manner that would avoid positive drug
21  testing.  Want me to go farther?
22      MR. BERNARD:
23      No.  That's good.
24      THE WITNESS:
25      I remember that, yeah.

Page 127

1      EXAMINATION BY MR. BERNARD:
2  Q.  What information were you
3  presented?
4  A.  Well, the information as far as
5  my recollection is that Lieutenant Vernon
6  Scott, who was at that particular time over
7  internal affairs, I think, there had been
8  some type of a -- he had been instructed to
9  go into the jail because there had been
10  some controversy between Deputy Davis and
11  another female deputy in the jail over some
12  events or some concerns.  These events and
13  concerns at some point in time led to an
14  investigation that a number of statements
15  were made, which led to Lieutenant Scott
16  and Sergeant Coleman Crump both to
17  transport the other female deputy and
18  Deputy Rhea Davis, I think, to the
19  Sheriff's Office for an investigation that
20  possibly had some criminal overtones
21  possibly to it.
22      And as a result of that, when
23  the remarks that were made that Lieutenant
24  Scott discovered, these remarks led that
25  some statements were made that indicated

Page 128

1  that Deputy Davis had -- or Corporal Davis
2  had made some statements to the effect that
3  she had used some substances that could
4  have raised some concern, and stuff of that
5  nature comes to our attention, then we have
6  to investigate.  And Lieutenant Scott led
7  that investigation that led to drug
8  testing, I think hair follicle test and I
9  think a fit for duty evaluation from the
10  psychological evaluation people.  And
11  that's something that we would have done
12  ordinarily with not just her, with anyone
13  because of the fact of what was allegedly
14  brought out.
15  Q.  Okay.  Now, prior to these facts
16  being brought to your attention,
17  Ms. Davis -- Corporal Davis at the time --
18  had not shown any -- provided you with any
19  evidence that she had used unauthorized or
20  illegal drugs, had she?
21  A.  You're asking me that question?
22  Q.  I'm asking you.
23  A.  She didn't provide anything to
24  me because I wasn't the person.  The
25  internal affairs person did the

Page 129

1  investigation and the things that were
2  brought up in that --
3  Q.   Isn't it a fact that Deputy
4  Edwards and Corporal Davis were friends?
5  A.   They worked together.  I would
6  assume they were.
7  Q.   I mean, did you look at -- you
8  said that evidence was brought to your
9  attention.
10  A.   Through -- through Lieutenant
11  Scott.
12  Q.   Uh-huh (Affirmative Response).
13  A.   Yes, through internal affairs,
14  IA person, yeah.
15  Q.   Did you -- was evidence brought
16  to your attention that these two
17  individuals got into an argument, had a
18  falling out?
19  A.   I don't know if you want to call
20  it an argument or a falling out, but a
21  number of allegations were made and I
22  asked, when the lieutenant -- IA person was
23  investigating it, I said these matters are
24  very concerning.
25  Q.   Isn't it a fact that Corporal

Page 130

1  Davis reported -- Deputy Edwards reported
2  that she was being insubordinate and not
3  nothing Corporal Davis's commands at work?
4  A.   Not to me.  Not to me, no.
5  Q.   And then after Corporal Davis
6  reported Deputy Edwards for
7  insubordination, at that time Deputy
8  Edwards accused or alleged that Corporal
9  Davis had been taking drugs?
10  A.   I -- if she made those
11  statements, she made them to IA person and
12  that's why we sent them both to the
13  Sheriff's Office, because allegations of
14  some other things were made in that
15  particular time.
16  Q.   After those allegations were
17  made, Corporal Davis was placed on
18  administrative leave?
19  A.   With pay.
20  Q.   Administrative leave?
21  A.   Right.
22  Q.   But Deputy Edwards was not
23  placed on administrative leave.
24  A.   Well, Deputy Edwards was not
25  alleged to have abused, been involved with

Page 131

1  some abusive substance, and that was very
2  troubling because Deputy Davis drove a
3  constable unit and carried a gun and a
4  badge.
5  Q.   Again, the allegation came from
6  Deputy Edwards?
7  A.   It came from Deputy Edwards, but
8  it came through, via the IA route and we
9  had to balance them out.  They both were
10  carried to the Sheriff's Office one
11  afternoon because I remember staying there
12  while they were carried to the detective
13  division.
14  Q.   And in fact Corporal Davis gave
15  a urine sample?
16  A.   Yes.
17  Q.   And a hair follicle sample?
18  A.   Yes.
19  Q.   And both tests came back
20  negative.
21  A.   And that was recommended by the
22  IA after getting legal advice, IA followed
23  through with the urine analysis and when
24  the urine analysis proved negative, the
25  hair follicle was used, and then the fit

Page 132

1  for duty was done, because the only way, if
2  something had happened and she'd been
3  involved in a situation, all of this would
4  come back to hit us right in the face, and
5  if she had been -- suppose she got out
6  there and got in a wreck or she shot
7  somebody.
8  Q.   Again, all of this upheaval was
9  essentially started by or after a deputy
10  was accused of insubordination and as a
11  result alleged that her supervisor was
12  engaged in illegal drug activity?
13  A.   I don't know about the -- I
14  don't know about the deputy's
15  insubordination.  It may be contained in
16  the IA report, but that was not the factor
17  that caused us to conduct the
18  investigation.  If somebody said I was
19  illegally using drugs, I would expect
20  someone to tell me to report somewhere to
21  be checked, just to make sure that the
22  records are clear and I wouldn't have any
23  objections to it.
24  Q.   Now, Major, you've been in this
25  position for 17 years.

Page 133

1  A.  Yes, sir.
2  Q.  And I would guess that you have
3  made some of your employees happy; is that
4  right?
5  A.  I've made some mad, too.
6  Q.  And you've made some mad?
7  A.  Right.
8  Q.  And I would venture to guess,
9  because I've talked to a couple, that
10  they've accused you of doing a couple of
11  things?
12  A.  Yeah.
13  Q.  As a matter of fact, I've even
14  heard that they thought you were sick, that
15  they hadn't seen you for a number of weeks
16  and they thought you may have been sick?
17  A.  That's not unusual.
18  Q.  So are you telling me that if an
19  employee accuses you of illegal drug
20  activity, that immediately you're going to
21  go down to -- and have your hair follicle
22  pulled?
23  A.  No.  I would expect that that
24  would be a call for me to be looked at and
25  evaluated if that was the case, because I

Page 134

1  drive a unit and if a person is driving a
2  unit, I would think -- and I wear the
3  uniform, I carry a badge, I carry the gun.
4  Q.  You're a police officer?
5  A.  Right.
6  Q.  Now, in doing any type of an
7  investigation, if someone makes an
8  allegation without more, is that probable
9  cause for an arrest, for drug testing?
10  A.  If we feel that it is warranted
11  based on the facts that --
12  Q.  Isn't it a fact, Major Brown,
13  that you felt it was warranted simply
14  because Ms. Corporal Davis had already
15  filed an EEOC report against your office?
16  A.  No, definitely not.
17  Q.  Isn't it a fact that after her
18  test results came back negative that she
19  still was -- remained on administrative
20  leave with pay?
21  A.  With pay until such time.
22  Q.  So even though the drug testing
23  came back negative, the administrative
24  leave continued?
25  A.  Until we got the psychological

Page 135

1  evaluation.
2  Q.  Okay.
3      MR. BERNARD:
4      No further questions.
5      MR. FOWLER:
6      Okay.  Let me just have a
7  second.
8      MR. BERNARD:
9      Okay.
10      (Short Break)
11      MR. FOWLER:
12      I don't have any questions,
13  Karl.
14      MR. BERNARD:
15      Okay.

Page 136

1      REPORTER'S CERTIFICATE
2
3      I, ROBERT K. TUCKER, Certified Court
4  Reporter, in and for the State of
5  Louisiana, as the officer before whom this
6  testimony was taken, do hereby certify that
7  the above-mentioned witness, after having
8  been first duly sworn by me upon authority
9  of R.S. 37:2554, did testify as
10  hereinbefore set forth;
11      That the testimony was reported by
12  me in stenotype and transcribed under my
13  personal direction and supervision, and is
14  a true and correct transcript, to the best
15  of my ability and understanding;
16      That the transcript has been
17  prepared in compliance with transcript
18  format guidelines required by statute or by
19  rules of the board;
20      That I have acted in compliance with
21  the prohibition on contractual
22  relationships, as defined by Louisiana Code
23  of Civil Procedure Article 1434 and in
24  rules and advisory opinions of the board;
25      That I am not of counsel, not

Page 137

1  related to counsel or the parties herein,

2  nor am I otherwise interested in the

3  outcome of this matter.

4        This certificate is valid only for a

5  transcript accompanied by my original

6  signature and original required seal on

7  this page.

8

9

10

11        ROBERT K. TUCKER
          CERTIFIED COURT REPORTER
12        STATE OF LOUISIANA
          CERTIFICATE NO. 87307
13

14

15

16

17

18

19

20

21

22

23

24

25

**0**

**0600 (3)**
94:15;95:14;99:6
**0800 (3)**
94:16;95:15;99:7

**1**

**1 (2)**
80:18;82:19
**10 (6)**
27:3,3;76:21;
101:22,23;102:9
**100 (1)**
109:4
**10th (3)**
81:11;82:20;
101:11
**12 (1)**
21:24
**1400 (3)**
94:16;95:14;99:6
**15 (1)**
76:22
**17 (2)**
17:6;132:25
**1700 (3)**
94:17;95:15;99:8
**17th (1)**
16:3
**19th (3)**
94:5,10;99:2

**2**

**2 (1)**
95:4
**2000 (1)**
16:5
**2001 (1)**
16:5
**2013 (12)**
94:5,11,13;98:7,
22;99:2,4;101:11,22,
24;102:9;103:2
**2014 (4)**
81:6,11;82:20;
84:5
**20th (3)**
98:6,22;103:1
**233 (1)**
33:18
**24/7 (1)**
39:3
**24th (2)**
94:13;99:4
**25 (2)**
17:2;37:20
**2nd (1)**
16:5

**3**

**3 (2)**
119:4,6
**365 (1)**
39:3

**4**

**4 (1)**
103:11
**4th (2)**
81:6;84:5

**5**

**5 (2)**
117:25;118:13

**6**

**6 (1)**
126:5

**7**

**7:15 (1)**
33:7
**7:30 (1)**
33:7
**70806 (1)**
11:2

**9**

**900 (1)**
10:25
**9-0-0 (1)**
10:25

**A**

**ability (2)**
10:20;92:9
**able (4)**
38:25;42:4;73:22;
126:3
**above (1)**
77:24
**absolutely (2)**
39:6;114:5
**abused (1)**
130:25
**abusive (1)**
131:1
**accept (5)**
28:23;29:18;69:1;
84:20;110:2
**accommodate (3)**
99:12,16;100:14
**accomplish (1)**
77:16
**accordance (1)**
4:8
**accordingly (1)**
123:20
**accurate (58)**
23:4;24:5;25:12;
35:1;40:24;43:1,2,
25;45:20;46:18,19;
47:17,19;48:5;53:25;
54:4,5,13,14,19,20;
55:5,13;58:16;61:4,
5;62:5;63:8,9,13,15;
65:9,21;66:4,5;
67:16,17;68:1,20,24;
72:8,9;75:15;79:23;
85:9;87:9;89:16;
94:23;97:19;103:22;
105:18;112:15;
121:9;123:23;
124:15,21;125:13,22
**accurately (1)**
37:14
**accused (3)**
130:8;132:10;
133:10
**accuses (1)**
133:19
**act (3)**
49:22;87:4;123:20
**acting (1)**
69:13
**action (1)**
20:5
**activity (2)**
132:12;133:20
**actually (1)**
43:13
**add (4)**
67:1;72:9;90:17;
92:7
**Additionally (3)**
119:16,18,22
**address (5)**
10:24,25;11:4;
102:7;103:5
**addressed (1)**
20:4
**adequately (1)**
37:14
**adhere (2)**
12:22;31:11
**adjusters (1)**
75:8
**administer (2)**
18:7;19:8
**administered (1)**
5:19
**administering (2)**
4:24;18:4
**administration (2)**
19:12,14
**administrative (11)**
16:23;20:14;93:6;
125:21;126:1,17;
130:18,20,23;
134:19,23
**administrator (1)**
20:20
**adult (1)**
11:15
**advance (1)**
99:18
**advice (1)**
131:22
**advised (1)**
13:13
**affairs (4)**
35:24;127:7;
128:25;129:13
**Affirmative (15)**
6:18;53:22;58:13;
65:14;71:12;73:1;
78:18;80:8;82:14;
86:10;105:8;109:17;
118:22;121:25;
129:12
**aforementioned (1)**
4:5
**afternoon (1)**
131:11
**again (13)**
7:7;15:14;16:3;
45:15;48:25;52:5;
90:20;93:20;104:2;
108:14;112:3;131:5;
132:8
**against (3)**
5:7;9:10;12:9;
124:12;134:15
**agencies (1)**
18:21
**agency (1)**
30:4
**ago (3)**
16:9;89:21,23
**agree (13)**
7:14,24;8:3,7,8;
29:12;30:11;88:4,9,
10,12;105:20;123:19
**agreeable (1)**
18:3
**agreed (2)**
4:3;91:19
**ahead (3)**
95:3;110:8;112:8
**AI (1)**
16:24
**allegation (2)**
131:5;134:8
**allegations (3)**
129:21;130:13,16
**alleged (3)**
130:8,25;132:11
**allegedly (1)**
128:13
**allocate (2)**
21:21;73:12
**allocated (1)**
18:1
**allowing (1)**
114:17
**all's (1)**
26:1
**almost (1)**
23:12
**alone (2)**
91:11;103:4
**along (2)**
19:25;78:15
**although (1)**
60:5
**always (8)**
22:7;23:19;36:23;
58:23;64:13,18;
96:14;116:13
**America (1)**
9:3
**amicably (1)**
9:6
**Amiss (1)**
16:24
**amongst (1)**
9:6
**analysis (2)**
131:23,24
**annual (3)**
44:19;45:12;47:3
**answered (1)**
8:21
**anticipate (2)**
7:4,5
**appearance (2)**
13:14;44:15
**appearances (1)**
34:19
**applicant (4)**
55:22;56:3,11;
104:5
**applicants (15)**
24:22;54:3,15,16,
17;55:2,3,12;56:15,
18;57:10,24;58:15;
60:9,25
**application (5)**
38:1;51:10,11;
54:6,11
**applied (11)**
26:20;69:23;
70:19;71:6;103:19,
21;104:8;106:2;
107:7,13;113:21
**applies (1)**
56:4
**apply (9)**
50:25;51:6,18;
53:6;54:3,22,23,25;
107:17
**applying (2)**
24:17;48:10

**appoint (1)**
79:21
**appointed (3)**
41:16;82:12;96:6
**appointing (8)**
21:8;27:12,20,21;
83:1,7;84:6;105:10
**appreciate (2)**
31:3;39:8
**approval (2)**
96:12;100:5
**approve (2)**
36:15;95:18
**approved (3)**
96:19,23;124:7
**Approximately (3)**
11:5;68:23;69:17
**area (11)**
19:7;23:6,7;32:11;
33:1;36:17;83:21;
85:19;91:12;108:19;
109:7
**areas (4)**
34:19;36:16;
88:25;121:4
**argument (2)**
129:17,20
**arm (1)**
17:16
**Army (1)**
67:10
**around (3)**
73:20;107:18;
122:20
**arrest (1)**
134:9
**arrested (1)**
11:18
**aside (2)**
17:25;73:25
**asset (3)**
120:14;123:22;
124:14
**assigned (4)**
81:13;82:22;
101:24;102:6
**assignment (5)**
81:17,21;87:17;
101:12,22
**assist (2)**
81:15;102:1
**assistance (3)**
37:6,8,11
**assistant (4)**
13:12;16:24;
56:20;58:2
**assistant's (1)**
36:25
**assume (1)**
129:6
**assuming (1)**
18:3
**attached (1)**

99:18
**attack (1)**
38:9
**attention (8)**
31:19;81:25;
119:3,4;128:5,16;
129:9,16
**attorney (3)**
15:15;39:1;121:8
**Attorney's (2)**
20:6;21:2
**authority (7)**
21:8;27:12,20,21;
96:7;105:11;110:13
**availability (2)**
26:3;90:6
**available (10)**
26:24;27:2;34:2;
48:9;52:17,18,21,24;
53:10,19
**avoid (1)**
126:20
**aware (2)**
38:23;109:3
**away (1)**
116:3

## B

**baby (1)**
84:23
**back (22)**
22:23,25;25:7;
28:18;29:1;36:18,22;
48:2;52:20;55:24;
57:25;58:25;73:9,23;
75:22;89:22;113:20;
114:8;131:19;132:4;
134:18,23
**background (14)**
10:6,8;15:23;25:8;
30:2,3,5,12,14;
115:19;116:14,16,
25;117:1
**badge (2)**
131:4;134:3
**bailiff (1)**
71:20
**balance (1)**
131:9
**based (15)**
37:25;38:11;
39:24;40:2;46:21;
56:24;90:21;92:9;
100:2;105:5;108:9;
109:21;110:13;
124:3;134:11
**basement (1)**
33:19
**Basically (23)**
12:21;17:11;
18:19;23:12,16,20;
24:10;29:17;31:14;

34:3;35:16;36:23;
37:6;40:11;47:18;
49:2;50:23;54:17;
66:14;78:4,15;79:3;
80:22
**basis (8)**
36:1;49:17;50:6;
66:4,6,9,15;74:1
**bathroom (1)**
6:6
**Baton (19)**
5:11;11:1;16:22;
17:1,16,18;18:5,6,
15;19:13,15;27:16;
81:7,8,14;82:23;
89:7;111:7;113:4
**became (5)**
16:3;86:8,12,20;
87:7
**become (2)**
15:24;82:12
**becomes (5)**
26:24;52:21,23;
53:18;73:18
**becoming (3)**
16:20;86:22;89:11
**began (1)**
68:17
**begin (3)**
10:13;33:14;50:23
**beginning (1)**
123:19
**begins (1)**
33:13
**benefits (1)**
107:3
**BERNARD (44)**
5:4,5;12:7;41:20,
23;42:7,12,19,21;
65:19;82:8,10;91:13,
15;94:4,20,24;98:12,
19;99:24;100:21,23;
101:4,17;102:18;
103:7,14,18;109:16,
20;110:17;118:6,9,
24;119:1,13,17;
121:6;126:13,22;
127:1;135:3,8,14
**best (8)**
6:22;7:10,12;8:13;
9:16;30:21;91:9;
120:11
**better (3)**
41:13;99:12;
110:15
**bit (4)**
8:24;10:7,8;57:7
**black (2)**
121:17;123:6
**bless (1)**
123:12
**board (2)**
20:8;53:14

**body (1)**
6:21
**bond (2)**
74:17;75:1
**bonded (1)**
75:2
**bonds (2)**
74:5,14
**Booking (1)**
74:8
**boots (1)**
65:22
**both (9)**
49:22;104:23;
105:1;110:5;114:2;
127:16;130:12;
131:9,19
**Boulevard (1)**
11:1
**break (8)**
6:3,5,6,11;57:6;
118:4,8;135:10
**Brian (1)**
85:21
**bring (4)**
9:8;79:8;96:18;
126:2
**bringing (1)**
9:11
**brings (1)**
119:23
**Brooks (25)**
14:4,13;15:12;
70:20;79:22,25;80:6,
11;81:11,12,16,20;
82:12,21;83:2,7;
84:9,10;85:11;86:1;
87:16;88:4,20;89:20;
125:14
**Brooks' (1)**
81:23
**brought (9)**
31:18;74:2;95:22;
96:17;128:14,16;
129:2,8,15
**BROWN (20)**
5:1;6:24;10:16,17;
15:23;32:16;39:7;
43:13;45:10;50:2;
81:8;92:12;101:10;
102:15;103:4;
109:10;118:10;
120:8;121:12;134:12
**B-R-O-W-N (1)**
10:18
**building (3)**
23:17;37:24;43:10
**bunch (1)**
34:17
**business (3)**
7:20;62:10;93:6
**busy (2)**
6:4;67:3,5

**C**

**Calculating (2)**
74:14,15
**call (15)**
6:5;29:8;32:19,21;
33:1,3;76:17;88:8;
89:14;103:10;
116:17;117:3;118:5;
129:19;133:24
**called (4)**
9:18;26:21;72:12,
15
**callout (1)**
74:3
**calls (1)**
34:14
**came (22)**
14:10;27:2;37:21;
51:16;88:20;89:4,6;
97:5,7;113:3,20,21,
22,25;114:8;121:20;
131:5,7,8,19;134:18,
23
**cameras (1)**
32:22
**can (40)**
5:23;6:5,10;8:20,
22;12:18;21:22;
23:9;24:13,13;29:12,
17;31:1,3,10;42:1,8;
51:6;52:12;53:6;
54:22,25;56:25;
59:16;61:6;67:1,20;
76:5,5,21;79:17;
91:4;95:16;99:16;
106:5;109:14;110:2;
116:17;117:3;118:4
**candidates (2)**
28:1;48:9
**capacities (1)**
49:23
**capacity (4)**
11:23;12:1;37:20;
44:10
**Captain (36)**
14:4,11,14,16,20;
15:7;18:25;40:21;
41:5,12;45:21;49:20,
22;51:4,24;55:16;
57:4;62:16,23,23,25;
63:19;64:2;78:1;
82:3;84:9;96:15;
99:23;100:6;102:14;
103:3;108:1,3,21;
120:11,20
**captains (6)**
24:1;28:24;42:24;
47:22;48:12;49:13
**captain's (1)**
63:2
**captains' (1)**

55:17
**carbon (1)**
102:12
**care (1)**
34:12
**Carl (1)**
119:11
**carried (3)**
131:3,10,12
**carry (5)**
91:11;96:9;
123:15;134:3,3
**carrying (1)**
96:10
**case (13)**
10:11;12:14;15:8,
16;28:15;58:22,23;
59:14;64:18;100:4,
11;113:7;133:25
**categories (1)**
20:18
**category (1)**
51:21
**cause (1)**
134:9
**caused (1)**
132:17
**Cc'd (2)**
82:2;99:22
**ceased (1)**
122:20
**center (2)**
32:20;36:5
**ceremonial (3)**
41:16;52:3;85:17
**certain (7)**
38:17,20,24;40:8;
41:10;55:21;121:4
**certainly (6)**
65:10;68:12;
74:11,20,25;95:24
**certification (1)**
4:10
**Certified (3)**
4:21;113:22,24
**chain (7)**
62:9,21;63:7;
67:16;70:8;96:13,14
**chains (1)**
67:14
**chair (1)**
109:22
**chance (2)**
99:11;109:9
**change (11)**
76:24;78:24;79:1;
93:22;94:11;97:9,17;
98:14,24;99:1;
114:23
**changed (5)**
5:16;17:8,12;
95:13;97:1
**changes (2)**

38:5,11
**characterize (1)**
111:23
**charge (1)**
9:18
**charges (1)**
118:20
**Chaver (1)**
85:22
**checked (1)**
132:21
**checking (1)**
36:6
**checklist (1)**
75:15
**checks (7)**
30:2,3,5;34:12;
35:16;116:16;117:1
**chief (64)**
18:2;23:20,21;
24:2,3;25:2;26:25;
27:1,1,8,9;28:24;
33:22,23;36:24;37:1;
49:22;56:19,21;
57:13,15,15,17;
62:17,17,23;63:1,2,4,
5;64:3;70:9;82:3;
93:21,24;94:8;95:11,
20,22;96:3,17,18;
97:7,24;98:13,22;
99:2;100:4;101:8,10,
21;102:9,23;103:6;
108:4,6,9,21;120:23;
122:1,8,17;123:10,
25
**child (1)**
95:7
**children (3)**
11:11,14,15
**choice (1)**
22:6
**choosing (1)**
110:18
**chose (1)**
110:19
**chosen (1)**
86:3
**circumstances (2)**
18:3;85:5
**citizen (2)**
9:7,11
**City (25)**
5:11;17:17,18;
18:5,16;19:13,15;
27:15,16,20;32:14;
34:6;39:2;42:23;
45:14;46:1,13;81:7,
9,14,19;82:23;87:15;
89:7;111:7
**Civil (15)**
4:7;21:20;24:20;
29:25;30:1;46:17;
50:24;51:18;54:10,

12,24;55:7;56:5,10;
57:9
**clarify (2)**
59:16,21
**clear (4)**
64:17,25;65:1;
132:22
**clearly (1)**
90:1
**clerical (5)**
22:12,13;23:6,7;
35:17
**clock (1)**
73:20
**close (10)**
21:1;36:17;94:18;
99:9;108:5;120:10,
15,16;121:2,5
**Club (2)**
83:12,17
**coincidence (1)**
117:8
**Coleman (4)**
101:25;102:2,13;
127:16
**collaborative (1)**
77:22
**collect (1)**
34:7
**Collecting (1)**
74:19
**collectively (1)**
90:14
**coming (2)**
25:25;33:13
**command (8)**
62:9,22;63:7;
67:15,16;70:9;96:13,
15
**commands (1)**
130:3
**commendations (1)**
110:24
**Commission (2)**
118:1,19
**commode (1)**
36:14
**communicate (2)**
33:21;117:4
**communication (1)**
21:2
**communications (2)**
36:19;108:5
**community (7)**
18:9,14;33:17;
34:16,20;35:14;67:7
**compile (1)**
21:25
**complain (1)**
97:8
**complainant (5)**
120:1,7,12,22,24
**complained (3)**

96:25;97:23,23
**complete (3)**
7:13;8:7;56:9
**completed (1)**
7:11
**Completely (1)**
7:15
**completes (2)**
81:20;87:16
**component (1)**
102:22
**concern (3)**
48:3;98:25;128:4
**concerning (1)**
129:24
**concerns (4)**
34:16;96:22;
127:12,13
**condition (1)**
39:4
**conditions (1)**
20:22
**conducive (1)**
36:12
**conduct (3)**
26:7;45:12;132:17
**conducted (1)**
43:13
**confine (2)**
8:14;113:6
**confined (1)**
42:8
**consider (4)**
22:2;25:23;28:11;
89:19
**consideration (9)**
22:11,14,19;27:7;
30:20;39:5;99:19;
113:16;114:14
**considered (3)**
5:17;88:15;120:22
**consistent (1)**
90:24
**constable (26)**
5:10;15:25;16:1,2,
4,20;17:4,6;20:4;
27:15;32:14;42:23;
44:1;50:17;81:9;
96:8;101:10;102:15;
103:4;113:10,11;
115:14;120:1,25;
121:12;131:3
**constables (1)**
34:10
**Constable's (22)**
5:7;12:15;18:16;
19:13,15;21:5;24:19;
34:25;37:21;45:14;
46:2,13;76:14;81:7;
83:4;89:7;105:16;
111:7,9,19,21;116:4
**contained (2)**
82:17;132:15

**content (1)**
94:12
**continue (3)**
39:10;76:24;
102:16
**continued (2)**
94:19;134:24
**continuous (1)**
77:21
**contributions (1)**
111:6
**control (3)**
32:19,21;36:5
**controversy (1)**
127:10
**convenient (1)**
99:14
**convicted (1)**
11:20
**cooperation (1)**
94:19
**coordinate (1)**
74:4
**coordinated (1)**
79:3
**copy (1)**
102:12
**corporal (63)**
37:16;39:22;40:6,
16,23;41:15,19;
47:10;52:2,6,7;
68:20;69:9;72:19;
81:12,18;82:21;
84:10,11;85:12,16,
20,21,22,23;86:3,9,
11,17,18,25;87:14;
88:20;94:16;99:7;
101:20;102:6;
106:16,17,20,22;
107:4,7;108:22;
115:1;120:17;124:7,
16,17,18,19;125:11;
126:16;128:1,17;
129:4,25;130:3,5,8,
17;131:14;134:14
**corporals (3)**
43:1;47:9;52:4
**corrected (1)**
122:25
**correctly (5)**
60:12;82:24;97:2;
107:25;108:20
**correspondence (1)**
87:5
**Cortana (2)**
18:10;33:15
**council (1)**
20:7
**counsel (1)**
4:4
**country (2)**
9:7,11
**counts (1)**

89:18
**couple (3)**
103:16;133:9,10
**course (5)**
20:25;22:7;38:3;
78:23;96:21
**Court (13)**
4:21;5:19;6:12,16;
7:8;13:14;17:17,17,
19;73:9;74:2;75:22;
81:22
**courtroom (16)**
23:17;35:4,9,10;
37:24;43:9,11,15,17;
71:4,5,7,9,17;88:24;
93:8
**co-workers (1)**
77:23
**created (1)**
85:17
**creating (1)**
97:9
**crime (1)**
11:20
**criminal (2)**
30:18;127:20
**cripple (1)**
120:16
**crippled (2)**
124:25;125:2
**criteria (1)**
91:20
**crossroads (1)**
46:3
**Crump (4)**
101:25;102:2,13;
127:16
**Cunningham (4)**
15:2,3;19:2,4
**cut (1)**
42:3

**D**

**daily (7)**
20:1;32:15;36:1;
66:6,9,15;74:1
**dangerous (1)**
121:5
**DARE (4)**
18:4,8;34:19;
35:14
**date (3)**
94:10;96:24;
101:21
**dated (6)**
81:6;84:4;94:5;
98:6;99:1;101:11
**Davis (59)**
5:6,9;9:10;68:9,10,
11,13;69:8,13,23;
83:3,8,24;84:17;
92:14;94:16;95:6;

96:25;97:22;99:7;
101:20;103:19;
104:12,24;106:2,10,
16;107:4,7;108:10,
23;109:24;110:5,19,
25;112:14;113:19;
114:3,17;117:13;
123:22;124:22;
125:18;126:10,16;
127:10,18;128:1,1,
17,17;129:4;130:1,5,
9,17;131:2,14;
134:14
**Davis's (3)**
117:6;118:20;
130:3
**Dawn (2)**
14:3;15:17
**day (16)**
24:14;32:8,15,17;
33:4,12,13,14;38:4;
39:10;49:10;66:1,16;
76:25;90:3;98:7
**day-by-day (2)**
49:17;50:6
**days (4)**
39:3;90:2,3,4
**day's (1)**
34:22
**day-to-day (1)**
66:4
**dead (2)**
36:21;123:12
**deal (2)**
20:19;109:14
**dealing (3)**
48:8;61:23;75:17
**deals (1)**
39:15
**Dear (1)**
126:16
**debating (1)**
68:3
**deceased (1)**
11:13
**December (1)**
84:25
**decide (1)**
30:21
**decided (3)**
79:21,25;80:5
**decision (22)**
21:7,15;24:14,15;
25:10;28:16;29:14;
39:1;49:1,10;80:5;
87:19,19;92:9;99:10;
100:14;105:3;
110:12,13;119:25;
120:23;121:15
**decisions (6)**
21:10,11,12;34:2;
123:17;124:10
**declared (1)**

92:5
**decline (1)**
60:16
**declined (1)**
60:14
**deemed (4)**
54:16;55:3;56:6;
58:15
**definitely (3)**
9:13;64:3;134:16
**degree (1)**
49:6
**Delta (6)**
18:22;19:4,8;
72:11,24,25
**Department (10)**
18:7;53:21;68:14,
17;110:25;111:2,4;
114:4;116:19,24
**departments (3)**
19:7;34:24;63:21
**depend (13)**
22:21;40:20;
42:23;43:3;47:21;
48:11,17;50:2,11;
67:22,25;68:4,6
**depending (8)**
22:9;25:20,24;
26:1,3,23;55:15;57:1
**depends (4)**
21:24;28:6;88:8;
90:6
**deposed (3)**
5:12;12:12,13
**deposit (1)**
74:23
**Depositing (2)**
74:21,22
**deposition (15)**
4:5,16;5:17;6:1,
10;7:3,17;8:12;10:4;
12:20;14:1,6;42:16;
52:13;96:5
**deputies (20)**
22:17;23:10;25:5,
18;37:9,16;39:22;
40:6,23;42:25;43:17;
45:13;46:1,12;47:2;
75:18;93:7;99:13,17;
107:14
**Deputy (91)**
19:3;23:7,20;24:2,
3;25:2;26:25;27:1,4,
9;33:23;40:16;43:7,
14;44:3,7,12;49:22;
54:22;57:14,15;
62:17;63:4,5;64:3;
68:17;70:21,22;71:1,
3;76:8;77:7,8;81:23;
83:3,9,11,12,13,16,
20,25;84:1;87:25;
88:25;89:12;90:10,
17;91:23,24;93:14;

94:9;96:17,18;98:22;
99:2;101:8,10,21;
102:9;105:11,14;
106:15;107:1,2,18;
108:6;110:22;
113:23;115:2,4,24;
120:1,8;121:16;
124:8;127:10,11,17,
18;128:1;129:3;
130:1,6,7,22,24;
131:2,6,7;132:9
**deputy's (9)**
22:16;24:18;
36:25;43:6;56:19,21;
72:6;97:7;132:14
**describe (4)**
24:16;29:17;
31:10;32:14
**described (2)**
28:22;75:22
**describing (2)**
51:11,13
**description (1)**
53:8
**deserve (1)**
59:25
**designed (1)**
39:3
**desire (2)**
49:3;52:19
**desk (2)**
56:20,21
**detailed (1)**
41:13
**details (2)**
41:9;109:1
**detainers (1)**
74:5
**detect (1)**
29:6
**detected (1)**
29:6
**detective (1)**
131:12
**determination (3)**
32:9;59:12;118:18
**determine (5)**
25:11;45:19;
54:25;55:1;115:21
**determining (3)**
28:7;50:18;120:10
**develop (1)**
25:4
**developing (1)**
77:20
**difference (3)**
29:9;88:1;106:18
**different (4)**
20:2;74:21;85:25;
109:12
**differently (1)**
108:2
**difficult (1)**

6:16
**difficulty (1)**
97:9
**direct (3)**
40:3;119:2,3
**directed (2)**
81:25;96:12
**direction (2)**
93:22;95:12
**directly (5)**
20:19;62:4;
104:14,18;121:11
**direct-reports (1)**
61:11
**disagree (4)**
29:12;46:22;
123:20;125:5
**disagreed (1)**
29:14
**disagreement (1)**
29:9
**discovered (1)**
127:24
**discriminate (1)**
124:11
**discuss (1)**
14:19
**discussed (1)**
95:23
**discussing (1)**
15:15
**discussion (2)**
13:20;100:9
**dispense (1)**
15:22
**dispute (1)**
9:5
**disseminated (1)**
53:19
**distinct (1)**
116:22
**distracted (1)**
77:4
**distributed (3)**
14:8;9;53:13
**district (5)**
39:1;75:12;79:6,7,
8
**diverse (1)**
34:5
**division (15)**
18:23;35:19;
68:23;94:8;99:3,17;
112:14;120:3,13,16,
18;123:23;124:24;
125:12;131:13
**divisions (1)**
67:7
**document (8)**
73:8;80:17,19;
93:24;94:25;118:11;
119:5;126:7
**documents (3)**

12:23;13:2;125:24
**dog (1)**
18:23
**dollars (1)**
34:7
**donating (1)**
89:8
**done (16)**
20:12;21:1;33:5;
38:2;19;43:16;77:15;
85:25;86:1;100:2;
111:21;113:12;
115:23;116:5;
128:11;132:1
**door (6)**
35:3,5,7;38:6,8;
72:5
**doors (1)**
32:23
**down (11)**
6:17;25:25;33:18;
36:17;38:20;57:6;
73:25;102:6;108:24;
116:12;133:21
**drive (1)**
134:1
**driving (3)**
106:17;114:22;
134:1
**drove (1)**
131:2
**drug (8)**
18:23;126:19,20;
128:7;132:12;
133:19;134:9,22
**drugs (3)**
128:20;130:9;
132:19
**due (2)**
81:22;92:7
**duly (1)**
5:2
**during (10)**
5:24;7:3,16;32:17;
38:22;72:7;81:16;
89:1;96:5;120:4
**duties (14)**
17:4,7,14,15,15,
20;19:16;72:22;73:2,
5,7;102:1,8;111:9
**duty (4)**
101:12,22;128:9;
132:1

**E**

**ear (1)**
8:24
**earlier (2)**
54:22;91:19
**East (3)**
16:22;17:1;113:4
**educational (2)**

10:8;15:23
**Edwards (8)**
129:4;130:1,6,8,
22,24;131:6,7
**EEOC (1)**
134:15
**effect (1)**
128:2
**Effective (7)**
81:11;82:20;
94:12;96:24;99:4;
101:23;102:8
**effectively (1)**
95:13
**efficient (1)**
100:17
**eight (9)**
59:1,3,6,7,10;
71:15;89:14,16;
90:16
**either (12)**
7:23;23:16;33:21;
36:24;48:1;58:2;
67:21;101:3;105:25;
108:1,22;123:14
**elaborate (4)**
41:3,25;42:1,4
**elected (3)**
16:4,8;27:15
**election (1)**
16:6
**elevation (1)**
114:24
**Elmer (1)**
16:25
**else (7)**
13:10;19:23;58:8,
9;83:20;106:24;
113:20
**elsewhere (2)**
111:23;113:12
**e-mailed (1)**
14:25
**emergency (2)**
33:4;75:23
**emphasizing (1)**
64:12
**employed (5)**
45:14;46:1;
117:14,16,20
**employee (14)**
26:19;31:15;
39:21;46:4;92:15,24;
93:1,10,13;113:11;
115:14;117:10,11;
133:19
**employees (15)**
37:5;39:15,17;
44:18;46:12;48:10;
49:16;50:5;63:11;
81:7;82:3;87:14;
117:9;121:3;133:3
**employer (1)**

117:6
**employment (3)**
5:10;116:3,3
**encouragement (1)**
9:17
**end (4)**
24:14;32:8;49:9;
82:2
**ended (1)**
122:19
**enforcement (16)**
17:16,19;23:19;
30:4;35:12,13;63:17;
93:9;103:22;104:25;
106:19;110:6;120:2;
121:19;124:23;
125:20
**engage (1)**
18:21
**engaged (2)**
126:19;132:12
**engagements (1)**
34:18
**enough (10)**
37:13,19;38:16,21;
39:16,20,24;50:15;
61:9;124:9
**ensure (1)**
8:11
**entire (1)**
23:14
**environment (1)**
66:13
**essentially (2)**
54:11;132:9
**ethic (4)**
77:13;92:1,2,11
**ethics (1)**
77:22
**evaluate (23)**
29:7;37:4,9,15;
39:17,22;40:1,5,15,
22;41:14;42:25;44:6,
7,14,14;45:6,23,25;
46:4,8,14;48:13
**evaluated (4)**
43:6;44:3;105:5;
133:25
**evaluating (2)**
46:12;63:11
**evaluation (21)**
28:9;43:14,16,20,
22,24;45:12,13;47:3,
4,9,12,15,23;48:4,18,
19;105:23;128:9,10;
135:1
**evaluations (4)**
44:19,25;45:18;
46:6
**even (12)**
6:19;30:11;38:22;
48:12;49:3;76:20;
105:22;107:17;

113:16;117:11;
133:13;134:22
**events (3)**
15:4;127:12,12
**eventually (1)**
68:19
**everybody (21)**
13:15,16;22:4;
23:11;25:13;27:6;
36:22;58:14;59:22;
60:2,17,18,19,21,22,
23;71:10;76:13;
80:2;83:20;107:12
**everybody's (1)**
107:19
**everyone (1)**
99:14
**evidence (5)**
4:17;119:23;
128:19;129:8,15
**exact (1)**
116:11
**Exactly (10)**
55:2;68:25;69:6,
18;71:23;74:15;
92:6;97:12;108:25;
111:25
**EXAMINATION (19)**
5:4;12:7;42:21;
56:6;65:19;82:10;
91:15;94:24;98:12;
99:24;100:23;103:7,
18;109:20;110:17;
118:9;119:1;121:6;
127:1
**examine (2)**
115:18,19
**examined (1)**
5:2
**example (8)**
22:12;29:23;38:5;
44:13;64:19;73:14;
112:2,5
**excelled (1)**
89:12
**excelling (1)**
89:9
**exception (1)**
60:16
**excuse (2)**
21:23;80:20
**executive (4)**
13:12;36:25;
56:20;58:1
**exemplary (1)**
116:5
**exercising (1)**
9:10
**Exhibit (7)**
80:18;82:19;95:4;
103:11;117:25;
118:12;126:5
**exist (1)**

32:10
**exists (1)**
119:23
**expanded (4)**
17:11,12;19:20,21
**expect (2)**
132:19;133:23
**experience (22)**
24:23,24;77:13,21;
88:5,9,16;89:10,24;
91:1,2,25;110:24;
111:11,23;112:21;
120:9,19,21;124:3;
125:12,14
**experienced (2)**
37:19;76:12
**explain (1)**
30:1
**explanation (2)**
8:20;119:25
**extensive (3)**
88:16;91:1,1
**extent (1)**
109:3
**eye (1)**
80:21

**F**

**face (1)**
132:4
**facilities (1)**
73:10
**fact (42)**
8:19;29:2;38:15,
23;45:11;48:11;
49:11;50:1;61:6;
62:20;66:22;72:13;
80:13;92:14,17,20;
93:9;95:2;96:24;
97:22;100:3;104:4;
105:21;106:2;108:8;
109:3;110:14;117:5;
121:20;122:6,13,22,
23;124:4;125:13;
128:13;129:3,25;
131:14;133:13;
134:12,17
**factor (3)**
28:8;120:10;
132:16
**facts (5)**
10:10;15:7;80:3;
128:15;134:11
**fair (1)**
62:7
**fairness (3)**
29:11;49:7;59:23
**falling (2)**
129:18,20
**familiar (1)**
126:6
**far (3)**

19:24;95:25;127:4

**farther (1)**
126:21

**fashion (1)**
53:20

**FDS (1)**
38:6

**February (4)**
81:6,11;82:20;
84:5

**Federal (1)**
4:7

**feel (4)**
20:3;45:20;103:5;
134:10

**feelings (1)**
123:1

**fees (3)**
74:19,22,23

**feet (1)**
16:18

**felt (2)**
110:14;134:13

**female (10)**
92:15;93:10;
121:1,17,18,21,22;
123:5;127:11,17

**few (1)**
78:11

**file (1)**
82:5

**filed (2)**
12:8;134:15

**filing (1)**
4:10

**fill (5)**
48:14;72:6;79:22;
107:22;114:18

**filled (2)**
47:25;87:24

**final (16)**
21:7,10,11,12,15;
24:14,15;25:9;27:12;
28:15;32:8;48:25;
80:4;105:3,10;
110:12

**finalized (1)**
30:13

**find (2)**
33:2;116:6

**fine (4)**
33:17,20;86:4;
112:8

**Fingerprinting (1)**
74:10

**firing (1)**
19:9

**first (36)**
5:2;6:9;14:8;
25:23;32:18,25;33:8;
37:18;38:8;41:5,15;
43:10;52:24;75:12;
76:5,6,10;77:2;79:6,

7,8;90:19,23;91:7;
92:15,24;93:1,10,13,
14;95:19;101:16;
106:8;107:19;
122:25;126:11

**fit (2)**
128:9;131:25

**Five (7)**
16:9;26:4;36:8;
68:23;69:4,4,17

**fleet (2)**
79:10,11

**flip-side (1)**
8:5

**focal (1)**
38:8

**focusing (2)**
63:22,23

**folks (2)**
87:14;93:7

**follicle (4)**
128:8;131:17,25;
133:21

**follow (1)**
50:18

**followed (1)**
131:22

**follows (3)**
5:3;94:14;99:5

**Force (2)**
18:22;72:11

**forget (2)**
71:21;96:7

**forgot (1)**
59:9

**form (6)**
4:13;46:16;53:20;
54:7;91:4;110:8

**formal (1)**
5:17

**formalities (1)**
4:9

**forms (2)**
47:23,24

**formulate (1)**
25:4

**forth (1)**
36:18

**four (5)**
15:6;31:23,23,25;
60:13

**FOWLER (33)**
12:3;13:9;14:2;
15:15;41:2,22;65:15;
80:25;81:4;91:3;
93:25;94:6;98:8,15,
21;101:2,13,19;
102:20;103:12;
109:8,18;110:7;
118:3,17;119:10,15,
19;121:8;126:8,15;
135:5,11

**Fred (1)**

16:25

**free (1)**
103:5

**friends (1)**
129:4

**front (7)**
35:3,5,7;36:24;
38:5,7;72:5

**full (2)**
41:11;91:11

**full-time (1)**
90:17

**fully (1)**
29:7

**Furman (1)**
85:21

**further (3)**
102:25;120:20;
135:4

**Furthermore (2)**
81:18;119:11

## G

**gain (2)**
76:16;77:21

**gamut (2)**
30:16;36:20

**garnishment (1)**
35:15

**garnishments (1)**
34:8

**gather (1)**
106:5

**gathered (1)**
26:18

**gathering (1)**
80:3

**gave (3)**
14:25;85:11;
131:14

**Gayle (1)**
11:9

**G-A-Y-L-E (1)**
11:10

**generally (3)**
52:4;56:18,23

**gestures (1)**
6:18

**gets (2)**
13:14;59:13

**given (14)**
12:22;15:4;27:18;
39:25;41:6;47:25;
72:14;96:25;97:15;
105:24;109:22;
116:22;120:5;124:23

**giving (3)**
39:11;89:1,8

**global (1)**
28:13

**God (1)**
123:11

**goes (2)**
52:10;79:3

**good (7)**
25:12;30:6,11;
50:15;61:9;91:24;
126:23

**government (2)**
27:21;34:6

**grade (1)**
51:24

**graded (1)**
55:17

**granting (1)**
93:17

**ground (4)**
5:15;49:8,15;
65:23

**group (4)**
25:16;26:18,21;
55:11

**grown (1)**
11:16

**guard (1)**
73:20

**guess (7)**
21:24;29:16;34:6;
36:8;86:14;133:2,8

**Guillot (2)**
14:3;15:17

**gun (2)**
131:3;134:3

**guys (2)**
44:18;97:25

## H

**hair (4)**
128:8;131:17,25;
133:21

**half (7)**
38:7;88:14;89:21,
23;90:15,19,24

**hand (3)**
5:25;6:17;113:7

**handing (1)**
101:9

**handled (2)**
35:17,20

**handles (2)**
17:20;35:16

**hands (1)**
9:4

**handwritten (2)**
102:17,22

**happen (1)**
41:10

**happened (2)**
31:2;132:2

**happens (3)**
7:6;52:24;56:15

**happy (1)**
133:3

**hard (2)**

7:8;29:21

**hardly (1)**
36:20

**Haynes (16)**
104:7;105:11,14;
106:15;107:1;
110:20,22,22;112:6,
10,12;113:24;115:4;
120:9,21;121:16

**hazed (1)**
125:25

**head (1)**
33:18

**hear (1)**
49:7

**heard (3)**
29:4,5;133:14

**help (1)**
74:4

**helping (1)**
23:3

**hereby (2)**
4:6,14

**hereto (1)**
4:4

**hierarchy (1)**
67:14

**hike (1)**
106:24

**Himself (1)**
110:1

**hire (5)**
25:5;30:15;
113:18;117:2;119:25

**hired (12)**
27:18;68:11;89:2,
12;113:19;114:9;
116:7,21;120:7,24;
123:4;124:5

**hiring (21)**
19:9,18;20:15;
21:4,12;22:9,15,19,
24;24:4,6;25:21;
28:25;29:20;31:4;
113:17;120:6,17,18;
125:10,11

**history (1)**
10:9

**hit (1)**
132:4

**hold (2)**
16:21;72:23

**holding (1)**
9:9

**home (2)**
10:23,25

**hope (1)**
9:9

**hospital (6)**
73:13,15,19,21,22;
75:23

**hospitalized (1)**
73:16

**hour (2)**
89:21;97:19
**hours (16)**
89:23;93:23;
94:15,16,16,17;
95:14,14,15;97:1,12,
16,17;99:7,7,8
**house (1)**
73:8
**housed (1)**
32:20
**HR (2)**
30:17;54:11
**Huh (2)**
13:1;117:15
**Human (5)**
50:23;51:6;118:2,
15,19
**hundred (1)**
5:16
**hypothet (1)**
55:25
**hypothetical (2)**
30:6,25

**I**

**IA (9)**
30:13;35:24;
129:14,22;130:11;
131:8,22,22;132:16
**identified (2)**
101:7;102:11
**illegal (4)**
126:19;128:20;
132:12;133:19
**illegally (1)**
132:19
**imagine (2)**
124:20;125:23
**immediately (1)**
133:20
**impede (1)**
10:20
**importance (1)**
93:16
**important (1)**
6:15
**impression (1)**
116:23
**improvement (1)**
38:4
**improvements (3)**
19:19;20:16;21:13
**inaccurate (1)**
121:13
**include (1)**
23:1
**included (3)**
22:8,8;100:8
**includes (2)**
94:17;99:8
**inconsistent (1)**

**increase (2)**
20:9,10
**indicate (2)**
8:1;48:2
**indicated (9)**
12:12;17:5;22:25;
23:25;27:11;57:9;
102:4;108:2;127:25
**indicates (1)**
100:2
**indicating (1)**
87:13
**individual (11)**
11:23,25;22:5;
25:9;28:12;31:4,13;
44:8;49:15;111:6,17
**individuals (20)**
21:5;23:24;26:7,
18;40:4,20;47:10;
52:19;54:12;62:3,8;
64:5;65:24;66:3,23;
76:18;104:23;
123:11,15;129:17
**infection (1)**
8:25
**informal (1)**
6:1
**information (12)**
30:13;41:13;
42:15;43:4;53:15,19;
67:23;68:5,7;126:18;
127:2,4
**in-house (1)**
52:17
**initiated (1)**
18:24
**initiative (1)**
18:14
**inmates (5)**
36:12;38:21;74:8;
79:5,6
**instance (1)**
24:17;40:13
**instead (1)**
110:18
**instructed (1)**
127:8
**instructing (1)**
96:1
**insubordinate (1)**
130:2
**insubordination (3)**
130:7;132:10,15
**integrity (1)**
9:18
**interact (2)**
19:5;50:5
**interest (2)**
30:21;81:24
**interested (1)**
108:23
**interim (1)**

**intermittent (2)**
90:20,23
**internal (4)**
35:24;127:7;
128:25;129:13
**interrupt (1)**
40:13
**interview (35)**
23:22;25:19;26:8,
9,10,16,19;27:8;
28:1;32:1,1;56:25;
57:1,23;58:16;59:7,
22;60:2,4,4,5,8,17,
21;61:3,12,15,20;
62:3,5,11;63:6;64:7;
65:6;66:25
**interviewed (16)**
27:4;56:7;59:13,
18;60:11,17,18,22,
23;61:7;70:6;85:2;
103:3;104:13,20;
109:25
**interviewing (3)**
22:18;30:8;80:2
**interviews (5)**
56:23,24;58:2;
61:22;120:4
**into (6)**
9:4;10:10;73:23;
119:23;127:9;129:17
**intrusive (1)**
10:7
**investigate (1)**
128:6
**investigating (1)**
129:23
**investigation (8)**
30:12;122:7;
127:14,19;128:7;
129:1;132:18;134:7
**invite (1)**
65:7
**involved (6)**
22:13,17;23:1,8;
130:25;132:3
**involving (1)**
13:22
**island (1)**
125:3
**issuing (1)**
87:12

**J**

**jail (128)**
23:15,17,18;32:20;
34:25;35:2,25;36:2,
3,4,6,10,19;37:4,14,
17,23;38:16,17,18;
39:2,15,16,17,21,22;
40:6,10,23;52:22;
55:25;57:2;58:20;

69:16
**intermittent (2)**

**jail (128)**
59:2;60:8,13,24;
61:24,25;62:9,15,19,
22;63:8,12,16,19,23,
24;64:2;67:6;68:14,
16,23;69:14,24;
71:11,14;72:5;73:3,
7,14,24;74:6,7,12;
75:5,7,22;76:12,16;
77:15;79:20;80:11,
14;81:14,19;82:12,
23;83:2,7,9,11,13,14,
25;84:6,10,12;85:23;
86:8,12;87:8,15;
88:5,7,15,16,23;
89:24;90:3,4,5,11,
15;91:2;93:8;94:8,
13;98:5;99:3,4,13,
15;103:2,20;114:21;
120:13,18;123:22;
124:16,18,24;
125:12,14,19;127:9,
11
**jail's (1)**
38:12
**January (1)**
16:5
**Jimoh (13)**
14:4,14,16,20;
15:7,7;104:15,15,21;
108:1,13,16;110:1
**job (39)**
16:21;17:3;31:8;
37:4,15;39:20;40:5,
15,22;44:3;47:1,11,
16;55:5;56:4,7;
57:22;70:10,15,20;
72:21;73:2,5;77:16;
78:4,16;96:9;100:19;
105:22,24,24;
111:16,18,20,22;
112:12,14;113:13;
116:5
**John (9)**
18:25;99:23;
102:14;120:11;
123:7,9,12,21;
124:13
**judge (4)**
6:2;71:21,22,23
**judicial (14)**
23:19;35:11,13;
63:17;93:9;103:21;
104:25;106:19;
110:6;112:14;120:2;
121:19;124:23;
125:20
**July (4)**
101:11,21,23;
102:8
**June (8)**
94:5,10,13;98:6,
22;99:1,4;103:1
**jury (1)**

6:2

**K**

**K9 (1)**
18:23
**Karl (3)**
5:5;101:14;135:13
**Katrina (2)**
38:22,23
**keep (3)**
25:10;64:12;
120:12
**keeping (1)**
93:15
**key (1)**
32:23
**kind (1)**
8:17
**knew (2)**
14:22;115:22
**knowing (3)**
38:1;74:22;76:19
**knowledge (7)**
13:3;15:9;37:25;
42:15;77:20,22;
92:10
**knowledgeable (1)**
13:19
**known (1)**
51:5
**knows (2)**
76:18,20

**L**

**lady (1)**
13:15
**land (1)**
80:4
**Larry (12)**
70:9;94:9;98:23;
101:8,11;108:10;
109:23,24;110:4;
120:23;122:1,8
**last (8)**
12:13;16:7;22:25;
38:6;43:5;44:2;
60:12;125:17
**later (3)**
5:24;109:14;
122:15
**lateral (3)**
106:9,9;114:25
**latest (1)**
33:7
**law (5)**
4:8;9:4;30:4;
117:18,19
**lawsuit (5)**
5:7;9:8,12;12:9;
15:5
**Lawton (11)**

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

18:25;82:4;99:23;
100:6;102:15;103:4;
108:1,21;120:11,20;
123:21
**Lawton's (4)**
123:7,9;124:13;
125:15
**lawyer (1)**
13:6
**lawyers (1)**
15:18
**lay (1)**
80:4
**learn (2)**
76:22,24
**least (6)**
44:1;56:7;59:25;
76:12;77:2;90:9
**leave (20)**
33:3;76:20;84:17,
22;85:8;92:16,21,22;
93:3,20;109:15;
125:3,22;126:1,17;
130:18,20,23;
134:20,24
**led (5)**
127:13,15,24;
128:6,7
**left (2)**
49:24;113:19
**legal (1)**
131:22
**length (2)**
23:13;69:6
**Less (4)**
88:11;110:23,24;
112:12
**letter (12)**
87:12;98:13;
100:25;101:6,9,10;
102:23,24;103:1,6;
118:1;126:9
**letterhead (4)**
81:6;94:8;101:14;
126:10
**letting (1)**
109:11
**liberty (1)**
116:17
**lieutenant (36)**
23:21;25:1;27:5;
28:24;40:9,10,21;
41:7,8,11;45:21;
51:3,22;55:18;62:18,
22;63:16,18,20;78:1;
81:14;82:1,4,4;
95:21;96:15;99:23;
100:7;102:14;108:6;
127:5,15,23;128:6;
129:10,22
**lieutenants (9)**
23:25;42:24;
47:22;48:12;49:12,

24;57:5;62:15;63:25
**life (1)**
32:15
**light (2)**
101:12,22
**list (27)**
21:18,23,25;22:1,
3,4;25:11,12,13,25;
27:2;29:23,24,25;
30:2;57:13,23;58:15;
59:1,2,17,22,25;60:3,
14;74:4;78:13
**listen (1)**
25:7
**listening (1)**
29:3
**Litchfield (1)**
16:25
**little (9)**
8:23,24;10:7,8;
57:7;88:5;120:18;
125:12,14
**lived (1)**
11:4
**living (1)**
11:12
**located (1)**
18:9
**location (1)**
61:14
**log (1)**
75:2
**Logging (1)**
75:1
**long (8)**
11:3;15:25;16:10;
42:14;69:18;103:19;
122:6;125:18
**longer (2)**
8:12;122:17
**look (21)**
13:18;25:8,8,19,
22;26:4;30:10;
40:12;41:6;44:11;
75:9;80:19;111:22;
113:10;114:14,19;
115:8,10,13,25;
129:7
**looked (6)**
114:15;115:6,11,
15,15;133:24
**looking (5)**
30:9;41:24;80:4;
90:18;114:16
**lost (2)**
106:20,22
**lot (6)**
6:21;34:21;39:13;
76:23;124:2,9
**louder (1)**
8:23
**Louis (1)**
33:19

**Louisiana (5)**
4:23;6:20;11:2;
118:1,19
**LSU (4)**
113:19;114:3;
116:9,20
**lunch (3)**
94:18;97:19;99:9

## M

**mad (2)**
133:5,6
**mail (1)**
13:17
**mails (1)**
34:11
**main (4)**
33:18;73:18,23;
75:8
**maintain (1)**
73:8
**maintained (2)**
36:13;79:12
**maintaining (2)**
36:13;79:10
**Major (14)**
15:23;17:1;32:15;
39:7;40:12;43:12;
45:10;50:1;91:20;
109:10;118:10;
120:8;132:24;134:12
**majors (1)**
11:14
**makes (6)**
59:12;81:21;
87:17,19;88:1;134:7
**making (8)**
25:9,15;34:3,11,
18;75:1;120:22;
123:16
**male (4)**
110:23;113:2;
121:17,21
**Mall (2)**
18:10;33:15
**man (3)**
6:4;67:3,5
**manage (2)**
46:8;77:16
**management (2)**
75:5;76:17
**manner (2)**
78:9;126:20
**manpower (1)**
73:12
**many (5)**
33:11;55:14;
72:11;122:14;123:2
**mark (6)**
80:17;82:18;
85:22;95:3;117:24;
126:4

**marked (3)**
100:25;118:12;
119:6
**married (1)**
11:6
**Marston (2)**
13:9;119:8
**mass (2)**
39:25;44:23
**maternity (6)**
85:8;92:16,21,22;
93:3,20
**matter (15)**
9:8;15:15;38:15;
53:16;72:13;80:13;
96:24;99:19;104:4;
105:21;117:5;
121:20;122:22;
124:4;133:13
**matters (3)**
13:21;34:3;129:23
**may (43)**
4:16;23:18,18;
25:2,22;29:4,4,5,6,9;
30:11,14,20,24;32:4;
33:15;36:11;37:12;
41:9;44:9,11;45:20,
20;57:1,25;58:1,2;
65:24;66:12;67:2;
77:3;83:14;86:2;
90:2,3,5;93:11,13;
98:24;122:21,21;
132:15;133:16
**maybe (9)**
13:11;23:21;26:3;
33:7;34:2;36:9;
65:25,25;108:3
**mayor (1)**
18:1
**mean (20)**
12:25;20:1;21:16;
27:6,13;31:22;36:4;
37:13;40:10;59:17;
66:13;86:19;88:12;
96:22;109:5;111:2;
121:14,21;124:7;
129:7
**means (5)**
21:17;27:14;
28:13;80:2;99:15
**medication (1)**
10:20
**meet (1)**
55:6
**member (1)**
72:10
**members (1)**
70:8
**memo (7)**
82:2,18;84:4;98:6,
25;99:3;102:22
**memory (5)**
60:11;83:17;

107:24;108:19;
126:12
**mention (2)**
91:21;97:5
**mentioned (17)**
6:13;20:15;52:25;
67:8;72:22;77:3,5;
86:7;91:23,24;92:2,
3;108:22;111:15;
113:2,9;117:22
**mentioning (1)**
103:24
**met (5)**
24:19;54:18;55:4;
57:11
**micromanage (1)**
40:2
**middle (1)**
36:23
**might (5)**
20:3;26:2;31:25;
64:19;108:20
**million (1)**
34:7
**mind (4)**
25:10;32:11;
72:10;77:14
**minimum (4)**
54:18;55:4,6;
57:11
**minute (2)**
77:4;111:13
**missing (1)**
37:12
**mistaken (2)**
62:14;107:25
**mold (1)**
36:10
**moment-by-moment (1)**
49:17
**Monday (2)**
94:13;99:4
**monitors (1)**
32:22
**month (1)**
34:8
**months (6)**
69:17;71:15;
89:14,16;90:4,16
**more (15)**
14:17;15:5;39:11,
13;41:12;66:10,13,
13;68:1;100:17;
103:16;106:9,14;
114:25;134:8
**morning (4)**
32:19;33:1;75:14;
94:10
**Most (4)**
9:13;23:10;34:5;
100:19
**move (4)**
10:10;29:12;

107:17;108:7
**moved (5)**
87:2,2;100:15;
114:7;124:22
**much (4)**
17:9;36:1;90:9;
98:4;123:2
**must (1)**
54:9
**myself (3)**
14:14;25:9;117:4

## N

**name (11)**
5:5;8:15,16;10:15;
11:8,9;24:21;26:22;
27:14;59:17,25
**named (4)**
70:20;83:3,8,16
**names (1)**
83:18
**Narcotics (7)**
18:22;19:4,8;
72:11,22,24,25
**naturally (1)**
87:1
**nature (6)**
14:7;20:8,11;
36:14;108:25;128:5
**Navarre (26)**
70:9;82:3;93:21,
24;94:9;95:11;96:3;
97:24;98:13,23;99:2;
100:4;101:8,11,21;
102:10,24;103:6;
104:14,21;108:10;
109:23,24;110:4;
120:23;122:1
**Navarre's (1)**
122:8
**nearly (1)**
34:7
**necessarily (4)**
23:8;31:24;96:11;
123:15
**necessary (3)**
20:23,25;113:18
**need (11)**
6:3;8:19;20:3;
36:7,7;38:4;42:16;
76:3;105:5;112:2,4
**needed (5)**
38:18,24;93:18;
97:18;100:20
**needs (2)**
38:1;77:15
**Negative (5)**
6:19;131:20,24;
134:18,23
**neighbors (1)**
121:4
**neither (2)**

109:2;122:22
**nevertheless (1)**
123:14
**new (3)**
81:17;120:17;
125:10
**Next (6)**
16:14,15;33:9;
56:16;80:11;103:4
**nicknames (1)**
8:16
**night (1)**
78:14
**Nobody (4)**
67:20;76:18,19,19
**nods (1)**
6:17
**normal (2)**
85:13,15
**normally (1)**
53:13
**note (3)**
102:4,23;103:2
**notes (2)**
109:11,21
**notice (1)**
102:25
**nowhere (1)**
121:22
**NTLR (1)**
18:11
**number (15)**
5:8;13:5;26:2;
51:21;56:24;77:1;
82:19;95:4;103:11;
117:25;118:13;
126:5;127:14;
129:21;133:15

## O

**oath (4)**
4:24;5:19;9:24;
10:1
**objection (5)**
48:3;91:4;101:3;
103:13;110:8
**objections (3)**
4:12;95:25;132:23
**Observation (3)**
43:19,23,24
**observe (1)**
44:11
**observes (1)**
41:7
**observing (1)**
65:24
**obviously (5)**
95:17;109:13;
110:21;123:24;
125:15
**occasionally (2)**
20:1,12

**occasions (1)**
96:5
**occur (2)**
45:3,5
**o'clock (1)**
33:2
**October (1)**
16:4
**off (12)**
23:15;27:16;33:4;
42:3;45:5,17,22,22;
46:20;48:1;71:10;
97:19
**offer (4)**
48:20;49:1;50:11;
52:8
**offered (1)**
108:24
**Office (78)**
5:7;12:15;13:16,
18;16:5,23;17:2,19;
18:9,16,20,20;19:13,
16,20,21;20:6;21:3,
5;22:9;23:11,11;
24:19;30:3;32:20;
33:16,17,18;34:25;
36:21,21,24,25;37:1,
20,22;45:14;46:2,5,
13;53:13;67:13,15;
72:16;76:14;81:8;
83:4,19;88:21;89:1,
4,7;97:7;100:18;
102:2;105:16;
107:18;111:2,3,5,8,9,
19,22;113:5,23,25;
116:4;117:10,11;
120:12;121:22;
124:5;125:4;127:19;
130:13;131:10;
134:15
**officer (7)**
23:18;70:19;
83:20;89:25;90:16;
117:21;134:4
**offices (3)**
19:6;111:4,10
**official (1)**
27:15
**officials (1)**
120:6
**officiated (1)**
4:23
**often (3)**
31:2;66:10,13
**OJT (3)**
76:17;78:16;92:2
**old (1)**
15:6
**Once (9)**
29:24;30:11;45:3,
6;51:1;53:18;57:9;
65:25,25
**one (57)**

7:6;11:12;12:16;
21:23;26:1;29:13;
30:25;31:1,16,20;
32:2;33:21;34:5;
35:20,20;36:4,16;
37:22,23;39:2;53:16,
24;57:3,18,20;58:1,
3;60:14;61:7;62:16,
18;64:1,1,2,21;77:1;
85:24;88:14,14;90:3;
92:21;98:7;100:3,15;
105:16;108:2;112:6,
8;113:1;115:23;
118:20;121:11;
122:22;123:10,14;
125:2;131:10
**one-hour (2)**
94:18;99:9
**ones (1)**
64:13
**one's (1)**
62:15
**only (22)**
6:6;9:15,17;27:7;
49:23,24;59:15;62:2;
64:13;88:23;89:4;
92:20;95:16;100:2;
104:5;105:15;
106:18;107:21;
111:8;114:22,22;
132:1
**on-the-job (2)**
78:17;92:3
**open (17)**
29:11;34:12;39:3,
4;51:1,2,5;53:10;
79:20;80:1;94:17;
99:8;120:9,13,15,25;
121:2
**opened (1)**
79:24
**opening (2)**
51:14;81:22
**operated (3)**
18:25;32:23;40:10
**operating (1)**
125:4
**Operation (17)**
18:15;19:25;20:1;
23:21;33:22;34:3;
35:18,19,21;38:9;
41:6;63:21;72:14;
88:25;100:17;
108:22;123:10
**operations (17)**
18:21;19:21;27:1,
10;34:5;35:22;37:1;
57:16,17;62:17,24;
63:1,3;72:12;95:21;
108:4;123:25
**opinion (7)**
29:10;65:8,12,13,
20,22;66:2

**opportunities (1)**
20:11
**opportunity (9)**
29:7,11;48:20;
49:1;60:1;76:15;
85:12,24;93:17
**option (1)**
60:5
**options (1)**
102:25
**order (4)**
17:18;25:24;76:3;
107:17
**ordinarily (1)**
128:12
**original (2)**
42:2;55:24
**Orleans (1)**
4:22
**others (6)**
13:22;18:2;32:3;
78:12;86:2;92:7
**out (32)**
9:6;17:18;18:11;
29:22;33:2;36:6,22;
38:18;43:9;47:25;
54:16;55:10;66:8;
73:17;75:2;79:12;
84:17,22;92:16,21,
22;93:3,19;96:9,11;
116:6;118:4;128:14;
129:18,20;131:9;
132:5
**outside (1)**
116:2
**over (16)**
7:6;17:8;18:6;
34:7;40:11;63:16,17,
17;67:6,6;90:14;
107:17;112:14;
119:21;127:6,11
**overall (2)**
28:10;41:6
**overseeing (1)**
81:15
**overtones (1)**
127:20
**own (10)**
9:4,18;25:4;30:5;
31:6,13;37:25;41:19;
85:12;123:11

## P

**P-2 (1)**
101:1
**P-3 (1)**
101:7
**P-5 (1)**
119:6
**page (2)**
119:5,6
**panel (1)**

30:8

**papers (1)**
121:3

**paperwork (7)**
13:13,15;14:12,18;
55:17;79:8;89:18

**parades (2)**
34:17;67:8

**paragraph (3)**
119:4,6,12

**parallel (2)**
106:23;112:17

**parameters (2)**
70:13,16

**parenthesis (4)**
94:17,18;99:8,9

**Parish (10)**
4:22;17:1;20:6;
21:2;27:20;34:6;
39:2;78:25;79:4;
113:4

**part (14)**
4:16;14:5;60:3,4;
62:10;73:23;74:6,7,
12,13,23;75:3,6;
101:15

**partially (2)**
63:14,15

**participate (8)**
49:2;61:21;63:6,
11;64:5,14;65:5,7

**participated (3)**
62:19;64:10;
105:22

**participating (2)**
49:13;122:7

**particular (39)**
10:11;14:1;15:5;
16:8;19:3;22:5;23:9;
26:2;28:1;29:22;
31:17;32:11;33:1;
36:16,16;41:14;44:8;
55:5;56:3;58:22;
64:11;71:3;76:4;
83:21;85:19;91:9,12;
100:25;101:6;105:6;
108:7,19;109:7;
110:15;111:18,20;
118:11;127:6;130:15

**particularly (4)**
20:9;22:15;51:3;
79:4

**particulars (3)**
32:10;85:3;109:1

**parties (2)**
4:4;9:5

**partly (3)**
44:5,5;45:15

**pass (1)**
66:15

**passed (1)**
19:1

**past (1)**

36:8

**pave (1)**
107:20

**pay (5)**
106:23;126:17;
130:19;134:20,21

**payroll (2)**
89:15,17

**pending (1)**
6:8

**people (35)**
13:6;22:13,22;
23:1,7;25:20;26:21,
22;27:3,3,8;30:14;
31:7,7,24;34:14,15;
53:15;56:24;59:24;
63:7,10;66:1;73:20;
74:1,2,3;78:20;
100:15;104:13;
110:1;116:9,11;
123:2;128:10

**per (1)**
100:1

**percent (1)**
109:4

**percentage (2)**
59:3,9

**perfectly (1)**
86:4

**perform (4)**
47:4,12,17;76:4

**performance (17)**
37:4,15;39:21;
40:5,15,22;43:6,14,
22;44:3,8,15;46:15;
47:2,11;111:8,16

**performances (1)**
47:16

**performed (1)**
70:4

**performing (1)**
44:9

**period (7)**
10:17,18;33:6;
72:8;81:17;90:14;
102:4

**periodically (2)**
72:4,7

**perjury (3)**
9:19,19,21

**persist (1)**
117:3

**person (30)**
14:13;25:23;
27:17;28:10;30:7,9,
9,10,15;31:19;32:2,
4;35:20;53:5;72:16;
89:4;91:9;100:18;
110:14;113:10;
116:24;121:11;
125:2,3;128:24,25;
129:14,22;130:11;
134:1

**personal (1)**
10:6

**personally (1)**
12:4

**personnel (8)**
19:20;20:8;22:8;
32:24;37:7,9;73:12;
82:5

**persons (7)**
13:17;21:21;22:2;
27:25;31:25;62:21;
123:4

**perspective (1)**
125:16

**phone (2)**
6:5;33:11

**physically (4)**
45:11,16;46:5,9

**pick (4)**
29:22;41:18;
51:21;53:15

**picking (3)**
79:5,6,7

**picture (1)**
41:11

**place (10)**
40:4,15,21;41:17,
18;46:15;51:7;85:4,
18;107:18

**placed (6)**
24:21;53:8;
125:21;126:17;
130:17,23

**places (1)**
112:23

**Plaintiff (1)**
80:18

**Plaintiff's (6)**
82:19;95:3;
103:11;117:25;
118:12;126:5

**plan (3)**
51:17;99:12,13

**planning (1)**
16:17

**plans (1)**
73:19

**play (2)**
21:6;24:9

**please (3)**
10:14;99:17;103:5

**pleasure (2)**
122:18,20

**plus (3)**
67:7,7;68:23

**point (9)**
31:17;38:9;40:8;
43:2;44:6;56:18;
76:16;116:20;127:13

**pointblank (1)**
96:4

**police (9)**
18:2,6,16;19:6,13,

15;82:23;114:4;
134:4

**policies (3)**
50:17,22;78:25

**policy (1)**
51:1

**Ponder (2)**
71:22,23

**pool (1)**
24:21

**population (1)**
73:23

**position (108)**
16:8;19:21;22:5,
12,16;23:2,2,9;
24:18,18,22;26:24;
27:2,23;28:2,10,11,
12;41:16;42:14;
44:11;47:11;48:8,11,
15;49:21;50:25;51:2,
5;52:3,16,17,17,21,
23;53:2,8,9,18;54:3;
55:16;56:1;57:12;
60:8,25;61:24;68:20;
69:17,20,21,25;
71:25;72:7,19,23;
79:20,22;81:19,24;
84:7,11,12,17;85:7,
16,17;86:11,25;87:5,
7,15,20,22;91:10;
100:19;102:6;
103:20,21;104:8,25;
105:12;106:3,7,19;
107:8,11,23;108:11;
109:5,6,24;110:6,15,
19;112:17;114:18;
120:2,7,14;121:1,16,
18;124:14,23,24;
125:20,21;132:25

**positions (5)**
20:10;55:17,21;
123:3,5

**positive (1)**
126:20

**possibility (1)**
67:4

**possible (2)**
100:20;106:21

**possibly (6)**
62:23;106:22;
115:1;116:23;
127:20,21

**post (2)**
113:22,24

**posted (3)**
53:11,12;75:1

**potential (1)**
26:19

**preface (2)**
58:25;61:6

**prefer (1)**
32:4

**pregnant (4)**

85:2;93:20;95:9;
97:18

**prepare (2)**
12:20;75:11

**prepared (1)**
38:25

**present (6)**
6:2;20:7;56:10;
60:1;99:12;117:6

**presented (3)**
100:4;126:18;
127:3

**presents (1)**
20:22

**pretty (1)**
17:9

**prevent (1)**
113:17

**primarily (1)**
5:18

**print (1)**
15:1

**printed (1)**
53:17

**printout (1)**
74:1

**prior (9)**
6:9,9;16:20;83:1,
6;88:6,9;111:11;
128:15

**prison (2)**
78:25;79:4

**prisoner (1)**
73:14

**prisoners (3)**
33:11;36:12;75:21

**probable (1)**
134:8

**probably (13)**
5:23;7:17;13:11;
34:4;57:4;69:2;
89:15;94:23;95:20;
105:22;120:25;
121:12;125:16

**probation (2)**
117:21,21

**problem (1)**
6:25

**problems (1)**
96:22

**Procedure (1)**
4:7

**procedures (4)**
20:2;50:18,22;
78:25

**proceed (1)**
10:5

**proceeding (1)**
5:24

**process (31)**
5:18;9:15;14:13;
15:3;16:6;22:14,18;
23:14,23;24:4;38:1;

48:4;49:14,14;51:10,
12,24;52:10,25;57:1;
62:11;64:7,11;65:6;
66:25;73:11;74:6,7,
12;80:1;100:8
**processed (2)**
14:18;34:13
**processes (2)**
51:25;59:21
**program (13)**
18:4,5,8,12,12;
19:1,5,5,8;34:20,21;
35:14;89:5
**projects (1)**
18:11
**promise (1)**
6:21
**promote (3)**
52:1;79:25;80:6
**promoted (19)**
19:10;27:17;32:3;
50:19,20;68:19;
72:18;80:10;81:12;
82:21;85:4;86:19;
88:6;89:3,5;109:5;
112:13;123:5;124:6
**promoting (13)**
19:18;20:15;
21:11;22:15,20,24;
24:4,7;28:25;29:20;
31:6,12;49:14
**promotion (24)**
21:20;22:3,10;
26:20;28:2;49:14;
50:4,16;51:2,14,15;
52:15;59:22;60:12;
61:1;69:24;81:10,23;
86:23;91:12;106:12,
15;114:24;124:7
**promotional (2)**
20:10;44:10
**promotions (3)**
48:8;50:23;113:14
**properly (1)**
79:12
**proved (1)**
131:24
**provide (7)**
14:12;47:22;
57:13;67:23;68:4,6;
128:23
**provided (4)**
46:17,21;112:11;
128:18
**provides (1)**
57:10
**psychological (2)**
128:10;134:25
**pulled (1)**
133:22
**pulling (1)**
73:25
**purposes (1)**

4:8
**pursued (1)**
109:2
**put (18)**
41:17,17;46:10;
51:4,17;52:16;53:1,
3,14;56:19,21;73:19,
20;85:17;121:1,16,
19;123:5

---

**Q**

---

**qualification (7)**
76:7;77:2,3,11,12,
18,19
**qualifications (10)**
24:20;54:18;55:4;
57:12;76:3,6;78:3,
10;91:17;115:7
**qualified (25)**
21:22;22:4;25:13;
37:3;50:25;54:17;
55:3,12;56:6,11,15,
17;57:11,23;58:15;
60:9;76:7;106:6;
107:10,13,20;
113:22,24;115:9,12
**qualifies (1)**
54:12
**qualify (2)**
51:19;55:12
**quite (1)**
78:11
**quote (10)**
120:9,10,14,15,16,
16,25;121:2,2,5

---

**R**

---

**raise (1)**
27:19
**raised (1)**
128:4
**ran (2)**
95:22;119:21
**Randall (2)**
19:2,3
**rank (3)**
25:20,22;115:1
**ranks (1)**
89:13
**rather (3)**
7:25;69:24;89:22
**read (13)**
45:18;80:22;81:1;
82:24;94:1,7;98:9,
16;101:15;119:9;
121:8;125:9;126:11
**reading (1)**
4:9
**reads (2)**
94:12;102:23
**ready (3)**

25:5;56:22;103:17
**real (1)**
29:8
**really (4)**
12:24;39:8;53:16;
84:21
**rearrange (1)**
38:20
**reason (11)**
6:4;28:21;29:2;
46:22,23;64:11;
97:15;100:11,16;
123:11,13
**reasonable (1)**
33:6
**recall (17)**
12:10,18;70:11;
79:18;83:10;84:19;
85:3;92:18;98:2,2;
99:25;100:1;103:9,
23;104:10;105:1;
106:4
**receive (7)**
13:17;34:14;
55:11;73:8,15;
104:24;125:19
**received (1)**
112:13
**receives (1)**
58:16
**recently (2)**
120:17;125:11
**recessing (1)**
6:10
**recognize (5)**
93:23;94:25;95:1;
103:8;118:11
**recollection (2)**
90:22;127:5
**recommend (2)**
20:23;24:10
**recommendation (11)**
21:18;22:19;
28:23;29:19;31:11,
22;38:11;48:14;
50:3;96:11;97:17
**recommendations (12)**
19:19;20:5;21:13;
25:15;26:6;27:24;
28:17,19;32:6;39:25;
96:9;109:12
**recommended (15)**
70:9,15;95:12,13,
20;96:16;104:24;
105:23;107:22;
108:10;109:23;
110:5;115:24;124:8;
131:21
**recommending (3)**
20:16;52:5;105:2
**reconsider (2)**
100:12,13
**reconsidered (1)**

99:11
**record (9)**
5:20;6:13;7:8;
10:15;30:16,19;
101:9;115:13;123:3
**records (2)**
69:5;132:22
**reduction (1)**
114:25
**re-election (1)**
16:13
**reference (1)**
99:1
**referencing (1)**
98:24
**referred (2)**
113:1
**referring (2)**
57:3;112:24
**reflect (4)**
69:5;101:9;123:1,
6
**Regarding (6)**
81:10;94:11;
101:12,22;103:6;
118:20
**REGINALD (5)**
5:1;10:16;81:8;
102:15;120:8
**R-E-G-I-N-A-L-D (1)**
10:17
**regs (1)**
54:13
**released (2)**
73:17,22
**relevant (1)**
10:10
**rely (1)**
25:16
**remained (2)**
17:9;134:19
**remark (1)**
122:24
**remarks (2)**
127:23,24
**remember (12)**
12:16;31:20;85:1,
5;97:2;115:23;
118:14,14,23;124:5;
126:25;131:11
**removed (2)**
38:18;122:9
**removing (1)**
122:14
**rendered (1)**
18:13
**reorganized (2)**
37:22,23
**rephrase (1)**
8:1
**replacement (1)**
102:8
**report (6)**

62:4;104:13,18;
132:16,20;134:15
**reported (3)**
130:1,1,6
**reportees (1)**
87:13
**Reporter (4)**
4:22;6:12,17;7:8
**reporter's (1)**
5:20
**reports (2)**
58:10;61:11
**representing (1)**
5:6
**reprimand (1)**
20:24
**reprimanded (1)**
27:19
**request (3)**
6:7;21:19;81:25
**requests (1)**
34:16
**required (1)**
14:21
**requirements (1)**
55:7
**requires (1)**
121:3
**rescind (2)**
102:24;103:6
**Reserve (6)**
18:11;34:21;
88:25;89:5,25;90:15
**reserved (1)**
4:15
**Reserves (1)**
89:8
**resigned (1)**
69:13
**resolved (1)**
9:8
**Resources (2)**
50:24;51:6
**respectfully (1)**
99:20
**Respondent's (1)**
119:24
**Response (17)**
6:18,19;53:23;
58:13;65:14;71:12;
73:1;78:18;80:8;
82:14;86:10;98:25;
105:8;109:17;
118:22;121:25;
129:12
**responsibilities (13)**
17:5,8,14,21,23,
24;18:18;19:17;
20:14;73:6;75:7;
122:8,14
**responsibility (1)**
27:22;73:18;74:24
**responsible (4)**

17:15;71:21;
116:15,25
**responsiveness (1)**
4:14
**rested (1)**
80:5
**result (4)**
100:24;101:5;
127:22;132:11
**results (1)**
134:18
**reveal (1)**
30:14
**reversing (1)**
100:14
**review (7)**
12:23;13:2;38:12;
47:24,24;48:1;
102:25
**Rhea (27)**
5:6;68:9,10,13;
69:8,13,23;83:3,8,
24;84:17;92:14;
94:16;96:25;99:7;
101:20;104:24;
106:2,10;109:23;
110:5,18;118:20;
123:21;124:22;
126:10;127:18
**right (86)**
5:15;7:16;8:23;
9:2,7,14;10:10,13,
23;12:11,19;15:21;
19:24;21:4;24:6,12;
31:16;32:6,12,24;
35:6;39:12;40:19;
42:6,11,18;46:25;
48:7,22;50:15;54:7;
55:20;56:14;58:11;
60:15;64:6,8,25;
65:3,4,66:19;68:8;
69:7;70:18,24;71:1,
7,24;74:16;76:1;
79:14,14,16,19;80:7;
81:5;86:13;87:18;
88:3;89:15;91:16;
96:3;102:21;103:15;
104:6;105:7,7,9;
106:11,13;107:6;
109:19;111:25;
112:15,18;113:8,15;
114:10;117:24;
125:17,25;130:21;
132:4;133:4,7;134:5
**rights (5)**
9:10;98:1;118:2,
16,19
**rise (1)**
15:5
**road (1)**
107:21
**ROBERT (1)**
4:21

**role (2)**
21:6;24:8
**roll (1)**
33:15
**rolling (3)**
33:15,16;34:10
**Rotary (2)**
83:12,17
**Rouge (19)**
5:11;11:2;16:22;
17:1,16,18;18:5,6,
15;19:13,15;27:16;
81:7,9,14;82:23;
89:7;111:7;113:4
**route (1)**
131:8
**Rules (4)**
4:7;5:16;49:8;
54:13
**run (3)**
20:2;30:16;36:20
**running (1)**
16:17

## S

**Safe (1)**
18:15
**same (11)**
7:1;9:14;17:10,11;
26:10;32:7;38:13;
52:25;59:20;97:13;
118:15
**sample (2)**
131:15,17
**sat (2)**
89:20;96:3
**save (1)**
4:12
**saying (2)**
7:9;68:4
**scenario (4)**
28:21;29:17,22;
31:10
**schedule (1)**
99:18
**school (2)**
89:9;117:19
**scope (3)**
19:12,25;42:2
**Scott (7)**
82:1,4;127:6,15,
24;128:6;129:11
**scrutiny (1)**
21:1
**se (1)**
100:1
**sealing (1)**
4:10
**seat (2)**
89:20;96:3
**second (7)**
25:23;76:11;

77:10,12;119:5,6;
135:7
**Secondly (1)**
124:6
**secretary (1)**
13:12
**section (3)**
34:10;35:15;
125:18
**sections (1)**
38:20
**security (21)**
23:17;35:3,4,5,7,9,
10;37:24;38:6;43:11,
15,17;71:4,5,8,10,18;
72:6;81:22;88:24;
93:8
**seeing (1)**
32:4
**seeking (1)**
61:1
**select (4)**
52:4;85:12,19;
86:3
**selected (11)**
27:9,25;83:18,22,
23;85:20,21,22;86:9;
105:11,15
**selection (1)**
23:3
**send (9)**
21:20,22,22,25;
22:1,3;48:2;56:11;
75:12
**sends (2)**
30:1;55:7
**senior (1)**
90:10
**seniority (4)**
91:10,10,20;
107:20
**sense (3)**
6:1;7:19,23
**sent (5)**
29:23,24,25;30:7;
130:12
**sentence (1)**
126:11
**sentiments (1)**
123:16
**separate (3)**
26:15;35:6;120:6
**Sergeant (79)**
14:4,11,12,13;
15:2,3,11;19:2;
23:22;25:1;27:5;
37:16;39:23;40:7,9,
16,24;41:18;45:21;
51:3,22;52:3;54:23;
56:1;57:2;58:18;
59:2;60:25;61:24,25;
69:24;73:3;79:20;
80:11,14;81:10,13,

16,20,22;82:13,22;
83:2,3,8;84:6,11;
85:18;86:8,12,20,20,
22;87:8,16;94:15;
98:5,23;99:6,20;
100:7;101:25;102:2,
7,12,13;103:1,2,20;
104:16;108:1,7,12,
15,18;120:18;
125:11,19;127:16
**sergeants (10)**
24:1;42:25;47:15,
16;48:13;49:12,25;
55:19;85:23;89:6
**sergeant's (2)**
52:22;60:8
**series (1)**
24:24
**serious (1)**
30:20
**serve (1)**
121:3
**served (2)**
69:8;71:20
**serves (5)**
60:11;83:17;
107:24;108:19;125:2
**service (18)**
15:3;21:20;24:20;
29:25;30:1;33:17;
46:17;50:24;51:19;
54:10,13,24;55:7;
56:5,10;57:10;67:7;
90:19
**services (6)**
18:9,13;34:20;
35:14,22;37:2
**set (6)**
56:22,23;57:22;
58:2;67:10,14
**sets (1)**
61:12
**seven (4)**
33:2,6;71:8;72:1
**seven-year (1)**
72:8
**several (6)**
12:17;18:21;
44:18;52:18;88:22;
96:4
**shadowing (1)**
90:10
**sheets (1)**
74:1
**Sheriff (4)**
16:24,24,25;67:13
**Sheriff's (10)**
16:23;17:2;18:20;
19:6;37:20;83:19;
113:4;127:19;
130:13;131:10
**shift (9)**
93:22;94:11;

95:14;97:8;98:14,24;
99:1,5;100:16
**shifts (1)**
94:14
**shock (1)**
96:2
**Short (2)**
118:8;135:10
**short-handed (2)**
72:4,5
**shot (1)**
132:6
**Show (4)**
78:6,7;80:16;
113:3
**showing (1)**
92:4;125:24
**shown (1)**
128:18
**shows (1)**
123:3
**sick (3)**
33:3;133:14,16
**side (8)**
62:10,15,19,22;
63:8,12;93:6;102:21
**sight (1)**
36:22
**sign (6)**
27:16;45:5,17,22;
46:20;48:1
**signature (1)**
94:10
**signed (4)**
81:9;99:22;
102:11;126:10
**signing (1)**
4:10
**signs (1)**
45:22
**simply (2)**
7:19;134:13
**Sincerely (1)**
102:9
**sinus (1)**
8:25
**sit (7)**
25:7;26:9;36:21;
61:20;62:2,4;112:24
**sitting (3)**
26:12;29:3;30:8
**situation (8)**
20:22;25:21;
28:25;30:7,25;41:14;
114:20;132:3
**situations (2)**
36:9,11
**Six (5)**
16:11,18;49:25;
63:20;67:6
**Six-year (1)**
16:12
**Sliman (1)**

16:25
**small (1)**
23:11
**somebody (6)**
38:10;58:8,9,10;
132:7,18
**someone (6)**
26:20;40:14;
61:11;116:19;
132:20;134:7
**sometimes (10)**
20:4;25:18;28:3,3;
41:8;66:7,7;76:21;
123:19,19
**somewhere (2)**
113:20;132:20
**sorry (1)**
84:9
**sorts (1)**
74:21
**sought (1)**
4:17
**sources (1)**
78:20
**south (1)**
6:20
**Southern (1)**
117:18
**speak (3)**
8:22;13:25;121:10
**speaking (2)**
34:18;58:17
**special (2)**
35:22;37:2
**specific (3)**
29:2;42:22;52:23
**specifically (2)**
4:11;39:14
**spell (1)**
10:14
**spend (4)**
36:1,3;37:13,18
**spent (4)**
38:15;90:10,13;
124:2
**spouse (1)**
11:8
**spouse's (1)**
11:9
**Sr (3)**
10:16,18;81:8
**S-R (1)**
10:18
**St (1)**
33:19
**staff (2)**
102:1;103:3
**stand (1)**
28:18
**start (1)**
23:15
**started (1)**
132:9

**Starting (1)**
119:11
**starts (1)**
71:10
**State (4)**
4:23;10:14;82:20;
114:7
**stated (6)**
54:21;120:8,11,20,
23;123:21
**statement (8)**
22:25;62:7;88:19,
19;122:2;123:8,9;
124:13
**statements (5)**
121:7;127:14,25;
128:2;130:11
**states (1)**
99:3
**stay (3)**
42:8;52:11;97:13
**staying (1)**
131:11
**step (6)**
53:24;54:2,9;55:9;
102:5;118:4
**steps (4)**
20:24,25;51:7;
113:18
**still (6)**
64:20,22;76:22,23;
107:2;134:19
**stipulated (1)**
4:3
**stop (1)**
125:4
**stoppage (1)**
36:14
**stopped (1)**
8:24
**Street (2)**
33:19;120:9
**Streets (1)**
18:15
**strictly (1)**
58:18
**stripes (2)**
106:20,22
**student (1)**
117:18
**stuff (1)**
128:4
**submit (4)**
54:10;56:4;81:24;
83:18
**submitted (2)**
55:18;56:9
**subordinates (2)**
57:19;59:15
**subpoena (1)**
12:22
**subpoenas (2)**
14:11,23

**substance (1)**
131:1
**substances (1)**
128:3
**successfully (1)**
56:8
**sued (2)**
11:22,25
**sufficient (1)**
119:22
**suggest (2)**
24:11;52:8
**suggestion (2)**
52:9;69:1
**suggestions (5)**
28:19;32:7;48:21,
23;50:12
**suggests (1)**
32:2
**supervise (2)**
22:22;75:19
**supervises (1)**
64:2
**supervision (3)**
44:4;76:17;85:19
**supervisor (13)**
31:18,21;33:10;
40:3;69:14;75:7;
81:13;82:22;88:6;
99:16;102:3;117:22;
132:11
**supervisors (13)**
29:19;31:12,23,24;
32:5;33:22;40:1;
44:20,24;46:21;50:3;
77:24;78:21
**supervisors' (2)**
94:14;99:5
**support (1)**
20:6
**supportive (1)**
109:4
**suppose (1)**
132:5
**supposed (1)**
14:9
**sure (29)**
32:5;33:16,20,23;
34:4,9,11;38:19;
68:25;69:6,18;75:2;
78:11;79:16;83:14;
86:15;89:19;97:6,11,
20,21;103:24;
105:19,25;106:1;
108:2;109:1;125:24;
132:21
**surgery (1)**
80:21
**surrounded (1)**
78:21
**suspend (1)**
20:24
**swapped (1)**

117:9
**sworn (1)**
5:2
**system (1)**
75:6

**T**

**table (1)**
53:14
**talent (1)**
92:10
**talk (16)**
6:20;7:6;13:4,8;
14:15;15:6,16;17:3;
34:15;68:8;72:21;
73:2;111:12;115:17;
116:18,19
**talked (7)**
13:5;100:5;116:9,
10,12;117:5;133:9
**talking (8)**
44:16;55:25;
58:24;93:5,7;111:1;
117:12;124:2
**Task (6)**
18:22;44:8;47:4,
12,17;72:11
**tasks (1)**
76:4
**team (1)**
68:2
**telling (1)**
133:18
**temporarily (1)**
101:24
**ten (1)**
11:5;21:24;44:2
**tendency (1)**
7:3
**term (3)**
16:10,12;96:8
**terminated (2)**
122:15,16
**terms (15)**
19:14,20;20:13;
21:4;25:15;27:6;
32:16;35:25;50:16;
52:5;87:11,12;93:16;
114:17;115:7
**Terrica (13)**
69:9,12;85:20;
86:7,16;87:7;94:15;
98:4;99:6,20;101:6;
102:12;113:3
**test (13)**
51:23;55:13,19,22,
23;59:24;61:2;70:2,
4;77:5;89:11;128:8;
134:18
**testified (5)**
5:3;44:17;61:1,10,
19;70:14;71:14;

72:3;82:11;89:23;
92:5;93:21;112:20
**testify (1)**
14:21
**testimony (11)**
9:25;13:24;43:12;
57:8;90:25;91:8;
108:9;109:22;
111:24;112:11;120:5
**testing (4)**
126:21;128:8;
134:9,22
**tests (1)**
131:19
**Thanking (1)**
99:18
**Thanks (1)**
94:18
**thereof (1)**
4:16
**thinking (1)**
12:15
**third (3)**
25:24;77:17,19
**Thomas (2)**
81:15;102:14
**thoroughness (1)**
39:8
**though (2)**
64:25;134:22
**thought (5)**
108:12,15;125:16;
133:14,16
**three (12)**
11:12;14:23;15:6;
26:4;34:24;51:25;
54:9;55:9;58:3;
59:11;89:6;120:5
**three-parish (1)**
19:7
**throughout (2)**
23:14;53:20
**thus (2)**
5:21;6:14
**thusly (1)**
10:5
**timeframe (2)**
17:9;90:22
**timely (1)**
78:9
**times (5)**
49:19,20,23;55:14;
92:23
**today (4)**
17:13;80:14;
108:9;112:25
**together (6)**
26:13,14,19;68:2;
90:18;129:5
**told (9)**
15:1;89:25;90:2;
91:16;92:6;95:23;
96:2;97:24;122:25

Rhea Davis vs
Baton Rouge City Constable's Office

Reginald R. Brown
January 30, 2017

**tomorrow (1)**
80:22
**took (5)**
16:5;18:5;59:24;
70:2;85:4
**top (1)**
119:21
**total (2)**
90:21;114:20
**totally (2)**
29:14;121:13
**trained (1)**
102:1
**training (5)**
66:8;78:17;89:10;
90:11;92:3
**transcript (1)**
109:13
**transfer (3)**
106:10;112:17;
114:25
**transferred (2)**
106:23;109:6
**transition (4)**
81:16,20;87:17;
102:3
**transmittals (1)**
75:11
**transport (3)**
73:9,9;127:17
**transportation (2)**
74:4;79:13
**transported (1)**
73:17
**transporting (2)**
33:12;75:21
**Travis (15)**
70:20;79:22,25;
80:6,10;81:10,12;
82:12,21;83:2,7;
86:1;88:4,20;89:20
**tremendous (3)**
120:14;123:22;
124:14
**trigger (1)**
126:12
**troubling (1)**
131:2
**true (2)**
51:9;114:1
**truth (1)**
9:16
**truthful (2)**
8:8;10:21
**try (1)**
52:11
**TUCKER (1)**
4:21
**turned (1)**
108:24
**two (23)**
7:18;15:18;21:24;
23:22,22;27:7;32:3;

49:24;54:2;57:4,20;
62:13,14;63:25;
65:25;76:8;89:23;
90:4,18;92:22;
104:13;109:25;
129:16
**two-year (1)**
90:22
**type (6)**
8:16;16:21;76:2;
124:10;127:8;134:6
**typed-written (1)**
101:15
**types (1)**
76:6
**typical (1)**
32:15

## U

**uh-huhs (1)**
6:18
**uh-uhs (1)**
6:19
**unauthorized (1)**
128:19
**under (15)**
4:6;9:24;10:1;
16:19;18:2,14,24;
19:11;27:20;39:4;
44:4;69:9,9;93:21;
95:11
**understood (1)**
7:15
**uniform (1)**
134:3
**unit (5)**
106:18;114:21;
131:3;134:1,2
**University (1)**
117:19
**unless (4)**
16:18;25:11;69:5;
96:21
**untruthful (1)**
9:23
**unusual (1)**
133:17
**up (40)**
8:22,24;16:12;
19:1;21:19,19;22:23;
25:19;32:18;34:10;
40:8;43:2;44:15;
46:10,14,20;51:1,16;
52:8,20;53:15;56:23,
24;57:22;61:12;
67:10,14;75:9;78:6,
7;79:5,6,7;87:2;
89:13;92:4;93:15;
103:17;117:8;129:2
**upheaval (1)**
132:8
**upon (16)**

22:21;25:16;36:7;
40:20;42:24;44:7;
47:21;48:11;50:2;
67:22,25;68:4,7;
72:12;90:21;109:21
**up-to-date (1)**
126:2
**urine (3)**
131:15,23,24
**use (3)**
23:25;75:5;126:19
**used (8)**
4:17,17;5:23;
23:20;96:14;128:3,
19;131:25
**using (1)**
132:19
**utility (2)**
72:15,16

## V

**vacant (3)**
57:12;79:21;
114:18
**vacate (1)**
87:6
**vacated (10)**
81:19;84:11,16;
85:8;86:12;87:1,1,
15,20,22
**vacating (1)**
87:5
**vacation (1)**
33:4
**valuable (3)**
72:14;89:10;124:4
**value (6)**
65:8,12,13,20,21;
66:2
**variety (2)**
34:1;78:19
**various (5)**
18:10,12;73:10;
75:17;123:3
**vehicle (3)**
72:15;106:25;
107:3
**vein (1)**
9:15
**venture (1)**
133:8
**venue (1)**
66:17
**veracity (1)**
119:24
**verbalize (2)**
6:15,22
**verbalizing (1)**
7:2
**verified (1)**
69:2
**verify (1)**

75:9
**Vernon (2)**
82:1;127:5
**vetted (1)**
31:8
**vetting (1)**
117:1
**via (5)**
24:20;54:12;87:4,
5;131:8
**violation (1)**
97:25
**visitors (1)**
34:14
**voluntarily (1)**
102:5
**voluntary (1)**
90:1
**volunteer (2)**
88:21,22
**volunteers (1)**
18:12

## W

**Wagner (7)**
81:15;82:4;84:6,8;
99:23;100:7;102:14
**wait (1)**
28:18
**waived (1)**
4:11
**wake (1)**
32:18
**walked (1)**
117:8
**wants (1)**
53:5
**warrant (4)**
35:18,18,19,21
**warranted (2)**
134:10,13
**warrants (3)**
63:18;75:9,9
**watching (1)**
65:23
**water (1)**
6:6
**way (16)**
9:15;40:3;44:14,
15;52:16,20;55:10;
67:11;85:13,14,15;
89:3,4,7;97:10;132:1
**wealth (1)**
42:15
**wear (1)**
134:2
**Wednesday (1)**
101:23
**week (2)**
65:25;103:5
**weeks (3)**
66:1;90:2;133:15

**weight (1)**
91:11
**What's (3)**
11:8;28:7;77:17
**whenever (1)**
18:19
**When's (1)**
43:5
**whereby (1)**
28:22
**white (2)**
121:18;123:6
**whoever's (1)**
50:25
**whole (1)**
39:13
**whomever (1)**
117:22
**who's (3)**
7:9;75:2;108:21
**wife (1)**
118:5
**Williams (17)**
69:10,12;85:20;
86:7,16;87:7;94:15;
98:5,23;99:6,21;
100:7;101:7;102:7,
13;103:1;113:3
**Williams' (1)**
103:2
**wise (1)**
19:22
**within (8)**
24:21;33:5;34:24;
42:1;62:9;63:21;
70:12,16
**Without (5)**
37:8,10,10,10;
134:8
**witness (19)**
4:6,24;12:5;41:4;
42:5,10,17;65:17;
81:2;82:6;91:6;94:2,
22;98:10,17;110:10;
118:21;120:4;126:24
**Wooddale (1)**
11:1
**W-O-O-D-D-A-L-E (1)**
11:1
**words (1)**
17:17
**work (24)**
9:6;10:9;25:17;
63:12;68:1;76:15;
77:13,13,14,21;78:7,
20;90:3,4,5;91:24;
92:1,2,10;111:7;
112:21;113:23;
123:3;130:3
**worked (22)**
16:22;23:14,16;
31:9;37:19;64:1;
68:13,16,22;71:3,5,

7;76:13;83:15;88:21,
23,23,24;112:23;
114:3,6;129:5

**working (11)**
33:24;66:12;
76:12;77:14,22;
78:16;88:5,15,16;
91:2;99:13

**works (3)**
9:15;37:17;122:18

**wrap (1)**
103:17

**wreck (1)**
132:6

**write (5)**
46:10,14,20;74:5;
104:3

**writing (6)**
45:1;51:4,17;53:1,
3;74:17

**written (18)**
45:12;46:5,16,16;
47:3,11,15;48:18,19;
50:17;53:7,9;54:7;
55:22,23;81:25;
101:6;104:1

**wrong (1)**
108:20

**wrongfully (1)**
116:23

**wrote (5)**
82:7;84:5;98:6,13;
101:8

## Y

**year (26)**
16:3,14,15;38:7,7;
39:4;45:4;68:25;
83:4,6,9,11,12,16,21;
84:1;87:25;88:11,14;
90:15,19,23;105:16;
112:13;115:24;124:9

**years (19)**
5:16;11:5;15:6;
16:9,11;17:2,7;36:8;
37:21;44:2;51:21;
68:24;71:8;72:1;
76:22;88:22;90:18;
114:6;132:25

**year's (1)**
88:15

**young (1)**
13:15

## Z

**zero (1)**
49:16